## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ETIENNE MAUGAIN, JOHN KUNDRATH, LOUISE SHUMATE, RICHARD ARCHER, DENISE HUNTER, HARRY REICHLEN, STEPHEN DREIKOSEN, KENNETH ESTEVES, JOHN SKLERES, AND LEONEL CANTU, individually and on behalf of all others similarly situated, | Civil Action No. 1:22-cv-00116 VAC-MPT |
| Plaintiffs, | FIRST AMENDED CLASS ACTION COMPLAINT |
| v. | |
| FCA US LLC, | |
| Defendant, | JURY TRIAL DEMANDED |

## I.      INTRODUCTION

1.      Plaintiffs Etienne Maugain, John Kundrath, Louise Shumate, Richard Archer,

Denise Hunter, Harry Reichlen, Stephen Dreikosen, Kenneth Esteves, John Skleres, and Leonel

Cantu ("Plaintiffs") bring this action individually and on behalf of all persons in the United States,

and in the alternative on behalf of all persons in the states of California, Florida, Georgia, Illinois,

Massachusetts, New Hampshire, New York, Pennsylvania, and Texas, who purchased or leased

2014 or newer Chrysler, Dodge, Jeep, or RAM-branded vehicles equipped with the 3.6L Pentastar

V6 engine[1] ("Class Vehicles") against Defendant FCA US LLC ("Defendant" or "FCA").  The

---

[1] These vehicles include but are not limited to: 2014-2016 Chrysler Town & Country; 2014-2019 Dodge Journey; 2014-2022 Dodge Challenger; 2014-2022 Dodge Charger; 2014-2022 Dodge Durango; 2014-2020 Dodge Grand Caravan; 2014-2022 Jeep Grand Cherokee; 2014-2022 Chrysler 300; 2014-2022 Jeep Wrangler; 2020-2022 Jeep Gladiator; 2014-2017 Chrysler 200;

allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

2.      This is a consumer class action concerning the misrepresentation of materials facts, the failure to disclose material facts, and safety concerns to consumers.

3.      Defendant manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles possessed a defect that materially affects the ability of the vehicles to operate as intended and provide safe, reliable transportation. Instead, FCA equipped these vehicles with a defective 3.6L engine and falsely marketed the vehicles as safe to drive, durable, reliable, and capable of providing transportation.

4.      The Class Vehicles are equipped with the 3.6L Pentastar V6 Engine (the "Engine"). The Engine suffers from defects in design, material selection, manufacturing, and/or workmanship in components of its valve train, specifically the rocker arms, camshafts, lifters and related components, as well as in the electronic and hydraulic modules controlling the timing, phasing and function of the camshafts, intake valves, lifters and related components, which cause said components to prematurely fail. As a result, the fundamental elements of the function of an internal combustion engine, which requires the precise timing of its valve train components, cannot be accomplished due to the subject defects. In short, the defective valvetrain cannot adequately, properly and timely transfer the motion of the cam lobes to open and close the valves to effectuate proper internal combustion (the "Defect").

---

2014-2022 Dodge Ram 1500; 2014-2022 Ram ProMaster; 2017- 2022 Chrysler Pacifica models; 2014 Dodge Avenger; and 2020-2022 Chrysler Voyager.

5.     The Defect causes, among other things, lifter collapse, rocker arm roller failure, and/or camshaft lobe destruction, which lead to significant power loss, decreased engine performance, hesitation and/or catastrophic engine failure. In particular, the valve train components cannot withstand the mechanical loads produced by the Engine, causing these components to wear, deteriorate and break far before the intended useful life of the component. This causes improper valvetrain tolerances, which result in engine misfires often causing the engine, and in turn the vehicle, to buck and surge. As these valvetrain components begin to prematurely fail, the Defect initially declares itself to unsuspecting consumers as an audible ticking noise from the engine.  The Defect eventually results in catastrophic engine failure and causes the metal particles and debris from the failed rocker arms, camshafts and related valve train components to contaminate the engine oil and circulate throughout the engine, damaging vital components and the engine at-large. Ultimately, the broken and/or worn valve train components cause catastrophic engine failure while the vehicle is being driven, leading to an increased threat of stalling, loss of motive power and collision.

6.      Despite FCA's knowledge, as early as 2013, of the existence and severity of the Defect, it touted the quality, durability, reliability, and performance of the Class Vehicles via its public statements and multimedia marketing campaigns.  FCA also advertised that the Engine was of high quality, with exceptional performance and comparatively low cost of ownership.

7.     Discovery will show that the Defect is the result of: (1) defective design of the valve train components, including in the needle bearings within the rocker arms; (2) the use of sub-standard materials in the design and manufacture of the rocker arms and other internal components of the valve train assembly; (3) sub-standard procedures in manufacturing the rocker arms and lifters such that the bearings and spring-loaded lift pins in the rocker arms and spring-loaded

locking pins in the lifters break down and fail; (4) defective or miscalibrated software in the modules that control the timing, phasing and function of the operation of the camshafts, intake valves and lifters in the valve train; and/or (5) poor quality-control procedures to ensure such defectively designed and/or manufactured rocker arms and lifters and other related valve train components are not installed in the Engine.  The Defect causes unsafe driving conditions because the Class Vehicles have a significant chance engine failure while being driven.  Further, even the lesser symptoms of the Defect affect vehicle performance and safety, making it harder for a driver to control the vehicle as it loses power, hesitates, or misfires.

8.      More specifically, as early as 2013-2014, FCA pinpointed the precise location where the Engine's rocker arms were failing – namely the "rocker arm spring loaded lift pin" – and noted that the Defect related to a "misfire" including during an "accelerating condition":



9.      The Defect is inherent in each Class Vehicle and was present at the time of sale or lease to each Class Member.  Each of the Engines installed in the Class Vehicles is identical or substantially similar, in that FCA made no material changes to the Engines over the years.

10.    The Defect not only causes unsafe driving conditions, but also causes internal damage to other engine components, notably the camshaft, lifters and valve springs.  Because FCA has no repair for the Defect and merely replaces defective parts with equally defective parts, consumers are often faced with repeated repairs because the replacement parts do not cure the Defect.  Further, many repairs leave damage to other engine components unaddressed, which given the cumulative harmful effects of the Defect, undermines the expected life of the Engine even when repairs are made before complete engine failure.

11.    Simply replacing rocker arms and associated valve train components can cost from $1,500 to $4,500, while it can cost more than $6,000 for a new engine.  Knowing that there is no permanent repair for the Defect, FCA directs its authorized dealerships to merely replace certain parts with equally defective parts, while informing consumers that their vehicles are fixed, including when repairs were made under warranty.  In this matter, FCA has purposefully concealed the existence and extent of the Defect, in order to transfer the costs of repairs from itself to unsuspecting consumers.

12.    The Defect not only decreases the value of the Class Vehicles, because there is no permanent repair, it can endanger drivers and passengers in the vehicles.  For example, when the vehicles suddenly lose power, drivers will be unable to maintain speed on highways or other roadways, become stranded on roadways, or have difficulty crossing intersections leading to an increased chance of collision.  The Defect also creates uncertainty for the owners and lessees of the Class Vehicles, who cannot rely on their vehicles to operate safely or reliably, even after repairs have been performed.

13.    Despite knowing that the Class Vehicles are equipped with engines that suffer from a defect in the design, manufacturing, materials, and/or workmanship that causes the valve train

system to prematurely fail well before its useful and expected life, while also damaging internal engine components, FCA failed to disclose such information about the Defect to the public and failed to offer a permanent remedy for the Defect.  Rather, FCA represented that the Engines installed in Class Vehicles were of high-quality and reliable, as well as sufficient for the intended use of the vehicles. FCA's deliberate non-disclosure and omission of these defects artificially inflated the purchase and lease price for these vehicles.  Had FCA disclosed the Defect, Plaintiffs and the Class members would not have purchased their vehicles or would have paid less for them.

14.     When an automobile manufacturer sells a car, it has a duty under federal law to ensure that the car functions properly and safely and is free from material defects which undermine the ability of the vehicle to provide safe, reliable transportation.  Federal law requires that when an automobile manufacturer discovers a defect, it must disclose the defect and remedy the problem or cease selling the car.  Further, when a company provides a warranty, it must honor that warranty. FCA deceived its customers when it promised to stand by the warranty it issued to purchasers when it had no intent to do so, when it failed to honor the warranties by providing only illusory repairs, when it sold vehicles that were not capable of providing safe, reliable transportation, and when it failed to disclose a safety defect in the Class Vehicles.

15.     Plaintiffs and members of the Classes reasonably expected that FCA's representations that the Class Vehicles were properly engineered and equipped to handle ordinary, public road driving would be true and complete and would not omit material information. However, Defendant concealed and failed to disclose to Plaintiffs and members of the Classes that the Defect exists in the Class Vehicles and that there is a significant safety risk when the Class Vehicles suddenly misfire, hesitate, buck, surge, or lose power while being driven. Moreover,

Defendant concealed that, as a result of the Defect, the Class Vehicles will require significant, costly repairs.

16.     Based on pre-production testing and design failure mode analysis, warranty claims, replacement part orders, ongoing communications with its suppliers regarding defective parts, and consumer complaints, including complaints to NHTSA, and testing done in response to those complaints, as well as other sources of internal data not available to consumers, Defendant was aware of the Defect in the Class Vehicles but concealed the Defect from Plaintiffs and members of the Classes. Indeed, despite being aware of the Defect and numerous complaints, FCA knowingly, actively and affirmatively omitted and/or concealed the existence of the Defect to increase profits by selling additional Class Vehicles and by unlawfully transferring the cost of repair and replacement of the valve train and other damaged associated parts to Plaintiffs and members of the Classes.

17.     FCA has exclusive knowledge of, and has been in exclusive possession of, information pertaining to the Defect, which was material to Plaintiffs and Class Members, who could not reasonably know of the Defect. FCA has not disclosed the Defect to the purchasers or lessees, like Plaintiffs, at the point of purchase or through advertisements or marketing materials. Such full and complete disclosures would have influenced Class Members' purchase decisions and the purchase price they paid. Under all circumstances, FCA had a duty to disclose the latent Defect at the point of sale of the Class Vehicles. Instead, FCA failed and refused—and continues to refuse—to disclose the Defect and provide a meaningful remedy to those who have suffered economic harm as a result of the Defect. Worse, FCA has denied warranty coverage to consumers with vehicles that are still covered by warranty for this Defect, particularly in refusing to replace all the components damaged by defective rocker arms and other valve train components.

18.     The Defect is a latent defect that presents a safety risk to drivers and passengers, causes damages to valve train and ancillary components over time, and makes vehicles equipped with the defective Engines imminently dangerous. It makes the Class Vehicles unfit for the ordinary and advertised use of providing safe and reliable transportation. As such, the Defect presents a breach of the implied warranty of merchantability.

19.     Additionally, because FCA concealed and failed to disclose the Defect, owners have suffered and continue to suffer substantial damages and should be entitled to the benefits of all tolling and estoppel doctrines.

20.     As a direct and proximate result of FCA's concealment of, and failure to disclose, the Defect, Plaintiffs and Class members: (1) overpaid for the Class Vehicles because the undisclosed Defect inflated the market price; (2) have Vehicles that have significantly diminished resale value; (3) have Vehicles that suffer premature valve train component, such as rocker arm, failures as well as catastrophic failures of the engine;  (4) have and/or must expend significant money to have their Vehicles (inadequately) repaired; and (5) are not able to use their Vehicles for their intended purpose and in the manner FCA advertised.

21.     In the United States, FCA provides warranty coverage for Class Vehicles under one or more warranties.  For illustrative purposes, FCA currently offers a 3-year/36,000 mile basic limited warranty and a 5-year/60,000 mile powertrain limited warranty for every vehicle, including the Class Vehicles.  FCA also provides a 7-year/100,000 mile powertrain limited warranty for vehicles which are purchased certified pre-owned.

22.     FCA breached its express and implied warranties through which FCA promised to, *inter alia*: (1) provide Class Vehicles fit for the ordinary and advertised purpose for which they were sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship

8

of any parts FCA supplied, including internal components to the Engine.  Because the Defect was present at the time of sale or lease of the Class Vehicles and concealed from Plaintiffs and members of the Classes, FCA, was required to repair or replace the Engine under the terms of the warranties. Yet, discovery will show that FCA has failed to repair or replace the defective and damaged parts, free of charge, under FCA's warranties.

23.    FCA's decision to sell the Class Vehicles without disclosing its specialized knowledge of the Defect also violates consumer state laws.

24.    Plaintiffs and Class members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Defect at the point of sale.  Plaintiff and Class members have consequently suffered ascertainable losses and actual damages. Moreover, Plaintiffs seek equitable remedies, including *inter alia*, an order that the Class Vehicles are defective and injunctive relief preventing FCA from continuing its wrongful conduct as alleged herein.

## II.    THE PARTIES

### Etienne Maugain

25.    Plaintiff Etienne Maugain, is a citizen of California, domiciled in Greenbrae, California.

26.    On or about July 18, 2017, Plaintiff Maugain purchased a certified pre-owned 2015 Jeep Grand Cherokee with approximately 40,515 miles on the odometer from Hilltop Chrysler Jeep Dodge Ram ("Hilltop CJDR"), an authorized FCA dealership located in Richmond, California.

27.    Plaintiff Maugain purchased his Class Vehicle primarily for personal, family, or household use.

28.     Passenger safety and reliability were important factors in Plaintiff Maugain's decision to purchase his vehicle.  Before making his purchase, Plaintiff Maugain researched the vehicle on the internet by visiting the dealership website, reviewed the window sticker which listed the 3.6L Pentastar Engine as a component, spoke to a representative of the authorized Jeep dealership who assured him of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff Maugain selected and purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

29.     None of the information provided to Plaintiff Maugain disclosed any defects in the Class Vehicle, Engine or the powertrain system.  FCA's omissions were material to Plaintiff Maugain, who was acting as a reasonable consumer.

30.     Had FCA disclosed the Defect before Plaintiff Maugain purchased his vehicle, Plaintiff Maugain would have seen such and been aware of the disclosures.  Indeed, FCA's misstatements and omissions were material to Plaintiff Maugain, who was acting as a reasonable consumer.  Like all members of the Class, Plaintiff Maugain would have not purchased his Class Vehicle, or would have paid less for the Class Vehicle, had he known of the Defect.

31.     In addition, at the time Plaintiff Maugain purchased his vehicle, and in purchasing his vehicle, he relied upon representations from FCA and its authorized dealership that he saw during his internet research, heard from the salesperson, and reviewed on the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Maugain relied on those representations and the omission of, or failure to

disclose, the Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle, or would have paid less for it.

32.     At all times during his ownership of the vehicle, Plaintiff Maugain properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

33.     When the vehicle had approximately 87,000 miles on the odometer, Plaintiff Maugain noticed a ticking noise coming from the engine compartment of his vehicle.  In addition, the engine light illuminated on the dashboard. On or about August 14, 2020, he brought his vehicle to Hilltop CJDR, which diagnosed his vehicle as having rocker arm and lifter failures on the driver's side of the engine.  The dealership replaced the rocker arms and lifters on the driver's side of the engine under his certified pre-owned powertrain warranty but did not replace the passenger side rocker arms and lifters.  As a result, the Defect was not repaired.

34.     On or about December 1, 2021, when the vehicle had approximately 112,000 miles on the odometer, Plaintiff Maugain returned his vehicle to Hilltop CJDR, complaining about a tapping noise coming from the engine compartment. Notwithstanding his prior repair for this exact issue, Hilltop CJDR charged Plaintiff Maugain a $200 diagnosis fee to again diagnose his vehicle as having a failed intake rocker arm on cylinder number one (1) and a failed lifter.  Hilltop CJDR ultimately replaced the twelve (12) rocker arms and lifters on the passenger side of his vehicle. Plaintiff Maugain ultimately paid $1,700 for these repairs, in addition to the diagnostic fee, as well as $500 in car rental fees for the period of time he was without his vehicle.  Plaintiff Maugain called FCA's customer service line repeatedly requesting warranty coverage for these repairs but was denied.

35.     At the time of the attempted repair and pursuant to FCA's established guidelines, the authorized dealership did not replace all of the rocker arms and associated components within the Engine, nor did they examine the interior of the Engine to check for damage from debris. Because the warranty on his vehicle has expired, Plaintiff Maugain will now bear the cost of any further repairs needed due to the prior repair being incomplete.  He is concerned that other parts of the engine may have been damaged due to the Defect, particularly because his vehicle vibrates significantly rougher on idle since the repairs have been attempted.

36.     To date, Plaintiff Maugain has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage to his Class Vehicle.

37.     As a result of the Defect, Plaintiff Maugain has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Maugain will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though he would like to do so.

38.     At all times, Plaintiff Maugain, like all Class Members, has attempted to drive his Class Vehicle in a manner that is and was both foreseeable, and in which it was intended to be used.

**John Kundrath**

39.     Plaintiff John Kundrath is a citizen of California, domiciled in La Puente, California.

40.     On or about August 15, 2014, Plaintiff Kundrath purchased a new 2015 Jeep Grand Cherokee with approximately 11 miles on the odometer from Puente Hills Chrysler Dodge ("Puente Hills CD"), an authorized FCA dealership located in City of Industry, California.

41.     Plaintiff Kundrath purchased his Class Vehicle primarily for personal, family, or household use.

42.     Passenger safety and reliability were important factors in Plaintiff Kundrath's decision to purchase his vehicle.  Before making his purchase, Plaintiff Kundrath saw the window sticker (the "Monroney" sticker) which listed the 3.6L Pentastar Engine as a component. Mr. Kundrath also spoke to a representative at the dealership and was assured of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff Kundrath selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

43.     None of the information provided to Plaintiff Kundrath disclosed any defects in the Class Vehicle, Engine or the powertrain system. At no point were the defects disclosed, and FCA's omissions were material to Plaintiff Kundrath, who was acting as a reasonable consumer.

44.     Had FCA disclosed the Defect before Plaintiff Kundrath purchased his vehicle, Plaintiff Kundrath would have seen such disclosures and been aware of them. Indeed, FCA's misstatements and omissions were material to Plaintiff Kundrath.  Like all members of the Class, Plaintiff Kundrath would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

45.     In addition, at the time Plaintiff Kundrath purchased his vehicle, and in purchasing his vehicle, he relied upon representations from FCA and its authorized dealership that he heard from the salesperson that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Kundrath relied on those representations and the omission of the disclose of, or failure to disclose, the Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle or would have paid less for it.

46.     At all times during his ownership of the vehicle, Plaintiff Kundrath properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

47.     When the vehicle had approximately 49,000 miles on the odometer, Plaintiff Kundrath began experiencing issues with his Jeep Grand Cherokee. It suffered from a rough idle and was experiencing misfires on cylinder number 2. On or about October 29, 2021, he brought his vehicle to Puentes Hill CD, who attempted to identify the source of problem but were unsuccessful. On a second trip to Puentes Hill CD, the dealership replaced left rocker arms and tappets on his vehicles—which stopped the rough idle and cylinder misfires. The mechanic informed him that the rocker arms on the number 2 cylinder head were bad, as well as the tappets.

48.     At the time of the repairs and pursuant to FCA's established guidelines, the authorized dealership did not replace all of the rocker arms and associated components within the Engine, nor did they examine the interior of the Engine to check for damage from debris.

49.     To date, Plaintiff Kundrath has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule which would

either repair the Defect or prevent the Defect from causing additional damage to his Class Vehicle. The repairs cost Mr. Kundrath over $2,000.00 out of pocket.

50.     As a result of the Defect, Plaintiff Kundrath has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Kundrath will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase another Class Vehicle although he would like to do so.

51.     At all times, Plaintiff Kundrath, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Louise Shumate**

52.     Plaintiff Louise Shumate, is a citizen of Florida, domiciled in Tampa, Florida.

53.     In or about September 2015, Plaintiff Shumate purchased a new 2015 Jeep Wrangler from Milton Dodge Chrysler Jeep, now known as Sandy Sansing Chrysler Dodge Jeep Ram, an authorized FCA dealer in located in Milton, Florida.

54.     Plaintiff Shumate purchased her Class Vehicle primarily for personal, family, or household use.  She continues to own her vehicle.

55.     Passenger safety and reliability were important factors in Plaintiff Shumate's decision to purchase her vehicle.  Before making her purchase, Plaintiff Shumate performed internet research, in particular visiting the Kelly Blue Book website, reviewed the window sticker which listed the 3.6L Pentastar Engine as a component, spoke to authorized Jeep dealership representative(s), and test drove the vehicle multiple times over a holiday weekend until she ultimately purchased.  Plaintiff Shumate selected and ultimately purchased her Class Vehicle, in part, because the vehicle was marketed as a high-quality vehicle capable of providing safe, reliable transportation, including as to the quality of the vehicle's components, including its Engine.  The

15

purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

56.     None of the information provided to Plaintiff Shumate disclosed any defects in the Class Vehicle, Engine or the powertrain system.  FCA's omissions were material to Plaintiff Shumate, who was acting as a reasonable consumer.

57.     Had FCA disclosed the Defect before Plaintiff Shumate purchased her vehicle, Plaintiff Shumate would have seen such and been aware of the disclosures.  Indeed, FCA's misstatements and omissions were material to Plaintiff Shumate, who was acting as a reasonable consumer.  Like all members of the Class, Plaintiff Shumate would have not purchased her Class Vehicle, or would have paid less for the Class Vehicle, had she known of the Defect.

58.     In addition, at the time Plaintiff Shumate purchased her vehicle, and in purchasing her vehicle, she relied upon representations from FCA and its authorized dealership that she saw during her internet research, heard from the salesperson, and reviewed on the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Shumate relied on those representations and the omission of, or failure to disclose, the Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle, or would have paid less for it.

59.     At all times during her ownership of the vehicle, Plaintiff Shumate has properly maintained and serviced her Class Vehicle according to FCA's recommended maintenance guidelines.

60.     In or around August 2020, when her vehicle had approximately 49,000 miles on the odometer, Plaintiff Shumate heard a ticking noise coming from the engine compartment of her vehicle.  She took her vehicle to Jerry Ulm Chrysler Dodge Jeep Ram, an authorized FCA

dealership located in Tampa, Florida.  The dealership performed an engine tune-up, costing Plaintiff Shumate $573.34.  The dealership also found a failed rocker arm and lifter on the intake side of cylinder 6.  The dealership replaced the rocker arm and lifter, and also the valve cover gasket, under the applicable 5-year, 100,000 miles powertrain warranty, but did not replace any other valve train components.

61.     At the time of the attempted repair and pursuant to FCA's established guidelines, the authorized dealership did not replace all of the rocker arms and associated components within the Engine, nor did they examine the interior of the Engine to check for damage from debris. Because of the Defect and the 5-year, 100,000 miles powertrain warranty on her vehicle coming due to expire, Plaintiff Shumate purchased a 7-year/100,000 mile powertrain warranty for $3,785.00. Plaintiff Shumate had to pay out of pocket in the past despite her vehicle being under warranty, and reasonably believes that she will bear costs for any further repairs needed due to the prior repair being incomplete.

62.     To date, Plaintiff Shumate has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage to her Class Vehicle.

63.     As a result of the Defect, Plaintiff Shumate has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Shumate will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though she would like to do so.

64.     At all times, Plaintiff Shumate, like all Class Members, has attempted to drive her Class Vehicle in a manner that is and was both foreseeable, and in which it was intended to be used.

**Denise Hunter**

65.     Plaintiff Denise Hunter, is a citizen of Texas, domiciled in Fort Worth, Texas.

66.     On or around June 28, 2016, Plaintiff Hunter purchased a certified pre-owned 2015 Jeep Grand Cherokee with approximately 27,600 miles on the odometer from South Oak Dodge Chrysler Jeep, an authorized FCA dealership located in Matteson, Illinois.

67.     Plaintiff Hunter purchased her Class Vehicle primarily for personal, family, or household use.  She continues to own her vehicle.

68.     Passenger safety and reliability were important factors in Plaintiff Hunter's decision to purchase her vehicle. Before making her purchase, Plaintiff Hunter performed internet research, in particular visiting the dealership website, reviewed the window sticker which listed the 3.6L Pentastar Engine as a component, spoke to authorized Jeep dealership representative(s), and test drove the vehicle she ultimately purchased.  Plaintiff Hunter selected and ultimately purchased her Class Vehicle, in part, because the vehicle was marketed as a high-quality vehicle capable of providing safe, reliable transportation, including as to the quality of the vehicle's components, including its Engine.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

69.     None of the information provided to Plaintiff Hunter disclosed any defects in the Class Vehicle, Engine or the powertrain system.  FCA's omissions were material to Plaintiff Hunter, who was acting as a reasonable consumer.

70.     Had FCA disclosed the Defect before Plaintiff Hunter purchased her vehicle, Plaintiff Hunter would have seen and been aware of the disclosures.  Indeed, FCA's misstatements and omissions were material to Plaintiff Maugain, who was acting as a reasonable consumer.  Like all members of the Class, Plaintiff Hunter would have not purchased her Class Vehicle, or would have paid less for the Class Vehicle, had she known of the Defect.

71.     In addition, at the time Plaintiff Hunter purchased her vehicle, and in purchasing her vehicle, she relied upon representations from FCA and its authorized dealership that she saw during her internet research, heard from the salesperson, and reviewed on the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Hunter relied on those representations and the omission of the disclosure of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.  At all times during her ownership of the vehicle, Plaintiff Hunter has properly maintained and serviced her Class Vehicle according to FCA's recommended maintenance guidelines.

72.     In or around early July 2021, Plaintiff Hunter's vehicle began to lose power while being driven, ran roughly, and make loud ticking noises from the engine.  On or about July 19, 2021, when her vehicle had approximately 106,000 miles on the odometer, Plaintiff Hunter took her vehicle to AutoNation Chrysler Dodge Jeep Ram, an authorized FCA dealership located in Fort Worth, Texas.  The technician at the dealership found that all the rockers and lifters in her vehicle were "bad," and needed replacement.  Ms. Hunter paid over $2,200 for this service.

73.     At the time of the attempted repair and pursuant to FCA's established guidelines, the authorized dealership did not replace associated components within the Engine, nor did they examine the interior of the Engine to check for damage from debris.  Because the warranty on her

vehicle has expired, Plaintiff Hunter will now bear the cost of any further repairs needed due to the prior repair being incomplete.

74.     To date, Plaintiff Hunter has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage to her Class Vehicle.

75.     As a result of the Defect, Plaintiff Hunter has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Hunter will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though she would like to do so.

76.     At all times, Plaintiff Hunter, like all Class Members, has attempted to drive her Class Vehicle in a manner that is and was both foreseeable and in which it was intended to be used.

**Leonel Cantu**

77.     Plaintiff Leonel Cantu is a citizen of Texas, domiciled in San Antonio, Texas.

78.     On or about September 21, 2015, Plaintiff Cantu purchased a new 2015 Jeep Grand Cherokee with approximately 19 miles on the odometer from Ancira Chrysler Jeep Dodge Ram ("Ancira CJDR"), an authorized FCA dealership located in San Antonio, Texas.

79.     Plaintiff Cantu purchased his Class Vehicle primarily for personal, family, or household use.

80.     Passenger safety and reliability were important factors in Plaintiff Cantu's decision to purchase his vehicle. Before making his purchase, Plaintiff Cantu saw the window sticker which listed the 3.6L Pentastar Engine as a component. Mr. Cantu also spoke to individuals at the dealership about the vehicle, and test drove the vehicle he ultimately purchased. Plaintiff Cantu

selected and ultimately purchased his Class Vehicle because he believed the vehicle was a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on Mr. Cantu's believe that the vehicle was safe, reliable, and a quality vehicle with quality components, including its Engine.

81.     At no point was any defects in the Class Vehicle, Engine or the powertrain system disclosed to Mr. Cantu. FCA's omissions were material to Plaintiff Cantu, who was acting as a reasonable consumer.

82.     Had FCA disclosed the Defect before Plaintiff Cantu purchased his vehicle, Plaintiff Cantu would have seen such disclosures and been aware of them. Indeed, FCA's misstatements and omissions were material to Plaintiff Cantu.  Like all members of the Class, Plaintiff Cantu would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

83.     In addition, at the time Plaintiff Cantu purchased his vehicle, and in purchasing his vehicle, he relied upon the representations and omissions from FCA and its authorized sales representatives leading him to believe it was a fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Cantu relied on the representations and the omission of, or failure to disclose, the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle or would have paid less for it.

84.     At all times during his ownership of the vehicle, Plaintiff Cantu properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

85.     When the vehicle had approximately 85,000 miles on the odometer, Plaintiff Cantu began experiencing issues with his Jeep Grand Cherokee. A knocking or ticking was coming from the engine. On or about August 27, 2021, he brought his vehicle to Ancira CJDR, who attempted to identify the source of problem. Ancira CJDR replaced a camshaft intake, 12 rocker arms and tappets, as well as a cylinder head cover and six gasket intake manifolds. As the vehicle was out of warranty, the repairs cost Mr. Cantu $2,243.43 out of pocket.

86.     To date, Plaintiff Cantu has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage to his Class Vehicle.

87.     As a result of the Defect, Plaintiff Cantu has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Cantu will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although he would like to do so.

88.     At all times, Plaintiff Cantu, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**<u>Harry Reichlen</u>**

89.     Plaintiff Harry Reichlen, is a citizen of New Hampshire, domiciled in Meredith, New Hampshire.

90.     On or about September 18, 2014, Plaintiff Reichlen purchased a new 2015 Jeep Grand Cherokee from 495 Chrysler Jeep Dodge, Inc., an authorized FCA dealership located in Lowell, Massachusetts.

91.     Plaintiff Reichlen purchased his Class Vehicle primarily for personal, family, or household use.

92.     Passenger safety and reliability were important factors in Plaintiff Reichlen's decision to purchase his vehicle.  Before making his purchase, Plaintiff Reichlen reviewed the Kelley Blue Book listings, reviewed the window sticker which listed the 3.6L Pentastar Engine as a component, spoke to a representative of the authorized Jeep dealership who assured him of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased. Plaintiff Reichlen selected and ultimately purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

93.     None of the information provided to Plaintiff Reichlen disclosed any defects in the Class Vehicle, Engine or the powertrain system.  FCA's omissions were material to Plaintiff Reichlen, who was acting as a reasonable consumer.

94.     Had FCA disclosed the Defect before Plaintiff Reichlen purchased his vehicle, Plaintiff Reichlen would have seen such and been aware of the disclosures.  Indeed, FCA's misstatements and omissions were material to Plaintiff Reichlen, who was acting as a reasonable consumer.  Like all members of the Class, Plaintiff Reichlen would have not purchased his Class Vehicle, or would have paid less for the Class Vehicle, had he known of the Defect.

95.     In addition, at the time Plaintiff Reichlen purchased his vehicle, and in purchasing his vehicle, he relied upon representations from FCA and its authorized dealership that he saw during his internet research, heard from the salesperson, and reviewed on the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Reichlen relied on those representations and the omission of, or failure to

disclose, the Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle or would have paid less for it.

96.     At all times during his ownership of the vehicle, Plaintiff Reichlen properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

97.     Beginning in the summer of 2020, Plaintiff Reichlen began to notice some hesitation as he was driving his vehicle, particularly when going up hills.  In the spring of 2021, he began to hear ticking noises coming from the engine compartment of his vehicle.  On or about July 27, 2021, he took his vehicle to Nucar Chrysler Dodge Jeep Ram, an authorized dealership located in Tilton, New Hampshire for diagnosis and repair.  At the time, the vehicle had less than 74,000 miles on the odometer.

98.     The dealership verified the noise was coming from the valve train and discovered a failed rocker arm on the right, or intake, bank of the engine.  The rocker arm failure also damaged the associated lifter and a lobe on the right intake camshaft.  As a result, the dealership replaced the intake camshaft, twelve (12) rocker arms, and twelve (12) lifters, as well as the gaskets for both valve covers.  Plaintiff Reichlen was charged $1,735.44 for repairs.

99.     The dealership advised Plaintiff Reichlen to call FCA directly to see if FCA would cover the repair under warranty, due to the defective rocker arm.  Plaintiff Reichlen called the FCA customer service hotline number provided by the dealership and explained the situation.  On or about August 2, 2021, a customer service representative that identified themselves as Moi informed Plaintiff Reichlen by email that his request for reimbursement had been denied.

100.    At the time of the attempted repair, the authorized dealership did not replace all of the rocker arms and associated components within the Engine, nor did they examine the interior

of the Engine to check for damage from debris.  Because FCA refuses to honor its warranty or admit the existence of the Defect, Plaintiff Reichlen will also bear the cost of any future repairs.

101.    To date, Plaintiff Reichlen has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage to his Class Vehicle.

102.    As a result of the Defect, Plaintiff Reichlen has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Reichlen will be unable to rely FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though he would like to do so.

103.    At all times, Plaintiff Reichlen, like all Class Members, has attempted to drive his Class Vehicle in a manner that is and was both foreseeable, and which it was intended to be used.

### Richard Archer

104.    Plaintiff Richard Archer, is a citizen of Alabama, domiciled in Pinson, Alabama.

105.    On or about July 15, 2014, Plaintiff Archer purchased a new 2014 Jeep Wrangler from Palmer Dodge Chrysler Jeep, an authorized FCA dealership located in Roswell, Georgia.

106.    Plaintiff Archer purchased his Class Vehicle primarily for personal, family, or household use.

107.    Passenger safety and reliability were important factors in Plaintiff Archer's decision to purchase his vehicle.  Before making his purchase, Plaintiff Archer researched the vehicle on the internet by visiting the dealership website, reviewed the window sticker which listed the 3.6L Pentastar Engine as a component, viewed television commercials, spoke to a representative of the authorized Jeep dealership who assured him of the quality, safety, and

25

reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff Archer selected and purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

108.    None of the information provided to Plaintiff Archer disclosed any defects in the Class Vehicle, Engine or the powertrain system.  FCA's omissions were material to Plaintiff Archer, who was acting as a reasonable consumer.

109.    Had FCA disclosed the Defect before Plaintiff Archer purchased his vehicle, Plaintiff Archer would have seen such and been aware of the disclosures.  Indeed, FCA's misstatements and omissions were material to Plaintiff Archer, who was acting as a reasonable consumer.  Like all members of the Class, Plaintiff Archer would have not purchased his Class Vehicle, or would have paid less for the Class Vehicle, had he known of the Defect.

110.    In addition, at the time Plaintiff Archer purchased his vehicle, and in purchasing his vehicle, he relied upon representations from FCA and its authorized dealership that he saw during his internet research, viewed on television commercials, heard from the salesperson, and reviewed on the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Archer relied on those representations and the omission of, or failure to disclose the disclose of the Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle or would have paid less for it.

111.    At all times during his ownership of the vehicle, Plaintiff Archer properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

112.    In or about March 2021, Plaintiff Archer noticed that his vehicle's engine was making a loud ticking sound and misfiring resulting in bucking and surging, decreased engine performance, hesitation, loss of power, and premature wear on internal components.  In or about May 2021, when his vehicle had approximately 110,453 miles on the odometer, Plaintiff Archer took his vehicle to Hendrick Chrysler Dodge Jeep Ram, an authorized FCA dealership located in Hoover, Alabama.  The technician at the dealership found "engine ticking" and "found roller followers making excessive noise, possible camshaft and phaser(s) damaged.  Will need to replace all roller followers, camshaft, and phaser…plus gaskets and oil change."  Mr. Archer paid approximately $2,319.33 to attempt to repair the Defect.

113.    At the time of the attempted repair and pursuant to FCA's established guidelines, the authorized dealership did not examine the interior of the Engine to check for damage from debris.  Because the warranty on his vehicle has expired, Plaintiff Archer will now bear the cost of any further repairs needed due to the prior repair being incomplete.  He is concerned that other parts of the engine may have been damaged due to the Defect.

114.    To date, Plaintiff Archer has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage to his Class Vehicle.

115.    As a result of the Defect, Plaintiff Archer has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Archer will be unable to rely on FCA's advertising or labeling in the

future, and so will not purchase or lease another vehicle from FCA in the future, though he would like to do so.

116.    At all times, Plaintiff Archer, like all Class Members, has attempted to drive his Class Vehicle in a manner that is and was both foreseeable, and in which it was intended to be used.

**Stephen Dreikosen**

117.    Plaintiff Stephen Dreikosen, is a citizen of Massachusetts, domiciled in Framingham, Massachusetts. Plaintiff Dreikosen was a citizen of New Hampshire at the time he purchased his Class Vehicle.

118.    On or about November 23, 2018, Plaintiff Dreikosen purchased a used 2016 Dodge Ram 1500 with approximately 22,141 miles on the odometer from AutoFair Volkswagen of Nashua located in Merrimack, New Hampshire.

119.    Plaintiff Dreikosen purchased his Class Vehicle primarily for personal, family, or household use.

120.    Passenger safety and reliability were important factors in Plaintiff Dreikosen's decision to purchase his vehicle.  Before making his purchase, Plaintiff Dreikosen reviewed the Kelley Blue Book listings, researched the vehicle by visiting the dealership website, reviewed the window sticker which listed the 3.6L Pentastar Engine as a component, spoke to a representative of the authorized Jeep dealership who assured him of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff Dreikosen selected and purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part

on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

121.    None of the information provided to Plaintiff Dreikosen disclosed any defects in the Class Vehicle, Engine or the powertrain system. FCA's omissions were material to Plaintiff Dreikosen, who was acting as a reasonable consumer.

122.    Had FCA disclosed the Defect before Plaintiff Dreikosen purchased his vehicle, Plaintiff Dreikosen would have seen such and been aware of the disclosures. Indeed, FCA's misstatements and omissions were material to Plaintiff Dreikosen, who was acting as a reasonable consumer. Like all members of the Class, Plaintiff Dreikosen would have not purchased his Class Vehicle, or would have paid less for the Class Vehicle, had he known of the Defect.

123.    In addition, at the time Plaintiff Dreikosen purchased his vehicle, and in purchasing his vehicle, he relied upon representations from FCA and its authorized dealership that he saw during his internet research, heard from the salesperson, and reviewed on the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Dreikosen relied on those representations and the omission of, or failure to disclose the Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle or would have paid less for it.

124.    At all times during his ownership of the vehicle, Plaintiff Dreikosen properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

125.    In or about February 2022, Plaintiff Dreikosen noticed that his vehicle's engine was making a loud ticking sound. On or about March 17, 2022, when his vehicle had approximately 81,237 miles on the odometer, Plaintiff Dreikosen took his vehicle to McGovern Chrysler Dodge

Jeep Ram, an authorized FCA dealership located in Newton, Massachusetts. The technician at the dealership found an "engine mechanical concern" and issues with the vehicle's camshafts (intake and exhaust both sides), rock arms, lifters, valve cover gaskets (both sides), 6 spark plug tube seals, upper intake seals, ticking noise from motor." Additionally, the technician found "failed rocker, lifters." Plaintiff Dreikosen was provided a Repair Estimate for $5,703.43 from McGovern Chrysler Dodge Jeep Ram. On or about March 21, 2022, Plaintiff Dreikosen took vehicle to Natick Gas Auto Repair. Per the technician, "[v]ehicle came in with a ticking noise. All 24 rockers and 24 lifters were to be replaced. After taking off the valve covers and timing cover it was determined that the left side tensioner, timing chain guide and exhaust cam phaser would also be replaced. The water pump had two cracks developed on the base of the fins and as preventive maintenance was replaced. The gaskets for the valve covers, spark plug wells, camshaft sensor and camshafts, intake manifold upper and lower, water pump and thermostat housing were all replaced. The coolant refilled and an oil change performed." On or about March 24, 2022, Plaintiff Dreikosen paid $3,252.56 for work completed to his vehicle in an attempt to repair the Defect.

126.    At the time of the attempted repair and pursuant to FCA's established guidelines, the authorized dealership did not replace all of the rocker arms and associated components within the Engine, nor did they examine the interior of the Engine to check for damage from debris. Because the warranty on his vehicle has expired, Plaintiff Dreikosen will now bear the cost of any further repairs needed due to the prior repair being incomplete. He is concerned that other parts of the engine may have been damaged due to the Defect, particularly because his vehicle vibrates significantly rougher on idle since the repairs have been attempted.

127.    To date, Plaintiff Dreikosen has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage to his Class Vehicle.

128.    As a result of the Defect, Plaintiff Dreikosen has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Dreikosen will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though he would like to do so.

129.    At all times, Plaintiff Dreikosen, like all Class Members, has attempted to drive his Class Vehicle in a manner that is and was both foreseeable, and in which it was intended to be used.

### Kenneth Esteves

130.    Plaintiff Kenneth Esteves, is a citizen of New York, domiciled in Bellerose, New York.

131.    On or about April 3, 2015, Plaintiff Esteves leased a new 2015 Jeep Grand Cherokee with approximately 8 miles on the odometer from Star Chrysler Jeep Dodge, an authorized FCA dealership, located in Queens Village, New York.

132.    Plaintiff Esteves purchased his Class Vehicle primarily for personal, family, or household use.

133.    Passenger safety and reliability were important factors in Plaintiff Esteves' decision to purchase his vehicle.  Before making his purchase, Plaintiff Esteves researched the vehicle on the internet by visiting the Jeep website, reviewed the window sticker which listed the 3.6L Pentastar Engine as a component, spoke to a representative of the authorized Jeep dealership who

assured him of the quality, safety, and reliability of the vehicle he ultimately purchased.  Plaintiff Esteves selected and purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

134.   None of the information provided to Plaintiff Esteves disclosed any defects in the Class Vehicle, Engine or the powertrain system.  FCA's omissions were material to Plaintiff Esteves, who was acting as a reasonable consumer.

135.   Had FCA disclosed the Defect before Plaintiff Esteves purchased his vehicle, Plaintiff Esteves would have seen such and been aware of the disclosures.  Indeed, FCA's misstatements and omissions were material to Plaintiff Esteves, who was acting as a reasonable consumer.  Like all members of the Class, Plaintiff Esteves would not have purchased his Class Vehicle, or would have paid less for the Class Vehicle, had he known of the Defect.

136.   In addition, at the time Plaintiff Esteves purchased his vehicle, and in purchasing his vehicle, he relied upon representations from FCA and its authorized dealership that he saw during his internet research, heard from the salesperson, and reviewed on the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Esteves relied on those representations and the omission of, or failure to disclose the Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle or would have paid less for it.

137.   At all times during his ownership of the vehicle, Plaintiff Esteves properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

138.    In or about June 2021, Plaintiff Esteves began to hear a ticking noise coming from the vehicle's engine compartment.  On or about June 10, 2021, when his vehicle had approximately 82,243 miles on the odometer, Plaintiff Esteves took his vehicle to Star Chrysler Jeep Dodge Fiat. The dealership diagnosed his vehicle as having failed rocker arms, lifters and cam shaft damage on the right/rear side of the engine. The dealership told Mr. Esteves that the ticking issue and engine failure was common with the Pentastar 3.6L engines. When Mr. Esteves asked if there was a recall, he was told by the dealership there was not, and he would have to pay for the repairs himself since the vehicle was out of warranty. The dealership replaced the rocker arms, camshaft, tappets and additional parts, which cost Plaintiff Esteves $4,938.37 for the repairs.  That repair stopped the ticking momentarily, but less than a year later in March of 2022, Plaintiff Esteves experienced the ticking noise again and returned his vehicle to Star Chrysler Jeep Dodge Fiat, complaining of the return of the ticking noise. The dealership diagnosed the issues as a failure of the same parts—although this time on the other side of the engine. Star Chrysler Jeep Dodge Fiat ultimately, replaced the lifters, cams and rocker arms. Due to Plaintiff Esteves frustration with the necessity of the second repair pair in less than a year, Star Chrysler Jeep Dodge Fiat discounted its services, but Plaintiff Esteves was still obligated to pay an additional $272.19.

139.    At the time of the attempted repair and pursuant to FCA's established guidelines, the authorized dealership did not replace all of the rocker arms and associated components within the Engine, nor did they examine the interior of the Engine to check for damage from debris. Because the warranty on his vehicle has expired, Plaintiff Esteves will now bear the cost of any further repairs needed.

140.    To date, Plaintiff Esteves has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule, which would either repair the Defect or prevent the Defect from causing additional damage to his Class Vehicle.

141.    As a result of the Defect, Plaintiff Esteves has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Esteves will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though he would like to do so.

142.    At all times, Plaintiff Esteves, like all Class Members, has attempted to drive his Class Vehicle in a manner that is and was both foreseeable, and in a manner which it was intended to be used.

**John Skleres**

143.    Plaintiff John Skleres, is a citizen of Maryland, domiciled in Havre de Grace, Maryland.

144.    On or about January 2, 2016, Plaintiff Skleres purchased a pre-owned 2015 Chrysler Town & Country with approximately 7,147 miles on the odometer from Blaise Alexander Family Dealerships, an authorized FCA dealership located in Bloomsburg, Pennsylvania.

145.    Plaintiff Skleres purchased his Class Vehicle primarily for personal, family, or household use.

146.    Passenger safety and reliability were important factors in Plaintiff Skleres' decision to purchase his vehicle.  Before making his purchase, Plaintiff Skleres researched the vehicle on the internet by visiting the dealership website, reviewed the window sticker which listed the 3.6L Pentastar Engine as a component, spoke to a representative of the authorized Jeep dealership who

assured him of the quality, safety, and reliability of the vehicle he ultimately purchased.  Plaintiff Skleres selected and purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

147.    None of the information provided to Plaintiff Skleres disclosed any defects in the Class Vehicle, Engine or the powertrain system.  FCA's omissions were material to Plaintiff Skleres, who was acting as a reasonable consumer.

148.    Had FCA disclosed the Defect before Plaintiff Skleres purchased his vehicle, he would have seen such and been aware of the disclosures.  Indeed, FCA's misstatements and omissions were material to Plaintiff Skleres, who was acting as a reasonable consumer.  Like all members of the Class, Plaintiff Skleres would have not purchased his Class Vehicle, or would have paid less for the Class Vehicle, had he known of the Defect.

149.    In addition, at the time Plaintiff Skleres purchased his vehicle, and in purchasing his vehicle, he relied upon representations from FCA and its authorized dealership that he saw during his internet research, heard from the salesperson, and reviewed on the window sticker that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Skleres relied on those representations and the omission of, or failure to disclose the Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle or would have paid less for it.

150.    At all times during his ownership of the vehicle, Plaintiff Skleres properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

151.    In or about April 2021, Plaintiff Skleres began to hear a ticking noise coming from the vehicle's engine compartment.  On or about May 25, 2021, when his vehicle had approximately 60,900 miles on the odometer, Plaintiff Skleres took his vehicle to Country Chrysler Dodge Jeep, an authorized FCA dealership located in Oxford, Pennsylvania.  The dealership diagnosed his vehicle as having failed roller lifters and cam shaft damage on the right/rear side of the engine. The dealership replaced the lifters and cams, and Plaintiff Skleres was required to pay $1,885.55 for the repair.  However, that repair failed to repair the Defect.  On or about February 16, 2022, Plaintiff Skleres returned his vehicle to Country Chrysler Dodge Jeep, complaining about a ticking noise coming from the engine compartment.  Notwithstanding his prior repair for this exact issue, Country Chrysler Dodge Jeep diagnosed Plaintiff Skleres' vehicle as having a lifter and cam failure on the left side.  Country Chrysler Dodge Jeep, ultimately, replaced the lifters, cams and rocker arms.  Plaintiff Skleres paid $1,858.19 for these repairs.

152.    At the time of the attempted repair and pursuant to FCA's established guidelines, the authorized dealership did not replace all of the rocker arms and associated components within the Engine, nor did they examine the interior of the Engine to check for damage from debris. Because the warranty on his vehicle has expired, Plaintiff Skleres will now bear the cost of any further repairs needed due to the prior repair being incomplete.  He is concerned that other parts of the engine may have been damaged due to the Defect, particularly because his vehicle vibrates significantly rougher on idle since the repairs have been attempted.

153.    To date, Plaintiff Skleres has received no notification from FCA about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage to his Class Vehicle.

154.    As a result of the Defect, Plaintiff Skleres has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Skleres will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though he would like to do so.

155.    At all times, Plaintiff Skleres, like all Class Members, has attempted to drive his Class Vehicle in a manner that is and was both foreseeable, and in a manner which it was intended to be used.

**Defendant**

156.    Defendant FCA US LLC is a limited liability company organized and in existence under the laws of the State of Delaware. FCA US LLC's Corporate Headquarters are located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide. FCA is the warrantor and distributor of the Class Vehicles in the United States. FCA's sole member is FCA North America Holdings LLC, a Delaware limited liability company, with its principal place of business located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA North America Holdings LLC's sole member is Fiat Chrysler Automobiles N.V., which was incorporated as a public limited liability company (a "naamloze vennootschap") under the laws of the Netherlands. Its principal office is located at 25 St. James's Street, London SW1A 1HA, United Kingdom.

157.    FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor vehicles. FCA (like its predecessor, Chrysler) is one of the "Big Three" American automakers (with Ford and General Motors). FCA engages in commerce by distributing and selling

new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

158.    FCA has designed, manufactured, imported, distributed, offered for sale, sold, and leased the Class Vehicles with the knowledge and intent to market, sell, and lease them in all 50 states, including in Florida and Massachusetts. Moreover, FCA and its agents designed, manufactured, marketed, distributed, warranted, sold and leased the Class Vehicles in Florida, Massachusetts, and throughout the United States. Dealers act as FCA's agents in selling automobiles under the Fiat Chrysler name and disseminating vehicle information provided by Fiat Chrysler to customers.

159.    FCA has a nationwide dealership network and operates offices and facilities throughout the United States.  In order to sell vehicles to the general public, FCA enters into agreements with dealerships who are then authorized to sell the brands of vehicles owned by FCA, including Jeep, to consumers such as Plaintiffs.  In return for the exclusive right to sell new FCA-brand vehicles in a geographic area, authorized dealerships are also permitted to service and repairs these vehicles under the warranties FCA provides directly to consumers.  These contracts give FCA a significant amount of control over the actions of the dealerships, including sale and marketing over the vehicles and parts and accessories for those vehicles.  All service and repairs at an authorized dealership are also completed according to FCA's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents.  Per the agreements between FCA and the authorized dealers, consumers such as Plaintiffs can receive services under FCA's issued warranties at dealer locations that are convenient to them.

160.   FCA also develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotion materials relating to Class Vehicles through the dealership network.   FCA is also responsible for the production and content of the information on the Monroney stickers, as well as other window stickers.

161.   FCA warrants the Class Vehicles and is the drafter of those warranties, the terms of which unreasonably favor FCA.  The warranties given by FCA to Plaintiffs and consumers are presented on a "take it or leave it" basis, and Plaintiffs and consumers are not given a meaningful choice in the terms of the warranties provided by FCA.

### III.   JURISDICTION AND VENUE

162.   This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than FCA, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. *See* 28 U.S.C. § 1332(d)(2)(A).

163.   In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.  Further, this Court may also exercise supplemental jurisdictions over Plaintiffs' Magnusson-Moss Warranty Act claims.

164.   This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which

renders the exercise of jurisdiction by this Court proper and necessary as FCA is "at home" in Delaware.

165.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue FCA in this District, FCA's state of incorporation.

## IV.     FACTUAL ALLEGATIONS

### A. Background of the subject Engine, including the Rocker Arm, Camshaft and Lifter Failure(s)

166.     The Engine debuted in the 2011 Jeep Grand Cherokee, first being offered for sale in 2010.  However, the Engine quickly became available in numerous Chrysler, Dodge, Jeep and Ram branded vehicles. Since the start of 2015, 47 percent of FCA vehicles sold are equipped with a Pentastar V-6 engine.[2]

---

[2]  *See*  https://media.stellantisnorthamerica.com/newsrelease.do?id=16576&mid=  (last   visited November 3, 2021).



**Figure 1[3]**

167.    The Engine was designed with significant improvements, in particular, (1) a lighter aluminum cast engine block to reduce weight, (2) additional chain drives to replace timing belts, and (3) the introduction of a variable cam timing design, which was meant to be more durable than previous engine designs.

168.    Variable cam timing is meant to improve fuel efficiency and reduce emissions, primarily by advancing intake camshaft timing at medium engine speeds.  In particular, the variable cam timing used in the Engine, referred to as the "hydraulic cam phasing," works by varying the camshaft target position at the command of the powertrain control module, or PCM. Variable cam timing, a form of variable valve timing, is aimed at increasing fuel efficiency, but comes at the cost of increasing the mechanical load (i.e. the physical stress) on valve train components. As such, any engine designed with variable valve timing or variable cam timing must have valve train components are specifically designed to withstand the expected stress of the system.

---

[3] Figure 1 depicts one of the earliest iterations of the 3.6L Pentastar V6 engine, known as the "Phoenix."

169.    The camshaft itself holds the cam lobes, pointed ovoid shapes which are computer designed to ensure that the valves which allow fuel into the combustion chamber and the valves which allow exhaust gases to leave the combustor chamber are opened and closed at the proper time.  Lifters sit on the lobes, and as the camshaft turns, the rotation motion of the lobe is converted to the linear movement of the lifters which move up and down.

170.    The Engine is equipped with lifters which have a roller in the center which stays in contact with the surface of the camshaft lobes which, during cam rotation, causes the intake and exhaust valves to open and close. The purpose of a roller lifter is to reduce friction on the surface of the cam lobes while the camshaft rotation transfer the lift and duration of the cam lobe to the rocker arm. The movement of the rocker arm caused by the rotation of the camshaft must open and close the intake and exhaust valves in the combustion chamber in a precisely timed manner for proper combustion to occur resulting in the production of horsepower and torque to drive the vehicle in which the engine is installed.

171.    Figure 2, below, illustrates how the rocker arm, as denoted by the red arrow, sits with one end over the valve stem and the other end over the lifter.  In the center of the rocker depicted in Figure 2 is the roller upon which the camshaft lobe is situated.



**Figure 2**

172.    As depicted in Figure 2, the rocker arms in the Engine are particularly small, akin in size to the rocker arms in motorcycle engines.

173.    As the camshaft moves over the top of the lifter, it actuates, temporarily opening the valve. If a lifter collapses or rocker malfunctions, it can cause the destruction of the surface of the camshaft, leading to a failed/dead cylinder which will result in a loss of power and can lead to bent intake and exhaust valves, broken rocker arms, and damage to the entire engine. When the rocker arm becomes loose, having been worn down by mechanical load, or breaks, the exhaust valves and the intake valves cannot function correctly, the camshaft lobes which rotate on the roller of the rocker arm are damaged and the cylinder associated with the failed defective rocker arm will be disabled.

174.    Each cylinder head in the 3.6 liter Pentstar V6 contains two camshafts which are installed above the rocker arms in the Engine, as illustrated Figure 3 below. Hence the designation as a dual overhead cam engine design.  In total, the Engine has four camshafts, two camshafts in each cylinder head located on each of the two banks of the engine.



**Figure 3**

175.    In 2016, FCA introduced a new version of the Engine, again aiming to increase fuel efficiency by approximately six percent.  New components included new cylinder heads, ignition coils, spark plugs, valve springs, piston rings, and lightened crankshaft and crank pins.  Critically, the fundamental dual overhead cam design of the lifters, camshaft and rocker arms remained unchanged, as did the engine bore, stroke, and bore-center spacing.

176.    In a statement released on August 31, 2015, Defendant touted the redesign, which included an "[u]pgraded variable valve timing (VVT) system."[4]  This upgraded system "reduces oil demand" while delivering "more torque [] more quickly."[5]  This system also increased the mechanical load on valve train components, in a design that also reduced the weight of certain engine components.

177.    The Class Vehicles are all equipped with a substantially similar Pentastar V6 engine, and each Engine is based on the same design and includes the same fundamental dual overhead camshaft design configuration including the rocker arms, camshaft and lifters.

### B.  The Defect

178.    At the time each Class Vehicles left FCA's possession and control, the incorporated Engine had an inherent and uniform latent Defect.  The Defect causes audible ticking noises from the engine, engine misfires often resulting in bucking and surging, decreased engine performance, hesitation, loss of power, premature engine wear of internal components such as the rocker arms, lifters, and camshaft, and eventually, catastrophic engine failure.

179.    As described above, the Engine suffers from defects in design, material selection, manufacturing, and/or workmanship in components of its valve train, specifically the rocker arms,

---

[4] *See* https://media.stellantisnorthamerica.com/newsrelease.do?id=16718&mid= (last visited April 28, 2022).
[5] *Id*.

camshafts, lifters and related components, as well as in the electronic and hydraulic modules controlling the timing, phasing and function of the camshafts, intake valves, lifters and related components which cause said components to prematurely fail. In short, the defective valvetrain cannot adequately, properly and timely transfer the motion of the cam lobes to open and close the valves to effectuate proper internal combustion (the "Defect") resulting in a significant loss of power or total engine failure.

180. Specifically, the Defect causes, among other things, lifter collapse, rocker arm roller failure, and/or camshaft lobe destruction, which lead to significant power loss, decreased engine performance, hesitation and/or catastrophic engine failure. In particular, the valve train components cannot withstand the mechanical loads produced by the Engine, causing these components to wear, deteriorate and break far before the intended useful life of the component. This causes improper valvetrain tolerances, which result in engine misfires often causing the engine, and in turn the vehicle, to buck and surge. As these valvetrain components begin to prematurely fail, the Defect initially declares itself to unsuspecting consumers as an audible ticking noise from the engine. The Defect eventually results in catastrophic engine failure and causes the metal particles and debris from the failed rocker arms, camshafts and related valve train components to contaminate the engine oil and circulate throughout the engine, damaging vital components and the engine at-large. Ultimately, the broken and/or worn valve train components cause catastrophic engine failure while the vehicle is being driven, leading to an increased threat of stalling, loss of motive power and collision.

181. Despite FCA's knowledge, as early as 2013, of the existence and severity of the Defect, it touted the quality, durability, reliability, and performance of the Class Vehicles via its

public statements and multimedia marketing campaigns.  FCA also advertised that the Engine was of high quality, with exceptional performance and comparatively low cost of ownership.

182.     Discovery will show that the Defect is the result of: (1) defective design of the valve train components, including in the needle bearings within the rocker arms; (2) the use of sub-standard materials in the design and manufacture of the rocker arms and other internal components of the valve train assembly; (3) sub-standard procedures in manufacturing the rocker arms and lifters such that the bearings and spring-loaded lift pins in the rocker arms and spring-loaded locking pins in the lifters break down and fail; (4) defective or miscalibrated software in the modules that control the timing, phasing and function of the operation of the camshafts, intake valves and lifters in the valve train; and/or (5) poor quality-control procedures to ensure such defectively designed and/or manufactured rocker arms and lifters and other related valve train components are not installed in the Engine.  The Defect causes unsafe driving conditions because the Class Vehicles have a significant chance engine failure while being driven.  Further, even the lesser symptoms of the Defect affect vehicle performance and safety, making it harder for a driver to control the vehicle as it loses power, hesitates, or misfires.

183.     Because precise valve timing is critical for an engine's performance, failures in the rocker arm(s) causes decreased power and acceleration that leads to stalling while driving or even catastrophic engine failure, which can cause the Class Vehicle to shut off in motion and render them unable to be restarted.

184.     In particular, the rocker arms of the Engine have defects of design, materials, manufacturing or workmanship which cause the rollers to prematurely wear down, become loose, and then drop, shifting the rocker arm out of alignment.  The damage to the rocker arm from the mechanical load of the variable valve timing can be as significant as 50% of the outer diameter of

the rocker arm being worn away.  Further, the rocker arms can then come into contact with the cam, scraping both components and producing particulate debris.  Simply put, the valve train components cannot withstand the mechanical load of the engine, either because they have not been adequately designed to withstand the stress or have been defectively manufactured.  As a result, the Defect results in worn valve train components which can damage the rest of the Engine, necessitating costly and routine repairs for engine components which are not intended to be replaced before 100,000 miles.

185.    Similarly, other components of the valve train are defective, either because they cannot withstand the mechanical load or are defectively manufactured: (1) the lifters may collapse and/or become stuck, causing the rocker arms to lose contact with the valve springs and damaging the cam lobes and camshaft; (2) the valve springs develop stress cracks and ultimately fail; and (3) the ECM is improperly programmed so that the valve train system is mistimed.

186.    FCA was well-aware of the problems of the Defect, and in an effort to remedy them, produced new versions of the rocker arms for the Engine in 2013.  By early 2014, FCA had instructed its authorized dealerships to replace rocker arms in Engines that come in for misfires with new rocker arms, with the part numbers MOPAR 5184296AD, AE, AF, and AG.

187.    Similarly, when FCA introduced the "re-designed" Pentastar in 2016, the Engine included new valve springs, part number MOPAR 5184060AN.

188.    However, these re-designed parts ultimately suffered from similar defects which caused their premature failure.  In fact, by 2017, FCA had manufactured another new rocker arm for the Engine, MOPAR 5184296AH, though that rocker arm does not remedy the Defect.

189.    Indeed, this has not stopped Class Vehicles from experiencing the symptoms of the Defect and FCA dealerships and independent mechanics have been inundated with requests for repairs by members of the Class.

190.    Discovery will show that FCA has been aware, since at least 2013, that Class Vehicles exhibit premature Engine failures at rates and in a manner that do not confirm to industry standards, and that the Defect substantially decreases the value of the Class Vehicles, forcing owners/lessees of the Class Vehicles to incur significant out of pocket expenses or hope that FCA will cover the cost to have the Engine repaired or replaced.

191.    Even then, repairing or replacing the defective parts does not resolve the Defect because the consumer is left with an engine damaged by defective components and/or receives another defective component in its place. As such, the Defect endangers the drivers and passengers of the vehicles, while also creating uncertainty for the drivers of the Class Vehicles who cannot reasonably rely on their vehicles to operate consistently, reliably, or safely.

C.   **FCA's Omissions and Misrepresentations Regarding the Engine**

192.    Notwithstanding FCA's knowledge of the Defect, as more specifically explained herein, FCA, through media outlets including Stellantis media, touted: "The Pentastar V-6 [a]s the most advanced six-cylinder engine in the history of FCA US, with an ideal integration of select technologies that deliver refinement, fuel efficiency and performance."[6]

193.    Bob Lee, Vice President—Engine and Electrified Propulsion Systems Engineering at Chrysler Group LLC proclaimed that: "Our engineers synthesized the best combination of design features and technologies to create a V-6 engine that will exceed customer needs . . . The

---

[6]   *See*  https://media.stellantisnorthamerica.com/newsrelease.do?id=16576&mid=  (last   visited November 3, 2021).

elegantly simple design maximizes functionality and provides class-leading levels of refinement, fuel-efficiency, performance and cost of ownership."[7]

194.    Defendant, FCA's, marketing material describes the various Class Vehicles Engines as, among other things: "The most advanced V-6 engine in the company's history—the Pentastar V-6. This new line of V-6 engines will contribute to an overall fuel-efficiency improvement across the Chrysler, Ram Truck, Jeep® and Dodge product lineup. More refined and fuel-efficient."[8]

195.    FCA also markets the Engine as having low costs of ownership: "The advanced oil-filter system eliminates oil spills and contains an incinerable filter element for more efficient disposal than typical oil filters. The use of long-life spark plugs and a high-energy coil-on-plug ignition system also helps to reduce maintenance costs."[9]   However, when the Defect is taken into account, the cost of ownership for the Engine is significantly increased to account for thousands of dollars in replaced valve train component costs.

196.    In brochures, FCA advertised the Pentastar V-6 Engine has a "workhorse [] designed to deliver the kind of power needed to tackle off-road elements and support all-weather travel on any terrain"[10] and "gives you the goods to go forth with confidence."[11]

---

[7]   *See*   https://media.stellantisnorthamerica.com/newsrelease.do?id=9506&mid=   (last visited November 3, 2021).

[8]   *Id.*

[9]   *Id.*

[10]   *See* https://www.jeep.com/assets/pdf/cherokee_2015.pdf (last visited January 6, 2022).

[11]   *See* http://www.motorologist.com/wp-content/uploads/2015-Jeep-Wrangler-brochure.pdf (last visited January 6, 2022).

197.     FCA further touts the Engines and makes other express representations and warranties about their quality, durability, and performance, as well as the value that it adds to the Class Vehicles, thus, making the Engines a selling feature to attract customers.

198.     However, in truth, FCA knew before selling the Class Vehicles that the Engines suffered from the Defect, but never disclosed that knowledge.

### D.    FCA Had Exclusive and Superior Knowledge of the Defect

199.     FCA fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Class the Defect in Class Vehicles, even though FCA knew or should have known of the design, material, manufacturing, and/or workmanship defects in the Class Vehicles.

200.     Knowledge and information regarding the Defect were in the exclusive and superior possession of FCA and its network of authorized dealerships, and that information was not provided to Plaintiffs and members of the Classes – either before their purchase or lease of Class Vehicles or when they sought repairs for their vehicles.  Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, knowledge of alternative designs for rocker arms and other valve train components, quality control audits of the valve train components, early consumer complaints made to FCA's network of dealerships, aggregate warranty data compiled from those dealers, repair orders and parts data received from those dealers, aggregate auto parts stores, consumer, and independent mechanic orders of replacement parts, and consumers complaints to dealers and NHTSA and testing performed in response to those complaint, *inter alia*, FCA was aware or should have been aware of the Defect in the Class Vehicles.  Instead, FCA fraudulently concealed the Defect and its associated safety risk from Plaintiffs and members of the Classes.

201.    FCA knew, or should have known, that the Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles or within applicable warranty periods.

202.    Notwithstanding FCA's exclusive and superior knowledge of the Defect, FCA failed to disclose the Defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continues to sell Class Vehicles suffering from the Defect. FCA intentionally concealed that the Defect presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

203.    In fact, before the first assembly of the Engine, the Engine benefited from more than 45,000 hours of computer analysis to optimize the design. Once assembled, the engines were thoroughly tested and evaluated on dynamometers and in vehicles. More than 12 million customer equivalent miles were logged on the dynamometers, followed by vehicle testing of nearly 4 million customer equivalent miles.[12]  In particular, "a test batch of engines were made in February 2009, and sent to Rosch Industries for extensive hot testing, to find any problems before customers."[13] (Hereinafter referred to collectively as the "pre-production testing.")

204.    This testing is designed to review defects in the Engine prior to being mass-produced and placed into the Class Vehicles. Due to the cumulative 16 million miles placed on the engines, FCA would have been made aware of the problems with the rocker arms, and other engine components, failing well before their designed-lifespan runs.

---

[12] *See e.g.,* https://www.towbindodge.net/pentastar-v6/ (last visited November 3, 2021).

[13] *See, e.g.*, https://www.pentastars.com/engines/tech.php (last visited November 10, 2021).

205.    Discovery will also show, as a result of their exclusive and superior knowledge regarding the Defect, FCA released several bulletins describing issues related to the Defect to their exclusive network of dealerships.  These bulletins are known as STAR Case Reports and they are issued by FCA engineers in response to consumer complaints from the field.

206.    In March 2014, FCA issued to authorized Ram, Dodge, Chrysler and Jeep dealerships STAR Case #S1309000016, which listed a vehicle symptom/issue related to the Engine as "Ticking/tapping Noise From Upper Engine Area." (hereinafter the "2014 Bulletin").



207.    The 2014 Bulletin stated "this condition is typically found on vehicles with mileage accumulation of 15K miles or more." *Id*. FCA also advised service personnel to, "Replace all rocker arms with latest superseded part."

208.    On August 11, 2017, another STAR Case #S1709000009  (the "2017 Bulletin), was

posted by a "[Chrysler Dodge Jeep Ram] CDJR Master Tech" in an online chat forum:[14]



209.    Like the 2014 Bulletin, the 2017 Bulletin also notes that "Vehicle Misfires at High

RPM during Usually During an Accelerating Condition[,]" and that "[t]his condition can set

misfire DTC's P0300, P0301, P0302, P0303, P0304, P0305, and P0306 [so one should i]nspect

---

[14] *See* ESS and flashing CEL | 2018+ Jeep Wrangler Forums (JL / JLU) - Rubicon, Sahara, Sport, 4xe, 392 - JLwranglerforums.com (last visited November 3, 2021).

the rocker arm spring loaded lift pin shown in the picture [and i]f the pin is stuck and does not move freely in and out as it should the rocker arm needs to be replaced." This confirmed that the redesigned rocker arm also failed to remedy the Defect.

210. In addition to FCA's own internal testing, investigation and knowledge of the Defect, customers complained on the NHTSA's website.

211. Federal law requires automakers like FCA to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

212. Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id*.

213. Consumers may file vehicle safety-related complaints through the NHTSA website, where they are logged and published. The customer complaints are easily sorted by make, model, and year of vehicle. Based on the legal obligations discussed above, FCA and/or FCA personnel would review NHTSA's website for complaints. Thus, FCA knew or should have known of the many complaints about the Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, FCA to the Defect in as early as 2014. With respect solely to the Class Vehicles, attached hereto as **Exhibit A,** is a

sampling of these complaints[15] filed with the NHTSA for the Class Vehicles, which are available

on the NHTSA's website, www.safercar.gov. These excerpts of customer complaints are but a few

examples of the many complaints concerning the Defect. Many of the complaints reveal that FCA,

through its network of dealers and repair technicians, had been made aware of the Defect. In

addition, the complaints indicate that despite having knowledge of the Defect and even armed with

knowledge of the exact vehicles affected, FCA often refused to diagnose the defect or otherwise

attempt to repair it while Class Vehicles were still under warranty.

214.     Consumers have also posted extensively on websites dedicated to discussions of

FCA vehicles regarding the defect in vehicles equipped with the Pentastar Engines. FCA has made

the monitoring of consumer complaints as posted on third-party websites a part of their brand and

reputational management for at least a decade.[16] Attached hereto as **Exhibit B** is a sampling of

those complaints, many similar to this thread dedicated to the "Rocker Arm Issue"[17]:



---

[15] Plaintiffs are unsure of the precise number of NHTSA complaints related to the Defect – while
reports about the symptoms of the Defect in Class Vehicles begin in 2013, many do not specifically
mention valve train components such as the rocker arm.  However, approximately 140 complaints
were filed with NHTSA within the past five years specifically mentioning the "rocker arms" or
"rockerarms," and Plaintiffs believe discovery will show that several hundred complaints at least
relate to the Defect and its symptoms.

[16] Read, Richard, "Taking your car complaint online? Chrysler, GM, and Ford will see it.",
*Christian Science Monitor*, Aug. 21, 2012 (available at https://www.csmonitor.com/Business/In-
Gear/2012/0827/Taking-your-car-complaint-online-Chrysler-GM-and-Ford-will-see-it.     (last
visited December 10, 2021)

[17] https://www.jlwranglerforums.com/forum/threads/rocker-arm-issue.11303/

215.    FCA acknowledged it monitors such complaints on www.JeepCherokeeClub.com, on April 4, 2016, and assuring consumers that online customer complaints would *not* merely be a blip on FCA's radar, instead FCA personnel would actively "monitor a myriad of FCA brand forums" to ensure customer satisfaction and resolution of issues:

> Hi all, sorry for the delay!
>
> There are several of us who monitor a myriad of FCA brand forums. We are Customer Care representatives from FCA HQ and are here to assist when you have questions or concerns with your vehicle. For customers outside the United States, we can help by providing contact information for our international teams.
>
> Kori
> Jeep Social Care Specialist[18]

### E.    Applicable Warranties

216.    FCA sold the Class Vehicles with a "Basic Limited Warranty" ("BLW"), which provides bumper-to-bumper coverage for a period of three years or 36,000 miles, whichever occurs first.

217.    The BLW states:

> The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and headphones. You pay nothing for these repairs. These warranty repairs or adjustments including all parts and labor connected with them will be made by an authorized dealer at no charge, using new or remanufactured parts.

218.    In addition, FCA provides a "Powertrain Limited Warranty ("PLW"), which provides coverage to the Class Vehicles' powertrain components, including the Engine components at issue here, for a period of five years or 60,000 miles[19], whichever occurs first.

---

[18] https://www.jeepcherokeeclub.com/threads/fca-is-watching-this-forum.179465/page-4

[19] Some consumers received a powertrain limited warranty of 7 years and/or 100,000 miles, particularly those who purchased their vehicles certified pre-owned.

219.    The PLW states:

> The Powertrain Limited Warranty covers the cost of all parts and labor needed to repair a powertrain component listed in "section 2.4 E" that is defective in workmanship and materials.

220.    Section 2.4 E, in turn, covers the parts and components of the Class Vehicles' Engines, including:

> Cylinder block and all internal parts; cylinder head assemblies; timing case, timing chain, timing belt, gears and sprockets; vibration damper; oil pump; water pump and housing; intake and exhaust manifolds; flywheel with starter ring gear; core plugs; valve covers; oil pan; turbocharger housing and internal parts; turbocharger wastegate actuator; supercharger; serpentine belt tensioner; seals and gaskets for listed components only.

221.    To date, FCA has been unable to provide a permanent remedy that actually repairs the Defect or prevents it from recurring. Accordingly, irrespective of the applicable model year of any Class Vehicle, or whether it is a new or used vehicle, FCA's representations that it would "[c]over the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" were materially false to the extent that FCA could not (and did not intend to) repair the Defect as it was obligated to do under the BLW.

222.    Similarly, FCA's representations that it "cover[] the cost of all parts and labor needed to repair a powertrain component," as obligated under the PLW, are also materially false.

223.    The full terms and conditions of the warranty are not presented to consumers prior to purchasing their vehicles.  The warranties were drafted by FCA without any input from consumers and are presented to consumers on a take-it-or-leave-it basis.  Further, under the terms of the warranty, FCA retains full authority on whether to authorize repairs under the warranty.

   **F.   Fraudulent Concealment Allegations**

224.     Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at FCA responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles.  FCA necessarily is in possession of or has access to all of this information.

225.     Plaintiffs' claims arise out of FCA's fraudulent concealment of the Defect and the problems it causes, and its representations about the quality, durability, and performance of the Class Vehicles, including their Engines.

226.     To the extent that Plaintiffs' claims arise from FCA's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims.  Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles, FCA knew, or was reckless in not knowing, of the Defect; FCA was under a duty to disclose the Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and FCA never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner.

227.     Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to FCA:

   a.     **Who**: FCA actively concealed the Defect from Plaintiffs and Class members while simultaneously touting the quality, durability and performance of the Class Vehicles and their Engines.  Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at FCA responsible for such decisions.

   b.     **What**: FCA knew, or was reckless or negligent in not knowing, that the Class Vehicles suffer from the Defect.  FCA concealed the Defect and made

contrary representations about the quality, durability, performance, and other attributes of the Class Vehicles.

c.   **When**: FCA concealed material information regarding the Defect at all times and made representations about the quality, durability, and performance of the Class Vehicles, starting no later than 2013, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day.  FCA has not disclosed the truth about the Defect in the Class Vehicles to anyone outside of FCA.  FCA has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles.  And when consumers brought their Class Vehicles to FCA complaining of the symptoms associated with the Defect, FCA denied any knowledge of, or responsibility for, the Defect.

d.   **Where**:  FCA concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and Class members and made contrary representations about the quality, durability, and performance of the Class Vehicles ad their Engines.  Plaintiffs are aware of no document, communication, or other place or thing in which FCA disclosed the truth about the Defect in the Class Vehicles to anyone outside of FCA.  Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on FCA's website.

e. **How**: FCA concealed the Defect from Plaintiffs and Class members and made representations about the quality and durability of the Class Vehicles. FCA actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and FCA promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

f. **Why**: FCA actively concealed material information about the Defect in Class Vehicles, and simultaneously made representations about the quality, durability, and performance of the Class Vehicles and their Engines, for the purpose of inducing Plaintiffs and Class members to purchase or lease the Class Vehicles, rather than purchasing or leasing competitors' vehicles. Had FCA disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of the Defect, and would not have bought the Class Vehicles or would have paid less for them.

### G.   FCA Has Actively Concealed the Defect

228.   Despite its knowledge of the Defect in the Class Vehicles, Defendant actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, Defendant failed to disclose to or actively concealed from Plaintiffs and Class Members, at and after the time of purchase, lease, or repair, and thereafter:

a. any and all known material defects or material nonconformities of the Class Vehicles, including the Defect;

b. that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and

c. that the Class Vehicles were defective, even though FCA learned of the Defect before it placed the Class Vehicles in the stream of commerce.

229.   More troubling, Defendant did not issue any recall and otherwise refuses to acknowledge the Defect, despite Star Cases as early as 2014 recognizing the Defect.  The Star Cases were never released to the public, despite the numerous repairs and reports of symptoms. FCA also refuses to acknowledge ongoing complaints made as a result of the Defect, even as a vehicle has been repaired and certain rocker arms and related parts and components were replaced. Indeed, FCA has refused to honor its warranty or admit the existence of the Defect after these repairs have taken place.

230.   Further, FCA re-designed several engine parts associated with the Defect, but did not notify current owners or lessees of the re-design or encourage replacement of older engines with the re-designed parts.

231.   FCA has also directed its authorized dealerships to inform Plaintiffs and members of the Class that ticking and knocking noises are normal and that no repairs are necessary, so consumers will delay repairs until after the warranty period has expired.  In this way, FCA unfairly transfers the cost of repair to Plaintiffs and Class Members and reduces its own recall and warranty costs.

232.     Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at their dealerships and/or be unable to drive their vehicles for long stretches of time, while they are being constantly repaired.

233.     Moreover, when vehicles are brought to Defendant's dealers for repair, whether covered by warranty or not, Class Members are provided with ineffective repairs in which defective parts are replaced with other defective parts, as experienced by Plaintiffs.

234.     As a result, Class Members continue to experience the Defect despite having repairs, as shown by the experiences of Plaintiffs. Because many Class Members, like Plaintiffs, are current owners or lessees who rely on their vehicles on a daily basis, compensation for repairs, related expenses (e.g. towing), and diminution in value is not sufficient. A remedial scheme which also makes available a fix and/or warranty extension is necessary to make Class Members whole.

235.     Defendant has not recalled all the Class Vehicles to repair the Defect, has not offered to its customers a free suitable repair or free replacement of parts related to the Defect, under the recall or otherwise, and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Defect.

236.     Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

237.     As a result of the Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

238.     The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a

material safety concern. Had Plaintiffs and other Class Members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

239.    Reasonable consumers, like Plaintiffs, expect that a vehicle is safe, will function in a manner that will not pose a safety risk, is free from defects, and will not malfunction while operating the vehicle as it is intended. Plaintiffs and Class Members further expect and assume that FCA will not sell or lease vehicles with known safety defects, such as the Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.

240.    The Class Vehicles do not function as FCA intended; no manufacturer intends for a vehicle's engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure.

## H.    FCA Has Unjustly Retained a Substantial Benefit

241.    Plaintiffs allege that Defendant unlawfully failed to disclose the alleged Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

242.    Plaintiffs further allege that Defendant, thus, engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles.

243.    As discussed above, therefore, Plaintiffs allege that Defendant unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Defect.

244.    Accordingly, Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

I.      **The Agency Relationship Between FCA US, LLC and its Network of Authorized Dealerships**

245.    In order to sell vehicles to the general public, Defendant enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Defendant-branded vehicles, the authorized dealerships are also permitted under these agreements with Defendant to service and repair these vehicles under the warranties Defendant provides directly to consumers who purchased new vehicles from the authorized dealerships.

246.    Accordingly, Defendant's authorized dealerships are Defendant's agents, and the consumers who purchase or lease Defendant vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Defendant vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

247.    Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

248.   Defendant issued the express warranty to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Monroney Stickers on Defendant-branded vehicles. Because Defendant issues the express warranty directly to the consumers, the consumers are in direct privity with Defendant with respect to the warranties

249.   In promoting, selling, and repairing its defective vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

a.   The authorized FCA US LLC dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, service bulletins, technical service bulletins ("TSBs"), STAR Case Reports, and other documents;

b.   Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

c.   The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d.   Defendant has provided training and partnered with various technical schools to provide FCA-specific training for technicians, so that dealerships are able to hire

technicians that have completed FCA-overseen certification course;

e.      Defendant dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

f.      Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Defendant's authorization;

g.      Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public; and

h.      Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

250.    Indeed, FCA's warranty booklets make it abundantly clear that FCA's authorized dealerships are FCA's agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "authorized dealerships."

251.    For example, at the outset, FCA notifies Plaintiffs and class members in the warranty booklet that "**Warranty service must be done by an authorized Chrysler, Dodge, Jeep or Ram dealer**" and that "**They know you and your vehicle best, and are most concerned that you get prompt and high quality service**." Further, the booklets states that "warranty problems can be resolved by your dealer's sales or service departments." The booklets direct Plaintiffs and Class Members, should they have a problem or concern, to "always talk to your

dealer's service manager or sales manager first." FCA then directs Plaintiffs and Class Members to first, "[d]iscuss your problem with the owner or general manager of the dealership," and if that is unsatisfactory to second, "contact the FCA US Customer Assistance Center." [20]

252.    FCA's Certified Pre-Owned vehicle program also relies on the authorized dealerships performing "a stringent certification process that guarantees only the finest late model vehicles get certified. Every vehicle that passes is then subjected to a comprehensive 125-point inspection and a thorough reconditioning process using Authentic Mopar Parts." The dealerships perform this certification process, signing the paperwork which then obligates FCA to provide a 100,000 mile, 7 year, whichever comes first, powertrain warranty to whomever purchases the vehicle.[21]   These factory-backed warranties are provided on the authorization of dealership personnel.

253.    Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Defendant or its agent dealerships to establish privity of contract between Defendant, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendant.

---

[20] *See e.g.*, Dodge Warranty Information- All Vehicles, https://www.dodge.com/warranty.html (last visited October 27, 2021)
[21] *See*, https://www.fcacertified.com/

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

### A. Fraudulent Concealment

254.    As previously described, any applicable statute(s) of limitations has been tolled by FCA's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the nature of the Defect prior to this class action litigation being commenced.

255.    FCA was and remains under the continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of the Class Vehicles, and it will require costly repairs, poses a safety concern, and diminished the resale value of the Class Vehicles. As a result of the active concealment by FCA, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

256.    FCA has known of the Defect in the Class Vehicles since at least 2013, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Defect, even when directly asked about it by Plaintiffs and Class members during communications with FCA, FCA Customer Assistance, FCA dealerships, and FCA service centers.  FCA continues to conceal the Defect to this day.

### B. Estoppel

257.    FCA was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles.  FCA actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles.  Plaintiffs and Class members reasonably relied upon FCA's knowing and affirmative representations and/or active concealment of these facts.  Based on the foregoing, FCA is estopped from relying on any statutes of limitation in defense of this action.

### C. Discovery Rule

258.     The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles suffered from the Defect.

259.     However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Defect caused their Engines and/or component parts failed.

260.     Even then, Plaintiffs and Class members had no reason to know that such failures, or the pre-failure symptoms described above, were caused by a defect in the Class Vehicles because of FCA's active concealment of the Defect.  Not only did FCA fail to notify Plaintiffs or Class members about the Defect, FCA, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it.

261.     Thus, Plaintiffs and Class members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing camshaft lobe and/or lifter failure in the Engines of their Vehicles.

## VI.     CLASS ALLEGATIONS

262.     Plaintiffs bring this action pursuant to Rule 23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and as the following proposed classes:

**Nationwide Class:**

All persons or entities in the United States (including its territories and the District of Columbia) that purchased or leased a Class Vehicle.

**California Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within California or that purchased or leased a Class Vehicle and reside in California.

**CLRA Sub-Class:**

All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

**Florida Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within Florida or that purchased or leased a Class Vehicle and reside in Florida.

**Georgia Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within Georgia or that purchased or leased a Class Vehicle and reside in Georgia.

**Illinois Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within Illinois or that purchased or leased a Class Vehicle and reside in Illinois.

**Massachusetts Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within Massachusetts or that purchased or leased a Class Vehicle and reside in Massachusetts.

**New Hampshire Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within New Hampshire or that purchased or leased a Class Vehicle and reside in New Hampshire.

**New York Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within New York or that purchased or leased a Class Vehicle and reside in New York.

**Pennsylvania Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within Pennsylvania or that purchased or leased a Class Vehicle and reside in Pennsylvania.

**Texas Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within Texas or that purchased or leased a Class Vehicle and reside in Texas.

263.    Excluded from the Class are Defendant; its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Defendant; Defendant's dealers; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

264.    Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

265.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

266.    **Numerosity**.  Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough that such joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from

information and records in FCA's possession, custody, and/or control as well as from records kept by the Department of Motor Vehicles.

267. **Commonality and Predominance**. Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to the following:

a. Whether Class Vehicles suffer from the Defect;

b. Whether FCA engaged in the conduct alleged herein;

c. Whether the Defect constituted an unreasonable safety risk;

d. Whether the Defect constitutes a material fact;

e. Whether FCA designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

f. Whether FCA designed, manufactured, marketed, and distributed Class Vehicles with the Defect;

g. Whether Defendant has a duty to disclose the defective nature of the 3.6L V6 Pentastar Engine to Plaintiffs and Class Members;

h. Whether Plaintiffs and Class members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

i. Whether Defendant should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective 3.6L V6 Pentastar Engine;

j. Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount;

k. Whether FCA's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

l. Whether FCA has been unjustly enriched under applicable state laws;

m.     Whether FCA has violated its express warranties to Plaintiffs and Class members;

n.     Whether Defendant breached the implied warranty or merchantability pursuant to the laws governing each of the Sub-Class jurisdictions;

o.     Whether FCA violated California's Consumers Legal Remedies Act;

p.     Whether FCA violated the Florida Deceptive and Unfair Trade Practices Act;

q.     Whether FCA violated Georgia's Fair Business Practices Act;

r.     Whether FCA violated Georgia's Uniform Deceptive Trade Practice Act;

s.     Whether FCA violated the Illinois Consumer Fraud Act;

t.     Whether FCA violated the Massachusetts Consumer Protection law;

u.     Whether FCA violated the New Hampshire Consumer Protection Act;

v.     Whether FCA violated New York General Business Law § 349;

w.     Whether FCA violated New York False Advertising Act;

x.     Whether FCA violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

y.     Whether FCA violated the Texas Deceptive Trade Practices Act – Consumer Protection Act;

z.     Whether FCA actively concealed the Defect in order to maximize profits to the detriment of Plaintiffs and Class members; and

aa.     Such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

268.    **Typicality**.  Plaintiffs' claims are typical of the claims of the Class and Sub-Classes in the Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by FCA, and equipped with the 3.6L Pentastar V6 Engine. The representative Plaintiffs, like all Class Members, have been damaged by FCA's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective 3.6L Pentastar

Engine.   Rule 23(a)(3) of the Federal Rules of Civil Procedure:  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above.  All claims seek recovery on the same legal theories and are based upon FCA's common course of conduct.

269.   **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

270.   **Declaratory Relief**.  Rule 23(b)(2) of the Federal Rules of Civil Procedure:  FCA has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

271.   **Superiority**.  Rule 23(b)(3) of the Federal Rules of Civil Procedure: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for Class members to individually seek redress for FCA's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CAUSES OF ACTION

### COUNT I
**Fraud by Omission or Fraudulent Concealment
(On behalf of the Nationwide Class, or in the Alternative,
on Behalf of all Sub-Classes against Defendant)**

272.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

273.    Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class, or in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

274.    FCA knew that the Class Vehicles suffered from an inherent Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

275.    Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

276.    Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

   a.   Defendant was in a superior position to know the true state of facts about the safety defect suffered by the Class Vehicles;

   b.   The omitted facts were material because they directly impact the safety of the Class Vehicles;

   c.   Defendant knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

   d.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

75

e.   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

277.   The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. A vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

278.   Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects suffered by the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of Defendant's defective Class Vehicles.

279.   Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

280.   As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the Defective Vehicles and recover damages.

281.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II
### Unjust Enrichment
### (On Behalf of the Class, or, in the Alternative, on Behalf of all Sub-Classes against Defendant)

282.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

283.    Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

284.    FCA has received and retained a benefit from Plaintiffs and all Class Members and inequity has resulted.

285.    FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

286.    As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, FCA charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to FCA's authorized distributors and dealers, which are in FCA's control.

287.    All Class members conferred a benefit on FCA.

288.    It is inequitable for FCA to retain these benefits.

Case 1:22-cv-00116-GBW   Document 34   Filed 05/18/22   Page 78 of 193 PageID #: 455

289.    Plaintiffs and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from FCA's conduct.

290.    FCA knowingly accepted the benefits of its unjust conduct.

291.    As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

292.    Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

293.    Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not suffer from the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

### COUNT III
**Violation of the Magnuson-Moss Warranty Act**
**(15 U.S.C. § 2301)**
**(On behalf of the Class, or in the Alternative,**
**on Behalf of all Sub-Classes against Defendant)**

294.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

295.    This claim is brought on behalf of Plaintiffs and the Class, or alternatively, on behalf of all Sub-Classes, against Defendant.

296.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

297.    FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

298.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

299.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

300.    Defendant's implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

301.    Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

302.    Defendant breached the implied warranty and the express warranty by virtue of the above-described acts.

303.    Plaintiffs and the other Class Members notified Defendant of the breach within a reasonable time and/or were not required to do so. FCA was also on notice of the Defect from, among other sources, the complaints and service requests it received from Class Members and its dealers.

304.    Defendant's breach of the implied warranty and express warranty deprived Plaintiff and Class Members of the benefits of their bargains.

305.     Because Plaintiffs and Class Members purchased their vehicles from an authorized FCA dealership, they are in privity with Defendant.  Plaintiffs and the members of the Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Plaintiffs and the members of the Class, on the other hand.  Furthermore, FCA provided warranties directly to Plaintiffs and the members of the Class and Plaintiffs and the members of the Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

306.     Nonetheless, privity is not required here because Plaintiffs and the members of the Class are the intended third-party beneficiaries of contracts between FCA and its dealerships. These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Plaintiffs and the members of the Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Plaintiffs and the members of the Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

307.     FCA breached these warranties, as described in more detail above. Without limitation, the Class Vehicles suffer from a Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they are manufactured with defective materials and/or with poor workmanship. Contrary to FCA's representations about its vehicles, the Class

Vehicles are defective in manufacture, materials and/or workmanship and are unsafe. The Class Vehicles share a common defect.

308.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, FCA has long been on notice of the claims of Plaintiffs and Class members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the defect.

309.    At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

310.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

311.    Plaintiffs provided notice to FCA of their intent to pursue class claims under the MMWA via letter dated September 16, 2021 and January 6, 2022.

312.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

313.     Plaintiffs, individually and on behalf of all members of the Class, seek all damages permitted by law, in an amount to be proven at trial.

**Claims on Behalf of the CLRA Sub-Class**

<u>COUNT IV</u>
**Violation of the California's Consumers Legal Remedies Act,**
**(California Civil Code § 1750, *et seq*.)**
**(On Behalf of the CLRA Sub-Class against Defendant)**

314.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

315.     Plaintiffs Etienne Maugain and John Kundrath ("California Plaintiffs") bring this cause of action on behalf of themselves and on behalf of the members of the CLRA Sub-Class.

316.     California Plaintiffs and the CLRA Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

317.     FCA is a "person" as that term is defined in California Civil Code § 1761(c).

318.     The purchase and leases of Class Vehicles by California Plaintiffs and the CLRA Sub-Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e)

319.     The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code § 1761(a) and (b).

320.     By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their Engines had characteristics and benefits that they do not have, and

represented that the Class Vehicles and their Engine were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§1770(a)(5) & (7).

321.   FCA knew that the Class Vehicles and their Engines suffered from an inherent defect, were defective and were not suitable for their intended use.

322.   FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

323.   FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

324.   FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

325.   As a result of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including California Plaintiff, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, California Plaintiffs and the CLRA Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' Engine and its components are substantially certain to fail before their expected useful life has run.

326.   Defendant was under a duty to California Plaintiffs and the CLRA Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b. Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c. Defendant actively concealed the defective nature of the Class Vehicles from California Plaintiffs and the CLRA Sub-Class Members at the time of sale and thereafter.

327. By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

328. The facts concealed or not disclosed by Defendant to California Plaintiffs and the CLRA Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had California Plaintiffs and the CLRA Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

329. California Plaintiffs and the CLRA Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

330. As a result of Defendant's misconduct, California Plaintiffs and the CLRA Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

331.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, California Plaintiffs and the CLRA Sub-Class Members have suffered and will continue to suffer actual damages.

332.    FCA's violations present a continuing risk to California Plaintiffs and the CLRA Sub-Class Members as well as to the general public.   FCA's unlawful acts and practices complained of herein affect the public interest.

333.    California Plaintiffs and the CLRA Sub-Class members are entitled to equitable relief.

334.    California Plaintiffs and the CLRA Sub-Class seek to recover an order enjoining FCA's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

335.    In accordance with section 1782(a) of the CLRA, Plaintiff Maugain and Kundrath's counsel, via letters dated January 6, 2022 and May 5, 2022, provided FCA with notice of its alleged violation of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by California Plaintiffs and CLRA Sub-Class Members, and demanded that FCA, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs.   FCA failed to correct the actions describe herein, to reimburse associated out-of-pocket costs, provide appropriate relief for its violation of the CLRA, or otherwise remedy the harm alleged.   Accordingly, California Plaintiffs seek monetary, compensatory, and punitive damages, in addition to injunctive and equitable relief.

**Claims on Behalf of the California Sub-Class**

<u>COUNT V</u>
**Breach of Express Warranty**
**(Cal. Com. Code §§ 2313 and 10210)**
**(On Behalf of the California Sub-Class against Defendant)**

336.   Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 261 as if fully set forth herein.

337.   California Plaintiffs bring this count on behalf of themselves and the California Sub-Class against Defendant.

338.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

339.   With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

340.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

341.   The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

342.   Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under California state law.

343.   FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

344.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

345.    The Warranty formed the basis of the bargain that was reached when California Plaintiffs and other members of the California Sub-Class purchased or leased their Class Vehicles.

346.    FCA breached the express warranty through the acts and omissions described above.

347.    Further, California Plaintiffs and members of the California Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform California Plaintiffs and members of the California Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

348.    FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

349.    California Plaintiffs and members of the Class have had sufficient direct dealing with either FCA or its agents (i.e., dealerships and technical support) to establish privity of contract between FCA, on one hand, and California Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because California Plaintiffs and each of the other Class Members are the intended third-party beneficiaries of contracts between FCA and its distributors and dealers, and specifically, of FCA's express warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty

agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

350.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect California Plaintiffs and the members of the California Sub-Class.  Among other things, California Plaintiffs and members of the California Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonably favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

351.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make California Plaintiffs and the members of the California Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

352.    California Plaintiffs were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

353.    Nonetheless, California Plaintiffs provided notice to FCA of the breach of express warranties when he repeatedly took his vehicle to an authorized FCA dealership and requested warranty repairs.  California Plaintiffs further provided notice by letter on January 6, 2022 and May 5, 2022.

354.    As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, California Plaintiffs and California Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

355.    As a result of FCA's breach of the express warranty, California Plaintiffs and California Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

### COUNT VI
**Breach of the Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act**
**(California Civil Code §§ 1792 and 1791.1, *et seq.*)**
**(On Behalf of the California Sub-Class against Defendant)**

356.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 as if fully set forth herein.

357.    California Plaintiffs bring this count on behalf of themselves and the California Sub-Class against Defendant.

358.    FCA's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

359.    FCA is a manufacturer within the meaning of Cal. Civ. Code § 1791(j), a distributor within the meaning of Cal. Civ. Code § 1791(e), and a lessor within the meaning of Cal. Civ. Code § 1791(i).

360.    California Plaintiffs and California Sub-Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

361.    FCA impliedly warranted to California Plaintiffs and California Sub-Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791(a) and 1792.

362.    FCA impliedly warranted to Plaintiffs and Class Members that it would repair or replace any defective products, including the Engine.

363.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom California Plaintiffs and members of the California Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to California Plaintiffs and members of the California Sub-Class, with no modification to the defective Class Vehicles.

364.    The Defect is latent and was present at the time of the sale/lease of Class vehicles. The propensity of the Defect to cause the rocker arms and related components, such as the lifters, to prematurely fail so that they do not adequately and timely transfer the motion of the cam lobes to open and close the valves, renders the Class Vehicles to not be of the quality that a buyer or lease would reasonable expect, and therefore not merchantable.

365. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiffs and California Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

366. In violation of Cal. Civ. Code § 1791(a), FCA breached its implied warranty by selling/leasing defective Class Vehicles and refusing to permanently replace and/or repair the defective Engines.

367. California Plaintiffs and members of the California Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

368. The Defect has deprived California Plaintiffs and California Sub-Class Members of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

369. California Plaintiffs and members of the California Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from California Plaintiffs and the Class Members and through other internal sources.

370. Nonetheless, California Plaintiffs provided notice to FCA of the breach of implied warranties when he repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs. California Plaintiffs also provided notice by letter dated January 6, 2022 and May 5, 2022.

Case 1:22-cv-00116-GBW  Document 34  Filed 05/18/22  Page 92 of 193 PageID #: 469

371.    Any attempt by FCA to limit or disclaim the implied warranties in a manner that would exclude coverage of the Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

372.    As a result of FCA's breach of its implied warranties, California Plaintiffs and California Sub-Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

**COUNT VII**
**Violation of the California Business & Professions Code § 17200, *et seq*.)**
**(On Behalf of the California Sub-Class against Defendant)**

373.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

374.    California Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the California Sub-Class.

375.    California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." FCA engaged in conduct that violated each of this statute's three prongs.

376.    As a result of their reliance on Defendant's omissions, owners and/or lessees of the Class Vehicles, including California Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, California Plaintiffs and the California Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' Engine and its components are substantially certain to fail before their expected useful life has run.

377.     California Plaintiffs and the California Sub-Class members are reasonable consumers who do not expect their engine to exhibit problems in its valve train, specifically the rocker arms and related components, such as the lifters, which cause those components to prematurely fail.

378.     Defendant knew the Class Vehicles and their Engines were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

379.     In failing to disclose the Piston Defect, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

380.     Defendant was under a duty to California Plaintiffs and the California Sub-Class Members to disclose the defective nature of the Class Vehicles because:

     d.  Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

     e.  Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

     f.  Defendant actively concealed the defective nature of the Class Vehicles from California Plaintiffs and the Califoria Sub-Class Members at the time of sale and thereafter.

381.      By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

382.     The facts concealed or not disclosed by Defendant to California Plaintiffs and the California Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles,

or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had California Plaintiffs and the California Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

383.   Defendant continued to conceal the defective nature of the Class Vehicles and their Engine even after California Plaintiffs and the other California Sub-Class members began to report problems.

384.   Defendant's conduct was and is likely to deceive consumers.

385.   FCA's acts, conduct, and practices were unlawful, in that they constituted:

      a.   Violations of California's Consumers Legal Remedies Act;

      b.   Violations of the Song-Beverly Consumer Warranty Act, including California Civil Code §§ 1792 and 1791.1.; and

      c.   Violations of the Magnuson-Moss Warranty Act.

386.   By their conduct, FCA has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

387.   FCA's unfair or deceptive acts or practices occurred repeatedly in FCA's trade or business and were capable of deceiving a substantial portion of the purchasing public.

388.   As a direct and proximate result of FCA's unfair and deceptive practices, California Plaintiffs and the other California Sub-Class members have suffered and will continue to suffer actual damages.

389.    California Plaintiffs and the other California Sub-Class members will be unable to reply on the advertising and labeling of Class Vehicles in the future, and so will not purchase the Class Vehicles although they would like to.

390.    FCA has been unjustly enriched and should be required to make restitution to California Plaintiffs and the other California Sub-Class members pursuant to §§ 17203 and 17204 of the Business & Professions Code.

**Claims on Behalf of the Florida Sub-Class**

**COUNT VIII**
**Breach of Express Warranty**
**F.S.A. §§ 672.313 AND 680.21**
**(On Behalf of the Florida Sub-Class against Defendant)**

391.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 261 as if fully set forth herein.

392.    Plaintiff Louise Shumates ("Florida Plaintiff") brings this count on behalf of herself and the Florida Sub-Class against Defendant.

393.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

394.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

395.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

396.    The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

397. Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under Florida state law.

398. FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

399. According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

400. The Warranty formed the basis of the bargain that was reached when Florida Plaintiff and other members of the Florida Sub-Class purchased or leased their Class Vehicles.

401. FCA breached the express warranty through the acts and omissions described above.

402. Further, Florida Plaintiff and members of the Florida Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Florida Plaintiff and members of the Florida Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

403. FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

404.     Because Florida Plaintiff purchased his vehicle from an authorized FCA dealership, she is in privity with Defendant.  Florida Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Florida Plaintiff and the members of the Florida Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Florida Plaintiff and the members of the Florida Sub-Class and Florida Plaintiff and the members of the Florida Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

405.     Nonetheless, privity is not required here because Florida Plaintiff and the members of the Florida Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Florida Plaintiff and the members of the Florida Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Florida Plaintiff and the members of the FCA Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

406.     Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Florida Plaintiff and the members of the Florida Sub-Class.  Among other things, Florida Plaintiff and

members of the Florida Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

407.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Florida Plaintiff and the members of the Florida Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

408.    Florida Plaintiff was not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

409.    Nonetheless, Florida Plaintiff provided notice to FCA of the breach of express warranties when she repeatedly took her vehicle to an authorized FCA dealership and requested warranty repairs.

410.    As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Florida Plaintiff and Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

411.    As a result of FCA's breach of the express warranty, Florida Plaintiff and Florida Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT IX**
**Breach of the Implied Warranty of Merchantability**
**F.S.A. §§ 672.314 AND 680.212**
**(On Behalf of the Florida Sub-Class against Defendant)**

412.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 as if fully set forth herein.

413.    Florida Plaintiff brings this count on behalf of herself and the Florida Sub-Class against Defendant.

414.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

415.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

416.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

417.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

418.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Florida Plaintiff and members of the Florida Sub-Class

bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiff and members of the Florida Sub-Class, with no modification to the defective Class Vehicles.

419.    FCA provided Florida Plaintiff and members of the Florida Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

420.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

421.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Florida Plaintiff and Florida Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

422.    As a result of FCA's breach of the applicable implied warranties, Florida Plaintiff and members of the Florida Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Florida Plaintiff and members of the Florida Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

423.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

424.    Florida Plaintiff and members of the Florida Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

425.    Florida Plaintiff and members of the Florida Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Florida Plaintiff and the Class Members and through other internal sources.

426.    Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs.

427.    Because Florida Plaintiff purchased her vehicle from an authorized FCA dealership, she is in privity with Defendant.  Florida Plaintiff and the members of the Florida Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Florida Plaintiff and the members of the Florida Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Florida Plaintiff and the members of the Florida Sub-Class and Florida Plaintiff and the members of the Florida Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their

vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

428.     Nonetheless, privity is not required here because Florida Plaintiff and the members of the Florida Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA vehicles, as well as service and perform warranty repairs on FCA's behalf.  Florida Plaintiff and the members of the Florida Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Florida Plaintiff and the members of the Florida Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

429.     As a direct and proximate cause of FCA's breach, Florida Plaintiff and members of the Florida Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiff and members of the Florida Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

430.     As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Florida Plaintiff and members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

### COUNT X
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**F.S.A. §§ 501.201-.213**
**(On Behalf of the Florida Sub-Class against Defendant)**

431.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

432.     Florida Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Florida Sub-Class.

433.     Florida Plaintiff and the Florida Sub-Class members are "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

434.     FCA's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq*., Florida Statutes ("FDUTPA").  FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the FDUTPA.

435.     FCA's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

436.     FCA participated in unfair or deceptive trade practices that violated the FDUTPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

437.     FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

438. FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

439. FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

440. FCA knew or should have known that its conduct violated the FDUTPA.

441. Defendant was under a duty to Florida Plaintiff and the Florida Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a. Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b. Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c. Defendant actively concealed the defective nature of the Class Vehicles from Florida Plaintiff and the Florida Sub-Class Members at the time of sale and thereafter.

442. By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

443. The facts concealed or not disclosed by Defendant to Florida Plaintiff and the Florida Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can

cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had Florida Plaintiff and the Florida Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

444.    Florida Plaintiff and the Florida Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

445.    As a result of Defendant's misconduct, Florida Plaintiff and the Florida Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

446.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Florida Plaintiff and the Florida Sub-Class Members have suffered and will continue to suffer actual damages.

447.    FCA's violations present a continuing risk to Florida Plaintiff and the Florida Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

448.    The foregoing acts, omissions, and practices proximately caused Florida Plaintiff and the Florida Sub-Class Members to suffer real damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution of value of the vehicles, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees, and costs of suit.

**Claims on Behalf of the Georgia Sub-Class**

<u>**COUNT XI**</u>
**Breach of Express Warranty**
**Ga. Code Ann. §§ 11-2-313 and 11-2A-210**
**(On Behalf of the Georgia Sub-Class against Defendant)**

449.     Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 261 as if fully set forth herein.

450.     Plaintiff Richard Archer ("Georgia Plaintiff") brings this count on behalf of himself and the Georgia Sub-Class against Defendant.

451.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

452.     With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

453.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

454.     The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

455.     Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under Georgia state law.

456.     FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

457.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

458.    The Warranty formed the basis of the bargain that was reached when Georgia Plaintiff and other members of the Georgia Sub-Class purchased or leased their Class Vehicles.

459.    FCA breached the express warranty through the acts and omissions described above.

460.    Further, Georgia Plaintiff and members of the Georgia Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Georgia Plaintiff and members of the Georgia Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

461.    FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

462.    Because Georgia Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Georgia Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Georgia Plaintiff and the members of the Georgia Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Georgia Plaintiff and the members of the Georgia Sub-Class and Georgia Plaintiff and the members of the Georgia Sub-Class are the intended beneficiaries of FCA's

express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

463.     Nonetheless, privity is not required here because Georgia Plaintiff and the members of the Georgia Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Georgia Plaintiff and the members of the Georgia Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Georgia Plaintiff and the members of the FCA Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

464.     Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Georgia Plaintiff and the members of the Georgia Sub-Class.  Among other things, Georgia Plaintiff and members of the Georgia Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

465.     Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to

make Georgia Plaintiff and the members of the Georgia Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

466. Georgia Plaintiff was not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

467. Nonetheless, Georgia Plaintiff provided notice to FCA of the breach of express warranties when he repeatedly took his vehicle to an authorized FCA dealership and requested warranty repairs. Georgia Plaintiff also provided notice to FCA of its breach of express warranty by letter dated April 6, 2022.

468. As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Georgia Plaintiff and Georgia Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

469. As a result of FCA's breach of the express warranty, Georgia Plaintiff and Georgia Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT XII**
**Breach of the Implied Warranty of Merchantability**
**Ga. Code Ann. § 11-2-314 and 11-2A-212**
**(On Behalf of the Georgia Sub-Class against Defendant)**

470.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 as if fully set forth herein.

471.    Georgia Plaintiff brings this count on behalf of himself and the Georgia Sub-Class against Defendant.

472.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

473.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

474.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

475.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

476.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Georgia Plaintiff and members of the Georgia Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Georgia Plaintiff and members of the Georgia Sub-Class, with no modification to the defective Class Vehicles.

477.    FCA provided Georgia Plaintiff and members of the Georgia Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

478.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

479.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Georgia Plaintiff and Georgia Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

480.    As a result of FCA's breach of the applicable implied warranties, Georgia Plaintiff and members of the Georgia Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Georgia Plaintiff and members of the Georgia Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

481.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

482.    Georgia Plaintiff and members of the Georgia Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

483.    Georgia Plaintiff and members of the Georgia Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Georgia Plaintiff and the Class Members and through other internal sources.

484.    Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs. Georgia Plaintiff also provided notice to FCA of its breach of express warranty by letter dated April 6, 2022.

485.    Because Georgia Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Georgia Plaintiff and the members of the Georgia Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Georgia Plaintiff and the members of the Georgia Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Georgia Plaintiff and the members of the Georgia Sub-Class and Georgia Plaintiff and the members of the Georgia Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

486.    Nonetheless, privity is not required here because Georgia Plaintiff and the members of the Georgia Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA vehicles, as well as

service and perform warranty repairs on FCA's behalf.  Georgia Plaintiff and the members of the Georgia Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Georgia Plaintiff and the members of the Georgia Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

487.    As a direct and proximate cause of FCA's breach, Georgia Plaintiff and members of the Georgia Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Georgia Plaintiff and members of the Georgia Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

488.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Georgia Plaintiff and members of the Georgia Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XIII
### Violation of Georgia's Fair Business Practices Act,
### Ga. Code Ann. § 10-1-390, *et seq*.
### (On Behalf of the Georgia Sub-Class against Defendant)

489.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

490.    Georgia Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Georgia Sub-Class.

491.    Georgia's Fair Business Practices Act ("GFBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful.  Ga. Code Ann. § 10-1-393(a).

492.    Unfair or deceptive acts or practices are defined to include, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and [a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-393(b).  FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the GFBPA.

493.    FCA participated in unfair or deceptive trade practices that violated the GFBPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

494.    FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

495.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

496.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

497. FCA knew or should have known that its conduct violated the GFBPA.

498. Defendant was under a duty to Georgia Plaintiff and the Georgia Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a. Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b. Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c. Defendant actively concealed the defective nature of the Class Vehicles from Georgia Plaintiff and the Georgia Sub-Class Members at the time of sale and thereafter.

499. By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

500. The facts concealed or not disclosed by Defendant to Georgia Plaintiff and the Georgia Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had Georgia Plaintiff and the Georgia Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

501.    Georgia Plaintiff and the Georgia Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

502.    As a result of Defendant's misconduct, Georgia Plaintiff and the Georgia Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

503.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Georgia Plaintiff and the Georgia Sub-Class Members have suffered and will continue to suffer actual damages.

504.    FCA's violations present a continuing risk to Georgia Plaintiff and the Georgia Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

505.    Pursuant to statute, Georgia Plaintiff provided notice of his claim by letter dated April 6, 2022.  Georgia Plaintiff and members of the Georgia Sub-Class seek all damages and relief to which they are entitled to because FCA failed to remedy its unlawful conduct within the requisite time period.

506.    Georgia Plaintiff and members of the Georgia Sub-Class seek monetary relief against Defendant in the amount of damages, exemplary damages for intentional violations, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-399(a).

**COUNT XIV**
**Violation of Georgia's Uniform Deceptive Trade Practices Act,**
**Ga. Code Ann. § 10-1-370, *et seq*.**
**(On Behalf of the Georgia Sub-Class against Defendant)**

507.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

508.    Georgia Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Georgia Sub-Class.

509.    The Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") prohibits "deceptive trade practices,' which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a).  FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the GUDTPA.

510.    Defendant, Georgia Plaintiff, and the members of the Georgia Sub-Class are "persons" within the meaning of the GUDTPA, GA. Code Ann. § 10-1-471(5).

511.    FCA participated in unfair or deceptive trade practices that violated the GUDTPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

512.    FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

513.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

514.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

515.    FCA knew or should have known that its conduct violated the GUDTPA.

516.    Defendant was under a duty to Georgia Plaintiff and the Georgia Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      c.    Defendant actively concealed the defective nature of the Class Vehicles from Georgia Plaintiff and the Georgia Sub-Class Members at the time of sale and thereafter.

517.    By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

518.    The facts concealed or not disclosed by Defendant to Georgia Plaintiff and the Georgia Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause

the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had Georgia Plaintiff and the Georgia Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

519.    Georgia Plaintiff and the Georgia Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

520.    As a result of Defendant's misconduct, Georgia Plaintiff and the Georgia Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

521.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Georgia Plaintiff and the Georgia Sub-Class Members have suffered and will continue to suffer actual damages.

522.    FCA's violations present a continuing risk to Georgia Plaintiff and the Georgia Sub-Class Members as well as to the general public.   FCA's unlawful acts and practices complained of herein affect the public interest.

523.    Pursuant to statute, Georgia Plaintiff provided notice of his claim by letter dated April 6, 2022.  Georgia Plaintiff and members of the Georgia Sub-Class seek all damages and relief to which they are entitled to because FCA failed to remedy its unlawful conduct within the requisite time period.

524.    Georgia Plaintiff and members of the Georgia Sub-Class seek monetary relief against Defendant in the amount of damages, exemplary damages for intentional violations,

injunctive relief, attorneys' fees, and any other just and proper relief available Ga. Code Ann. § 10-1-373.

**Claims on Behalf of the Illinois Sub-Class**

**COUNT XV**
**Breach of Express Warranty**
**810 Ill. Comp. Stat. §§ 5/2-313 AND 5/2A-210**
**(On Behalf of the Illinois Sub-Class against Defendant)**

525.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 261 as if fully set forth herein.

526.    Plaintiff Denise Hunter ("Illinois Plaintiff") brings this count on behalf of herself and the Illinois Sub-Class against Defendant.

527.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

528.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

529.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

530.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

531.    The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

532.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under Illinois state law.

533.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

534.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

535.    The Warranty formed the basis of the bargain that was reached when Illinois Plaintiff and other members of the Illinois Sub-Class purchased or leased their Class Vehicles.

536.    FCA breached the express warranty through the acts and omissions described above.

537.    Further, Illinois Plaintiff and members of the Illinois Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Illinois Plaintiff and members of the Illinois Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

538.    FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

539.     Because Illinois Plaintiff purchased her vehicle from an authorized FCA dealership, she is in privity with Defendant.  Illinois Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Illinois Plaintiff and the members of the Illinois Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Illinois Plaintiff and the members of the Illinois Sub-Class and Illinois Plaintiff and the members of the Illinois Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

540.     Nonetheless, privity is not required here because Illinois Plaintiff and the members of the Illinois Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Illinois Plaintiff and the members of the Illinois Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Illinois Plaintiff and the members of the Illinois Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

541.     Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Illinois Plaintiff and the members of the Illinois Sub-Class.  Among other things, Illinois Plaintiff

and members of the Illinois Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

542.     Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Illinois Plaintiff and the members of the Illinois Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

543.     Illinois Plaintiff was not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

544.     Nonetheless, Illinois Plaintiff provided notice to FCA of the breach of express warranties when she repeatedly took her vehicle to an authorized FCA dealership and requested warranty repairs.  Illinois Plaintiff also provided notice by letter dated January 6, 2022.

545.     As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Illinois Plaintiff and Illinois Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

546.     As a result of FCA's breach of the express warranty, Illinois Plaintiff and Illinois Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XVI
### Breach of the Implied Warranty of Merchantability
### 810 Ill. Comp. Stat. §§ 5/2-314 AND 5/2A-212
### (On Behalf of the Illinois Sub-Class against Defendant)

547.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 as if fully set forth herein.

548.     Illinois Plaintiff brings this count on behalf of herself and the Illinois Sub-Class against Defendant.

549.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

550.     With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

551.     The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

552.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

553.     FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Illinois Plaintiff and members of the Illinois Sub-Class

bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiff and members of the Illinois Sub-Class, with no modification to the defective Class Vehicles.

554.    FCA provided Illinois Plaintiff and members of the Illinois Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

555.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

556.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Illinois Plaintiff and Illinois Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

557.    As a result of FCA's breach of the applicable implied warranties, Illinois Plaintiff and members of the Illinois Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Illinois Plaintiff and members of the Illinois Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

558.   FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

559.   Because Illinois Plaintiff purchased her vehicle from an authorized FCA dealership, she is in privity with Defendant.  Illinois Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Illinois Plaintiff and the members of the Illinois Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Illinois Plaintiff and the members of the Illinois Sub-Class and Illinois Plaintiff and the members of the Illinois Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

560.   Nonetheless, privity is not required here because Illinois Plaintiff and the members of the Illinois Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Illinois Plaintiff and the members of the Illinois Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Illinois Plaintiff and the members of the Illinois Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

561.   Illinois Plaintiff and members of the Illinois Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

562.   Illinois Plaintiff and members of the Illinois Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Illinois Plaintiff and the Class Members and through other internal sources.

563.   Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs.  Illinois Plaintiff also provided notice by letter dated January 6, 2022.

564.   As a direct and proximate cause of FCA's breach, Illinois Plaintiff and members of the Illinois Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and members of the Illinois Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

565.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Illinois Plaintiff and members of the Illinois Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XVII
**Violation of the Illinois Consumer Fraud And Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq*.**
**(On Behalf of the Illinois Sub-Class against Defendant)**

566.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

567.     Illinois Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Illinois Sub-Class.

568.     Illinois Plaintiff and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

569.     Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

570.     The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Illinois CFA.

571.     FCA participated in unfair or deceptive trade practices that violated the Illinois CFA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease

128

of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

572.     FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

573.     FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

574.     FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

575.     FCA knew or should have known that its conduct violated the Illinois CFA.

576.     Defendant was under a duty to Illinois Plaintiff and the Illinois Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

    c.   Defendant actively concealed the defective nature of the Class Vehicles from Illinois Plaintiff and the Illinois Sub-Class Members at the time of sale and thereafter.

577.     By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

578.     The facts concealed or not disclosed by Defendant to Illinois Plaintiff and the Illinois Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had Illinois Plaintiff and the Illinois Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

579.     Illinois Plaintiff and the Illinois Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

580.     Illinois Plaintiff provided notice of her claims and intention to represent a class of similarly situated consumers on January 6, 2022.

581.     As a result of Defendant's misconduct, Illinois Plaintiff and the Illinois Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

582.     As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Illinois Plaintiff and the Illinois Sub-Class Members have suffered and will continue to suffer actual damages

583.     FCA's violations present a continuing risk to Illinois Plaintiff and the Illinois Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

584.     Pursuant to 815 ILCS 505/10a(a), Illinois Plaintiff and the Illinois Sub-Class Members seek monetary relief against FCA in the amount of actual damages, as well as punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

585.     Illinois Plaintiff and the Illinois Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq*.

**Claims on Behalf of the Massachusetts Sub-Class**

**COUNT XVIII**
**Breach of Express Warranty**
**Mass. Gen. Laws Ann. ch. 106, §§ 2-313 and 2A-210**
**(On Behalf of the Massachusetts Sub-Class against FCA)**

586.     Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 261 as if fully set forth herein.

587.     Plaintiff Harry Reichlen ("Massachusetts Plaintiff") brings this count on behalf of himself and the Massachusetts Sub-Class against FCA.

588.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106 § 2-104(1), and a "seller" of motor vehicles under Mass. Gen. Laws ch. 106 § 2-103(1)(d).

589.     With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Mass. Gen. Laws ch. 106 § 2A-103(1)(p).

590.     Massachusetts Plaintiff and members of the Massachusetts Sub-Class are and were at all relevant times "buyers" of the Class Vehicles under Mass. Gen. Laws ch. 106 §2- 103(1)(a).

591.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

592.    The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

593.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under Massachusetts state law.

594.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

595.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

596.    The warranty formed the basis of the bargain that was reached when Massachusetts Plaintiff and other members of the Massachusetts Sub-Class purchased or leased their Class Vehicles.

597.    FCA breached the express warranty through the acts and omissions described above.

598.    Further, Massachusetts Plaintiff and members of the Massachusetts Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Massachusetts Plaintiff and members of the Massachusetts Sub-Class that the Class Vehicles were equipped with defective engines and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

599.     Because Massachusetts Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Massachusetts Plaintiff and the members of the Massachusetts Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Massachusetts Plaintiff and the members of the Massachusetts Sub-Class, on the other hand. Furthermore, FCA provided warranties directly to Massachusetts Plaintiff and the members of the Massachusetts Sub-Class and Massachusetts Plaintiff and the members of the Massachusetts Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

600.     Nonetheless, privity is not required here because Massachusetts Plaintiff and the members of the Massachusetts Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Massachusetts Plaintiff and the members of the Massachusetts Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Massachusetts Plaintiff and the members of the Massachusetts Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

601.     Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing

consumers about the Defect.  The time limits are unconscionable and inadequate to protect Massachusetts Plaintiff and the members of the Massachusetts Sub-Class.  Among other things, Massachusetts Plaintiff and members of the Massachusetts Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

602.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Massachusetts Plaintiff and the members of the Massachusetts Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

603.    Massachusetts Plaintiff was not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

604.    Nonetheless, Massachusetts Plaintiff provided notice to FCA of the breach of express warranties when he repeatedly took his vehicle to an authorized FCA dealership and requested warranty repairs.  Further, Massachusetts Plaintiff provided written notice by letter dated September 16, 2021.

605.    As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money,

property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Massachusetts Plaintiff and Massachusetts Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

606.    As a result of FCA's breach of the express warranty, Massachusetts Plaintiff and Massachusetts Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XIX
### Breach of the Implied Warranty of Merchantability
### Mass. Gen. Laws Ann. ch. 106, §§ 2-314 and 2A-212
### (On Behalf of the Massachusetts Sub-Class against Defendant)

607.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 as if fully set forth herein.

608.    Massachusetts Plaintiff brings this count on behalf of himself and the Massachusetts Sub-Class against Defendant.

609.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mass. Gen. Laws ch. 106 § 2-104(1), and "sellers" of motor vehicles under Mass. Gen. Laws ch. 106 § 2-103(1)(d).

610.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Mass. Gen. Laws ch. 106 § 2A-103(1)(p).

611.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§2-105(1) and 2A-103(1)(h).

612. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mass. Gen. Laws ch. 106 §§2-314 and 2A-212.

613. FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Massachusetts Plaintiff and members of the Massachusetts Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Massachusetts Plaintiff and members of the Massachusetts Sub-Class, with no modification to the defective Class Vehicles.

614. FCA provided Massachusetts Plaintiff and members of the Massachusetts Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

615. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

616. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Massachusetts Plaintiff and Massachusetts Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

617.    As a result of FCA's breach of the applicable implied warranties, Massachusetts Plaintiff and members of the Massachusetts Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Massachusetts Plaintiff and members of the Massachusetts Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

618.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

619.    Massachusetts Plaintiff and members of the Massachusetts Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

620.    Because Massachusetts Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Massachusetts Plaintiff and the members of the Massachusetts Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Massachusetts Plaintiff and the members of the Massachusetts Sub-Class, on the other hand. Furthermore, FCA provided warranties directly to Massachusetts Plaintiff and the members of the Massachusetts Sub-Class and Massachusetts Plaintiff and the members of the Massachusetts Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

621.     Nonetheless, privity is not required here because Massachusetts Plaintiff and the members of the Massachusetts Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Massachusetts Plaintiff and the members of the Massachusetts Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Massachusetts Plaintiff and the members of the Massachusetts Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

622.     Massachusetts Plaintiff and members of the Massachusetts Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Massachusetts Plaintiff and the Class Members and through other internal sources.

623.     Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs.  Further, Massachusetts Plaintiff provided written notice by letter dated September 16, 2021.

624.     As a direct and proximate cause of FCA's breach, Massachusetts Plaintiff and members of the Massachusetts Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Massachusetts Plaintiff and members of the Massachusetts Sub-Class

have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

625.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Massachusetts Plaintiff and members of the Massachusetts Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XX**
**Violation of the Massachusetts Consumer Protection Law**
**Mass. Gen. Laws Ch. 93a**
**(On Behalf of the Massachusetts Sub-Class against Defendant)**

626.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

627.    Massachusetts Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Massachusetts Sub-Class.

628.    FCA, Massachusetts Plaintiff, and members of the Massachusetts Sub-Class are "persons" within the meaning of the Mass. Gen. Laws 93A, § 1(a).

629.    FCA engaged in "trade" or "commerce" within the meaning Mass. Gen. Laws 93A, § 1(b).

630.    Massachusetts's Consumer Protection Law prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws 93A, § 2(a).  FCA's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the Massachusetts Consumer Protection Law.  FCA engaged in unlawful deceptive act and/or practices that violated the Massachusetts Consumer Protection Law.

631.    FCA participated in unfair or deceptive practices that violated the Massachusetts Consumer Protection Law.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-

engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

632.    FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

633.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

634.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

635.    FCA knew or should have known that its conduct violated the Massachusetts Consumer Protection Law.

636.    Defendant was under a duty to Massachusetts Plaintiff and the Massachusetts Sub-Class Members to disclose the defective nature of the Class Vehicles because:

  a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

  b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

     c.  Defendant actively concealed the defective nature of the Class Vehicles from Massachusetts Plaintiff and the Massachusetts Sub-Class Members at the time of sale and thereafter.

637.   By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

638.   The facts concealed or not disclosed by Defendant to Massachusetts Plaintiff and the Massachusetts Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had Massachusetts Plaintiff and the Massachusetts Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

639.   Massachusetts Plaintiff and the Massachusetts Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

640.   As a result of Defendant's misconduct, Massachusetts Plaintiff and the Massachusetts Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

641.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Massachusetts Plaintiff and the Massachusetts Sub-Class Members have suffered and will continue to suffer actual damages.

642.    FCA's violations present a continuing risk to Massachusetts Plaintiff and the Massachusetts Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

643.    Pursuant to Mass. Gen. Laws 93A, § 9, Massachusetts Plaintiff and members of the Massachusetts Sub-Class seek monetary relief against FCA measures as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for Massachusetts Plaintiff and each member of the Massachusetts Sub-Class. Because Defendant's conduct was committed willfully and knowingly, Massachusetts Plaintiff and members of the Massachusetts Sub-Class are entitled to recover, for Massachusetts Plaintiff and each Massachusetts Sub-Class member, up to three times actual damages, but no less than two times actual damages, and any other just and proper relief available under Mass. Gen. Laws Ch. 93A.

644.    In accordance with Mass. Gen. Laws Ch. 93A, § 9(3), Massachusetts Plaintiff has provided Defendant with the appropriate notice and demand by letter dated September 16, 2021, but Defendant has denied the existence of a defect and refused to provide any relief to Massachusetts Plaintiff and members of the Massachusetts Sub-Class.

**Claims on Behalf of the New Hampshire Sub-Class**

<u>COUNT XXI</u>
**Breach of Express Warranty**
**N.H. Rev. Stat. Ann. §§ 382-A:2-313 and 382-A:2A-210**
**(On Behalf of the New Hampshire Sub-Class against Defendant)**

645.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 261 as if fully set forth herein.

646.    Plaintiff Stephen Dreikosen ("New Hampshire Plaintiff") brings this count on behalf of himself and the New Hampshire Sub-Class against Defendant.

647.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2-104(1), and a "seller" of motor vehicles under 382-A:2-103(1)(d).

648.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2A-103(1)(p).

649.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. Ann. §§ 382-A:2-105(1) and 2A-103(1)(h).

650.    The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

651.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under New Hampshire state law.

652.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

143

653.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

654.    The Warranty formed the basis of the bargain that was reached when New Hampshire Plaintiff and other members of the New Hampshire Sub-Class purchased or leased their Class Vehicles.

655.    FCA breached the express warranty through the acts and omissions described above.

656.    Further, New Hampshire Plaintiff and members of the New Hampshire Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform New Hampshire Plaintiff and members of the New Hampshire Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

657.    FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

658.    Because New Hampshire Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  New Hampshire Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and New Hampshire Plaintiff and the members of the New Hampshire Sub-Class, on the other hand. Furthermore, FCA provided warranties directly to New Hampshire Plaintiff and the members of

the New Hampshire Sub-Class and New Hampshire Plaintiff and the members of the New Hampshire Sub-Class are the intended beneficiaries of FCA's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

659.    Nonetheless, privity is not required here because New Hampshire Plaintiff and the members of the New Hampshire Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships. These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf. New Hampshire Plaintiff and the members of the New Hampshire Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships. New Hampshire Plaintiff and the members of the FCA Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

660.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate to protect New Hampshire Plaintiff and the members of the New Hampshire Sub-Class. Among other things, New Hampshire Plaintiff and members of the New Hampshire Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in

bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

661.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make New Hampshire Plaintiff and the members of the New Hampshire Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

662.    New Hampshire Plaintiff was not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

663.    Nonetheless, New Hampshire Plaintiff provided notice to FCA of the breach of express warranties when he repeatedly took his vehicle to an authorized FCA dealership and requested warranty repairs. New Hampshire Plaintiff also provided notice to FCA of its breach of express warranty by letter dated April 6, 2022.

664.    As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, New Hampshire Plaintiff and New Hampshire Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

665.     As a result of FCA's breach of the express warranty, New Hampshire Plaintiff and New Hampshire Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

### COUNT XXII
**Breach of the Implied Warranty of Merchantability**
**N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 382-A:2A-212**
**(On Behalf of the New Hampshire Sub-Class against Defendant)**

666.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 as if fully set forth herein.

667.     New Hampshire Plaintiff brings this count on behalf of himself and the New Hampshire Sub-Class against Defendant.

668.     FCA is and was at all relevant times a "merchant" with respect to motor vehicle under N.H. Rev. Stat. Ann. § 382-A:2-104(1), and a "seller" of motor vehicles under 382-A:2-103(1)(d).

669.     With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2A-103(1)(p).

670.     The Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. Ann. §§ 382-A:2-105(1) and 2A-103(1)(h).

671.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 382-A:2A-212.

672.     FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through

authorized dealers, like those from whom New Hampshire Plaintiff and members of the New Hampshire Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Hampshire Plaintiff and members of the New Hampshire Sub-Class, with no modification to the defective Class Vehicles.

673.    FCA provided New Hampshire Plaintiff and members of the New Hampshire Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

674.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

675.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing New Hampshire Plaintiff and New Hampshire Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

676.    As a result of FCA's breach of the applicable implied warranties, New Hampshire Plaintiff and members of the New Hampshire Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, New Hampshire Plaintiff and members of the New Hampshire Sub-Class were harmed and suffered

actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

677.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

678.    New Hampshire Plaintiff and members of the New Hampshire Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

679.    New Hampshire Plaintiff and members of the New Hampshire Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from New Hampshire Plaintiff and the Class Members and through other internal sources.

680.    Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs. New Hampshire Plaintiff also provided notice to FCA of its breach of express warranty by letter dated April 6, 2022.

681.    Because New Hampshire Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  New Hampshire Plaintiff and the members of the New Hampshire Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and New Hampshire Plaintiff and the members of the New Hampshire Sub-Class, on the other hand. Furthermore, FCA provided warranties directly to New Hampshire Plaintiff and the members of

the New Hampshire Sub-Class and New Hampshire Plaintiff and the members of the New Hampshire Sub-Class are the intended beneficiaries of FCA's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

682.    Nonetheless, privity is not required here because New Hampshire Plaintiff and the members of the New Hampshire Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships. These contracts give the dealerships the right to sell FCA vehicles, as well as service and perform warranty repairs on FCA's behalf. New Hampshire Plaintiff and the members of the New Hampshire Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships. New Hampshire Plaintiff and the members of the New Hampshire Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

683.    As a direct and proximate cause of FCA's breach, New Hampshire Plaintiff and members of the New Hampshire Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Hampshire Plaintiff and members of the New Hampshire Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

684.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, New Hampshire Plaintiff and members of the New Hampshire Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XXIII**
**Violation of the New Hampshire Consumer Protection Act**
**N.H. Rev. Stat. Ann. § 358-A:1, *et seq*.**
**(On Behalf of the New Hampshire Sub-Class against Defendant)**

685.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

686.    New Hampshire Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New Hampshire Sub-Class.

687.    New Hampshire Plaintiff, the New Hampshire Sub-Class Members, and FCA are "person" as that term is defined in N.H. Rev. Stat. Ann. § 358-A:1.

688.    FCA's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. Ann. § 358-A:1.

689.    The New Hampshire Consumer Protection Act ("New Hampshire CPA") prohibits a person in the conduct of any trade or commerce from using "any unfair or deceptive act or practice," including "but … not limited to the following: . . . (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have," "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another," and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. Ann. § 358-A:2.  FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New Hampshire CPA.

690.    FCA participated in unfair or deceptive trade practices that violated the New Hampshire CPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly

and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

691.   FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

692.   FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

693.   FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

694.   FCA knew or should have known that its conduct violated the New Hampshire CPA.

695.   Defendant was under a duty to New Hampshire Plaintiff and the New Hampshire Sub-Class Members to disclose the defective nature of the Class Vehicles because:

   a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

   b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

   c.   Defendant actively concealed the defective nature of the Class Vehicles from New Hampshire Plaintiff and the New Hampshire Sub-Class Members at the time of sale and thereafter.

696.     By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

697.     The facts concealed or not disclosed by Defendant to New Hampshire Plaintiff and the New Hampshire Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had New Hampshire Plaintiff and the New Hampshire Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

698.     New Hampshire Plaintiff and the New Hampshire Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

699.     As a result of Defendant's misconduct, New Hampshire Plaintiff and the New Hampshire Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

700.     As a direct and proximate result of Defendant's unfair or deceptive acts or practices, New Hampshire Plaintiff and the New Hampshire Sub-Class Members have suffered and will continue to suffer actual damages.

701.     FCA's violations present a continuing risk to New Hampshire Plaintiff and the New Hampshire Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

702.    New Hampshire Plaintiff provided notice of his claim by letter dated April 6, 2022.

703.    Pursuant to N.H. Rev. Stat. Ann. § 358-A:10, New Hampshire Plaintiff and the New Hampshire Sub-Class members seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, and any other just and proper relief available under N.H. Rev. Stat. Ann. § 358-A:10.

**Claims on Behalf of the New York Sub-Class**

<u>COUNT XXIV</u>
**Breach of Express Warranty**
**N.Y. U.C.C. §§ 2-314 and 2A-210**
**(On Behalf of the New York Sub-Class against Defendant)**

704.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 261 as if fully set forth herein.

705.    Plaintiff Kenneth Esteves ("New York Plaintiff") brings this count on behalf of himself and the New York Sub-Class against Defendant.

706.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

707.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

708.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

709.    The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

710.     Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under New York state law.

711.     FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

712.     According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

713.     The Warranty formed the basis of the bargain that was reached when New York Plaintiff and other members of the New York Sub-Class purchased or leased their Class Vehicles.

714.     FCA breached the express warranty through the acts and omissions described above.

715.     Further, New York Plaintiff and members of the New York Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform New York Plaintiff and members of the New York Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

716.     FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

717.    Because New York Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  New York Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and New York Plaintiff and the members of the New York Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to New York Plaintiff and the members of the New York Sub-Class and New York Plaintiff and the members of the New York Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

718.    Nonetheless, privity is not required here because New York Plaintiff and the members of the New York Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  New York Plaintiff and the members of the New York Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  New York Plaintiff and the members of the FCA Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

719.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing

consumers about the Defect.  The time limits are unconscionable and inadequate to protect New York Plaintiff and the members of the New York Sub-Class.  Among other things, New York Plaintiff and members of the New York Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

720.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make New York Plaintiff and the members of the New York Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

721.    New York Plaintiff was not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

722.    Nonetheless, New York Plaintiff provided notice to FCA of the breach of express warranties when he repeatedly took his vehicle to an authorized FCA dealership and requested warranty repairs. New York Plaintiff also provided notice to FCA of its breach of express warranty by letter dated May 16, 2022.

723.    As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money,

property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, New York

Plaintiff and New York Sub-Class Members were harmed and suffered actual damages in that the

Class Vehicles are substantially certain to fail before their expected useful life has run.

724.    As a result of FCA's breach of the express warranty, New York Plaintiff and New

York Sub-Class Members are entitled to legal and equitable relief against FCA, including actual

damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.


**COUNT XXV**
**Breach of the Implied Warranty of Merchantability**
**N.Y. U.C.C. §§ 2-314 and 2A-212**
**(On Behalf of the New York Sub-Class against Defendant)**

725.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1

through 261 as if fully set forth herein.

726.    New York Plaintiff brings this count on behalf of himself and the New York Sub-

Class against Defendant.

727.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles

under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

728.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor

vehicles under N.Y. UCC Law § 2A-103(1)(p).

729.    The Class Vehicles are and were at all relevant times "goods" within the meaning

of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

730.    A warranty that the Class Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law under N.Y. UCC Law §§ 2-314

and 2A-212.

731.     FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom New York Plaintiff and members of the New York Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New York Plaintiff and members of the New York Sub-Class, with no modification to the defective Class Vehicles.

732.     FCA provided New York Plaintiff and members of the New York Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

733.     This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

734.     Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing New York Plaintiff and New York Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

735.     As a result of FCA's breach of the applicable implied warranties, New York Plaintiff and members of the New York Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, New York

Plaintiff and members of the New York Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

736.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

737.    New York Plaintiff and members of the New York Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

738.    New York Plaintiff and members of the New York Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from New York Plaintiff and the Class Members and through other internal sources.

739.    Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs. New York Plaintiff also provided notice to FCA of its breach of express warranty by letter dated May 16, 2022.

740.    Because New York Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  New York Plaintiff and the members of the New York Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and New York Plaintiff and the members of the New York Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to New York Plaintiff and the members of the New York Sub-Class

and New York Plaintiff and the members of the New York Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

741.    Nonetheless, privity is not required here because New York Plaintiff and the members of the New York Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA vehicles, as well as service and perform warranty repairs on FCA's behalf.  New York Plaintiff and the members of the New York Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  New York Plaintiff and the members of the New York Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

742.    As a direct and proximate cause of FCA's breach, New York Plaintiff and members of the New York Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New York Plaintiff and members of the New York Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

743.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, New York Plaintiff and members of the New York Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XXVI**
**Violation of the New York General Business Law § 349,**
**N.Y. GEN. BUS. LAW § 349**
**(On Behalf of the New York Sub-Class against Defendant)**

744.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

745.    New York Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New York Sub-Class.

746.    New York Plaintiff and members of the New York Sub-Class are "persons" as defined by the New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

747.    FCA is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

748.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New York GBL.

749.    FCA participated in unfair or deceptive trade practices that violated the New York GBL.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

750.     FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

751.     FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

752.     FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

753.     FCA knew or should have known that its conduct violated the New York GBL.

754.     Defendant was under a duty to New York Plaintiff and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a.      Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.      Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.      Defendant actively concealed the defective nature of the Class Vehicles from New York Plaintiff and the New York Sub-Class Members at the time of sale and thereafter.

755.      By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

756.     The facts concealed or not disclosed by Defendant to New York Plaintiff and the New York Sub-Class Members are material because a reasonable person would have considered

them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had New York Plaintiff and the New York Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

757.    New York Plaintiff and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

758.    As a result of Defendant's misconduct, New York Plaintiff and the New York Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

759.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, New York Plaintiff and the New York Sub-Class Members have suffered and will continue to suffer actual damages.

760.    FCA's violations present a continuing risk to New York Plaintiff and the New York Sub-Class Members as well as to the general public.   FCA's unlawful acts and practices complained of herein affect the public interest.

761.    New York Plaintiff provided notice of his claim by letter dated May 16, 2022.

762.    Pursuant to N.Y. Gen. Bus. Law § 349(h), New York Plaintiff and each New York Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y.

Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining FCA's deceptive conduct, and any other just and proper relief available under the New York GBL.

**COUNT XXVII**
**Violation of the New York General Business Law § 350,**
**N.Y. GEN. BUS. LAW § 350**
**(On Behalf of the New York Sub-Class against Defendant)**

763.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

764.    New York Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New York Sub-Class.

765.    New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

766.    FCA caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including New York Plaintiff and the New York Sub-Class Members.

767.    FCA violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, FCA's failure to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by

165

presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

768. In purchasing or leasing the Class Vehicles, New York Plaintiff and the New York Sub-Class Members were deceived by FCA's failure to disclose the Defect.

769. New York Plaintiff and the New York Sub-Class Members had no way of knowing that FCA's representations and omissions were false and misleading, that an internal component part of the Class Vehicles is defective and causes a safety hazard, that the engine may fail under normal and intended use of the Class Vehicles, or that FCA would refuse to repair, replace, or compensate New York Plaintiff and the New York Sub-Class Members for the failure of the defective systems and the known consequences of that failure to the Class Vehicles.

770. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

771. FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

772. FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

773. FCA knew or should have known that its conduct violated the New York FAA.

774.    FCA's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

775.    FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead New York Plaintiff and the New York Sub-Class Members.

776.    New York Plaintiff and the New York Sub-Class Members reasonably relied on FCA's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

777.    Defendant was under a duty to New York Plaintiff and the New York Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.    Defendant actively concealed the defective nature of the Class Vehicles from New York Plaintiff and the New York Sub-Class Members at the time of sale and thereafter.

778.    By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

779.    The facts concealed or not disclosed by Defendant to New York Plaintiff and the New York Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power,

and eventual catastrophic engine failure is a material safety concern. Had New York Plaintiff and the New York Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

780.    New York Plaintiff and the New York Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

781.    As a result of Defendant's misconduct, New York Plaintiff and the New York Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

782.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, New York Plaintiff and the New York Sub-Class Members have suffered and will continue to suffer actual damages.

783.    FCA's violations present a continuing risk to New York Plaintiff and the New York Sub-Class Members as well as to the general public.   FCA's unlawful acts and practices complained of herein affect the public interest.

784.    New York Plaintiff provided notice of his claim by letter dated May 16, 2022.

785.    New York Plaintiff and the New York Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because FCA acted willfully or knowingly, New York Plaintiff and the New York Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

**Claims on Behalf of the Pennsylvania Sub-Class**

**COUNT XXVIII**
**Breach of Express Warranty**
**13 PA. CONS. STAT. §§ 2313 and 2A210**
**(On Behalf of the Pennsylvania Sub-Class against Defendant)**

786.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 261 as if fully set forth herein.

787.    Plaintiff John Skleres ("Pennsylvania Plaintiff") brings this count on behalf of himself and the Pennsylvania Sub-Class against Defendant.

788.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

789.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

790.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

791.    The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

792.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under Pennsylvania state law.

793.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

794.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

795.    The Warranty formed the basis of the bargain that was reached when Pennsylvania Plaintiff and other members of the Pennsylvania Sub-Class purchased or leased their Class Vehicles.

796.    FCA breached the express warranty through the acts and omissions described above.

797.    Further, Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

798.    FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

799.    Because Pennsylvania Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Pennsylvania Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class and Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the

ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

800.    Nonetheless, privity is not required here because Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Pennsylvania Plaintiff and the members of the FCA Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

801.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class.  Among other things, Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

802.     Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

803.     Pennsylvania Plaintiff was not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

804.     Nonetheless, Pennsylvania Plaintiff provided notice to FCA of the breach of express warranties when he repeatedly took his vehicle to an authorized FCA dealership and requested warranty repairs. Pennsylvania Plaintiff also provided notice to FCA of its breach of express warranty by letter dated February 22, 2022.

805.     As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Pennsylvania Plaintiff and Pennsylvania Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

806.     As a result of FCA's breach of the express warranty, Pennsylvania Plaintiff and Pennsylvania Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT XXIX**
**Breach of the Implied Warranty of Merchantability**
**13 PA. CONS. STAT. §§ 2314 and 2A212**
**(On Behalf of the Pennsylvania Sub-Class against Defendant)**

807.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 as if fully set forth herein.

808.    Pennsylvania Plaintiff brings this count on behalf of himself and the Pennsylvania Sub-Class against Defendant.

809.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

810.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

811.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

812.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 13 Pa. Cons. Stat. §§ 2314 and 2A212.

813.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class, with no modification to the defective Class Vehicles.

814.    FCA provided Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

815.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

816.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Pennsylvania Plaintiff and Pennsylvania Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

817.    As a result of FCA's breach of the applicable implied warranties, Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

818.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

819.    Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

820.    Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Pennsylvania Plaintiff and the Class Members and through other internal sources.

821.    Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs. Pennsylvania Plaintiff also provided notice to FCA of its breach of express warranty by letter dated February 22, 2022.

822.    Because Pennsylvania Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class, on the other hand. Furthermore, FCA provided warranties directly to Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class and Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

823.    Nonetheless, privity is not required here because Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA vehicles, as well as service and perform warranty repairs on FCA's behalf.  Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Pennsylvania Plaintiff and the members of the Pennsylvania Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

824.    As a direct and proximate cause of FCA's breach, Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

825.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Pennsylvania Plaintiff and members of the Pennsylvania Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XXX**
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 P.S. § 201-1, *et seq*.**
**(On Behalf of the Pennsylvania Sub-Class against Defendant)**

826.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

827.   Pennsylvania Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Pennsylvania Sub-Class.

828.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

829.   All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

830.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).  FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Pennsylvania CPL.

831.   FCA participated in unfair or deceptive trade practices that violated the Pennsylvania CPL.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

832.    FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

833.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

834.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

835.    FCA knew or should have known that its conduct violated the Pennsylvania CPL.

836.    Defendant was under a duty to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      c.   Defendant actively concealed the defective nature of the Class Vehicles from Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members at the time of sale and thereafter.

837.    By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

838.    The facts concealed or not disclosed by Defendant to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members are material because a reasonable person would have considered

them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

839.   Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

840.   As a result of Defendant's misconduct, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

841.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members have suffered and will continue to suffer actual damages.

842.   FCA's violations present a continuing risk to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

843.   Pennsylvania Plaintiff provided notice of his claim by letter dated February 22, 2022.

844.   FCA is liable to Pennsylvania Plaintiff and the Pennsylvania Sub-Class Members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under

73 P.S. § 201-9.2(a). Pennsylvania Plaintiff and the Pennsylvania Sub-Class members are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**Claims on Behalf of the Texas Sub-Class**

<u>**COUNT XXXI**</u>
**Breach of Express Warranty**
**Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
**(On Behalf of the Texas Sub-Class against Defendant)**

845.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 261 as if fully set forth herein.

846.    Plaintiff Leonel Cantu ("Texas Plaintiff") brings this count on behalf of himself and the Texas Sub-Class against Defendant.

847.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

848.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

849.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

850.    The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

851.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under Texas state law.

852.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

853.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

854.    The Warranty formed the basis of the bargain that was reached when Texas Plaintiff and other members of the Texas Sub-Class purchased or leased their Class Vehicles.

855.    FCA breached the express warranty through the acts and omissions described above.

856.    Further, Texas Plaintiff and members of the Texas Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Texas Plaintiff and members of the Texas Sub-Class that the Class Vehicles were equipped with defective engines and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

857.    FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

858.    Because Texas Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Texas Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Texas Plaintiff and the

members of the Texas Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Texas Plaintiff and the members of the Texas Sub-Class and Texas Plaintiff and the members of the Texas Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

859.    Nonetheless, privity is not required here because Texas Plaintiff and the members of the Texas Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Texas Plaintiff and the members of the Texas Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Texas Plaintiff and the members of the FCA Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

860.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Texas Plaintiff and the members of the Texas Sub-Class.  Among other things, Texas Plaintiff and members of the Texas Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

861.     Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Texas Plaintiff and the members of the Texas Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

862.     Texas Plaintiff was not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

863.     Nonetheless, Texas Plaintiff provided notice to FCA of the breach of express warranties when he repeatedly took his vehicle to an authorized FCA dealership and requested warranty repairs. Texas Plaintiff also provided notice to FCA of its breach of express warranty by letter dated May 5, 2022.

864.     As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Texas Plaintiff and Texas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

865.     As a result of FCA's breach of the express warranty, Texas Plaintiff and Texas Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXXII
### Breach of the Implied Warranty of Merchantability
### Tex. Bus. & Com. Code §§ 2.314 and 2A.212
### (On Behalf of the Texas Sub-Class against Defendant)

866.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 as if fully set forth herein.

867.    Texas Plaintiff brings this count on behalf of himself and the Texas Sub-Class against Defendant.

868.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

869.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

870.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

871.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

872.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Texas Plaintiff and members of the Texas Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiff and members of the Texas Sub-Class, with no modification to the defective Class Vehicles.

873.    FCA provided Texas Plaintiff and members of the Texas Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

874.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

875.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Texas Plaintiff and Texas Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

876.    As a result of FCA's breach of the applicable implied warranties, Texas Plaintiff and members of the Texas Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Texas Plaintiff and members of the Texas Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

877.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

878.    Texas Plaintiff and members of the Texas Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

879.     Texas Plaintiff and members of the Texas Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Texas Plaintiff and the Class Members and through other internal sources.

880.     Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicle to an authorized FCA dealership and requested warranty repairs. Texas Plaintiff also provided notice to FCA of its breach of express warranty by letter dated May 5, 2022.

881.     Because Texas Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Texas Plaintiff and the members of the Texas Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Texas Plaintiff and the members of the Texas Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Texas Plaintiff and the members of the Texas Sub-Class and Texas Plaintiff and the members of the Texas Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

882.     Nonetheless, privity is not required here because Texas Plaintiff and the members of the Texas Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA vehicles, as well as service and perform warranty repairs on FCA's behalf.  Texas Plaintiff and the members of the Texas Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and

users of the products FCA distributes to its authorized dealerships. Texas Plaintiff and the members of the Texas Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

883.   As a direct and proximate cause of FCA's breach, Texas Plaintiff and members of the Texas Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiff and members of the Texas Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

884.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Texas Plaintiff and members of the Texas Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XXXIII**
**Violation of the Texas Deceptive Trade Practices Act –**
**Consumer Protection Act,**
**Texas Bus. & Com. Code § 17.41,** *et seq*.
**(On Behalf of the Texas Sub-Class against Defendant)**

885.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 261 above as if fully set forth herein.

886.   Texas Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Texas Sub-Class.

887.   Texas Plaintiff and members of the Texas Sub-Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

888.   FCA is a "person" as that term is defined in Tex. Bus. & Com. Code § 17.45(3).

889.     FCA is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

890.     The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).  FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Texas DTPA.

891.     FCA participated in unfair or deceptive trade practices that violated the Texas DTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

892.     FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

893.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

894.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

895.    FCA knew or should have known that its conduct violated the Texas DTPA.

896.    Defendant was under a duty to Texas Plaintiff and the Texas Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.    Defendant actively concealed the defective nature of the Class Vehicles from Texas Plaintiff and the Texas Sub-Class Members at the time of sale and thereafter.

897.    By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

898.    The facts concealed or not disclosed by Defendant to Texas Plaintiff and the Texas Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine with a defect in its valve train, which can cause the engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had Texas Plaintiff and the Texas Sub-Class Members known that the Class Vehicles suffered from the Defect described

herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

899.    Texas Plaintiff and the Texas Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

900.    As a result of Defendant's misconduct, Texas Plaintiff and the Texas Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

901.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Texas Plaintiff and the Texas Sub-Class Members have suffered and will continue to suffer actual damages.

902.    FCA's violations present a continuing risk to Texas Plaintiff and the Texas Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

903.    Pursuant to statute, Texas Plaintiff provided notice of his claim by letter dated May 5, 2022.  Texas Plaintiff and members of the Texas Sub-Class seek all damages and relief to which they are entitled to because FCA failed to remedy its unlawful conduct within the requisite time period.

904.    Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiffs and members of the Texas Sub-Class seek an order enjoining FCA from engaging in unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

## VIII.   PRAYER FOR RELIEF

905.   WHEREFORE, Plaintiffs, individually and on behalf of the members of the Nationwide and State Classes, respectfully request that the Court certify the proposed Nationwide and State Classes, including designating the named Plaintiffs as representatives of the Nationwide Class and their respective State Classes and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiffs' favor and against FCA including the following relief:

906.   A declaration that any applicable statutes of limitations are tolled due to FCA's fraudulent concealment and that FCA is estopped from relying on any statutes of limitations in defense;

i.      Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

ii.     Punitive and exemplary damages under applicable law;

iii.    Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by a Plaintiff or Class member to remedy the Defect;

iv.     A determination that FCA is financially responsible for all Class notices and the administration of Class relief;

v.      Any applicable statutory or civil penalties;

vi.     An order requiring FCA to pay both pre-judgment and post-judgment interest on any amounts awarded;

vii.    An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

viii.      Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

ix.      Any such other and further relief the Court deems just and equitable.

## IX.      DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues so triable.

Dated:  May 18, 2022                    Respectfully submitted,

Attorneys for Plaintiff,

By: /s/ *Russell D. Paul*
Russell D. Paul (Bar No. 4647)
Abigail Gertner (*pro hac vice*)
Amey J. Park (*pro hac vice*)
Natalie Lesser (*pro hac vice*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:    (215) 875-3000
Fax:    (215) 875-4604
Email: rpaul@bm.net
        agertner@bm.net
        apark@bm.net
        nlesser@bm.net

Tarek H. Zohdy (*pro hac vice*)
Cody R. Padgett (*pro hac vice*)
Laura Goolsby (*pro hac vice*)
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:      (310) 556-4811
Facsimile:      (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com

Steven Calamusa (*pro hac vice*)
Geoff Stahl (*pro hac vice*)

Rachel Bentley (*pro hac vice*)
**GORDON & PARTNERS, P.A.**
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050
scalamusa@fortheinjured.com
gstahl@fortheinjured.com
rbentley@fortheinjured.com

Geoffrey Graber (PHV app. forthcoming)
Brian E. Johnson (PHV app. forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW East Tower, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
ggraber@cohenmilstein.com
bejohnson@cohenmilstein.com