IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ETIENNE MAUGAIN et al.,

        Plaintiffs,

     v.

FCA US LLC,

        Defendant.

Civil Action No. 22-116-GBW

---

Kelly A. Green, SMITH, KATZENSTEIN, & JENKINS LLP, Wilmington, Delaware; Russell D. Paul, Abigail J. Gertner, Amey J. Park, Natalie Lesser, BERGER MONTAGUE PC, Philadelphia, Pennsylvania; Tarek H. Zohdy, Cody R. Padgett, Laura Goolsby, CAPSTONE LAW APC, Los Angeles, California; Steven Calamusa, Geoff Stahl, Rachel Bentley, GORDON & PARTNERS, P.A., Palm Beach Gardens, Florida; Geoffrey Graber, Brian E. Johnson, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C.

     *Counsel for Plaintiffs*

Patrick M. Brannigan, Jessica L. Reno, ECKERT SEAMANS CHERIN & MELLOTT, LLC, Wilmington, Delaware; Stephen A. D'Aunoy, Scott H. Morgan, THOMPSON COBURN LLP, St. Louis, Missouri.

     *Counsel for Defendants*

## **MEMORANDUM OPINION**

February 7, 2023
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Plaintiffs Etienne Maugain, Louise Shumate, Denise Hunter, Harry Reichlen, John Kundrath, Kenneth Esteves, John Skleres, Richard Archer, Stephen Dreikosen, and Leonel Cantu (collectively, "Plaintiffs") filed this consumer class action against Defendant FCA US LLC ("FCA") to obtain monetary relief based on FCA's alleged failure to disclose engine defects in "2014 or newer Chrysler, Dodge, Jeep, or RAM-branded vehicles equipped with 3.6L Pentastar V6 engine ('Class Vehicles')." D.I. 34 at 1, 191. Plaintiffs' claims stretch to 906 paragraphs over 192 pages and sound in thirty-three counts. *See* D.I. 34. Thirty of the Counts allege violations of California, Florida, Georgia, Illinois, Massachusetts, New Hampshire, New York, Pennsylvania, or Texas law. D.I. 34 ¶¶ 314–904. Count III alleges violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, ("MMWA"), D.I. 34 ¶¶ 294–313, and Counts I and II allege common law fraud by omission (or fraudulent concealment) and unjust enrichment, D.I. 34 ¶¶ 272–93. FCA now moves to dismiss Plaintiffs' First Amended Class Action Complaint (the "Complaint") for lack of standing as to claims related to certain Class Vehicles or under the laws of states in which the named plaintiffs do not reside, under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim on which relief can be granted, under Rule 12(b)(6) (the "Motion"). D.I. 46; D.I. 47 at 1–2. The Court grants-in-part and denies-in-part FCA's Motion.[1]

## I.   BACKGROUND[2]

FCA sold Class Vehicles "with a defective 3.6L engine and falsely marketed the vehicles as safe to drive, durable, reliable, and capable of providing transportation." D.I. 34 ¶¶ 1, 3. The

---

[1] The Motion is fully briefed, D.I. 47; D.I. 54; D.I. 55, and no hearing is necessary.

[2] On a motion to dismiss under 12(b)(6) or a facial attack on subject matter jurisdiction, the Court accepts as true all factual allegations in the Complaint. *See Fed. Trade Comm'n v. AbbVie Inc*, 976 F.3d 327, 351 (3d Cir. 2020); *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

defective engines "prematurely fail" and are unable to accomplish "the fundamental elements of the function of an internal combustion engine . . . ." D.I. 34 ¶ 4. The vehicles generate an "audible ticking noise" and then may "buck and surge" and, eventually, the engines may fail while the vehicles are "being driven, leading to an increased threat of stalling, loss of motive power[,] and collision." D.I. 34 ¶ 5. FCA knew "as early as 2013" about these severe defects—such as from internal testing, complaints, and supplier communications—but still "touted the quality, durability, reliability, and performance" of the vehicles at issue "via its public statements and multimedia marketing campaigns." D.I. 34 ¶¶ 6, 16. FCA has also instructed car dealers to replace defective parts with new parts that have the same defect "while informing consumers that the vehicles are fixed, including when repairs were made under warranty." D.I. 34 ¶ 11. "FCA has exclusive knowledge of, and has been in exclusive possession of, information pertaining" to these defects. D.I. 34 ¶ 17. Plaintiffs "reasonably expected that FCA's representations that the Class Vehicles were properly engineered and equipped to handle ordinary, public road driving would be true and complete and would not omit material information." D.I. 34 ¶ 15.

FCA is a Delaware limited liability company (LLC) headquartered in Auburn Hills, Michigan that "designs, manufactures, markets, distributes, services, repairs, sells, and leases" the Class Vehicles "nationwide." D.I. 34 ¶ 156. "FCA provides warranty coverage for Class Vehicles under one or more warranties[,]" such as a "3-year/36,000 mile basic limited warranty and a 5-year/60,000 mile powertrain limited warranty for every vehicle" and "a 7-year/100,000 mile powertrain limited warranty for vehicles which are purchased certified pre-owned." D.I. 34 ¶ 21. FCA's sole member is another Delaware LLC, and that LLC's sole member is Fiat Chrysler Automobiles N.V., "which was incorporated as a public limited liability company" in the Netherlands and is headquartered in the United Kingdom. D.I. 34 ¶ 156. FCA sells the Class

2

Vehicles throughout the United States through a nationwide dealer network, but it sells warranties directly to consumers.  D.I. 34 ¶ 159.

Plaintiffs include individuals with the following combinations of car type and citizenship: a California and a Texas citizen with a "certified pre-owned 2015 Jeep Grand Cherokee"; a California, a Texas, a New York, and a New Hampshire citizen each with a "new 2015 Jeep Grand Cherokee"; a Florida citizen with a "new 2015 Jeep Wrangler"; an Alabama citizen with a "new 2014 Jeep Wrangler"; a Massachusetts citizen with a "used 2016 Dodge Ram"; and a Maryland citizen with a "pre-owned 2015 Chrysler Town & Country[.]"  D.I. 34 ¶¶ 25–26, 39–40, 52–53, 65–66, 77–78, 89–90, 104–05, 117–18, 130–31, 143–44.  Plaintiffs allege that they—and others similarly situated—"overpaid" for the Class Vehicles, "have Vehicles that have significantly diminished resale value[,]" "have and/or must expend significant money to have their Vehicles (inadequately) repaired[,]" and cannot use their Vehicles for the purposes that FCA advertised.  D.I. 34 ¶ 20.

Plaintiffs filed this class action suit initially on January 28, 2022.  D.I. 1.  After FCA filed a motion to dismiss Plaintiffs' original complaint, D.I. 16, Plaintiffs filed the operative Complaint on May 18, 2022, D.I. 34, and the Court dismissed the prior motion to dismiss as moot, D.I. 57.  The Complaint seeks relief under common law fraud and unjust enrichment doctrines; the MMWA; and numerous laws from nine states.  D.I. 34 ¶¶ 272–904.  FCA argues that Plaintiffs lack standing both to bring claims for vehicles no named plaintiff purchased and to bring a nationwide class action.  D.I. 47 at 1–2.  FCA also argues that Plaintiffs fail to state a claim for fraud, fraudulent omission, or unjust enrichment.  *Id.*  FCA further argues that Plaintiffs' MMWA and state law express and implied warranty claims fail, as do claims under California's Unfair Competition Law ("UCL").  *Id.*  While this case remained in the District of Delaware's judicial

3

vacancy docket, *see* D.I. 19, Chief Magistrate Judge Thygne granted the parties' stipulation to extend the typical briefing page limits for this Motion, D.I. 45, and then enforced these page limits, D.I. 50.  As of October 7, 2022, the parties had begun and intended "to continue their respective discovery efforts, including the production of documents, coordinating the inspections of Plaintiffs' vehicles," and other relevant tasks.  D.I. 56 at 1–2.

## II.   LEGAL STANDARD

### A.   Lack of Subject Matter Jurisdiction, Rule 12(b)(1)

Once a court's jurisdiction is challenged, it must presume that it lacks jurisdiction unless the party asserting that jurisdiction exists can prove otherwise.  *G. W. v. Ringwood Bd. of Educ.*, 28 F.4th 465, 468 (3d Cir. 2022); *accord Carney v. Adams*, 141 S. Ct. 493, 499 (2020) ("[Plaintiff] bears the burden of establishing standing as of the time he brought this lawsuit and maintaining it thereafter.").  "'Under [Rule] 12(b)(1), a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim.'"  *Shibles v. Bank of Am., N.A.*, 730 F. App'x 103, 105 (3d Cir. 2018) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)) (alteration in original).  A motion to dismiss under Rule 12(b)(1) may be a "facial" attack, in which defendants argue that the allegations in the complaint are insufficient to invoke federal jurisdiction, or a "factual" attack, in which defendants question the asserted facts underlying federal court jurisdiction.  *Davis*, 824 F.3d at 346.  If a party brings a facial attack, as here, D.I. 47 at 2–5 (reciting facts from the Complaint), the Court must "'consider the allegations of the complaint as true[,]'"  *Davis*, 824 F.3d at 346 (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)).

The Constitution extends "[t]he judicial Power" only to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  Thus, the plaintiff must have "a personal stake in the case—in other words, standing."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (internal quotation marks

and citation omitted). "'Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed.'" *Davis*, 824 F.3d at 346 (citation omitted). "To establish standing, a plaintiff must show '(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.'" *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 130–31 (3d Cir. 2022) (quoting *TransUnion*, 141 S. Ct. at 2203). American Courts traditionally recognize "physical harms and monetary harms" as "providing a basis for a lawsuit . . . ." *TransUnion*, 141 S. Ct. at 2204. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), as revised (May 24, 2016) (citation omitted). In a class action suit, "class representatives need to present a justiciable claim." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 366 (3d Cir. 2015).

## B.  Failure to State a Claim, Rule 12(b)(6)

To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). The Court disregards "'legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th at 342 (quoting *Davis*, 824 F.3d at 341). The court may consider matters of public record

5

and documents "integral to or explicitly relied upon in" the complaint. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (cleaned up); *see also Nekrilov v. City of Jersey City*, 45 F.4th 662, 675 n.7 (3d Cir. 2022) (similar).

However, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Rule 9(b)'s particularity requirement requires a plaintiff to allege all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and how of the events at issue." *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019) (internal quotation marks and citation omitted). Even "where the factual information is peculiarly within the defendant's knowledge or control[,] . . . boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997); *see Friedberg v. Barefoot Architect Inc*, 723 F. App'x 100, 103 (3d Cir. 2018) (quoting *Burlington Coat Factory*, 114 F.3d at 1418).

At the motion to dismiss stage, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 638 (3d Cir. 2015) (citation omitted). "'A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief.'" *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 87 n.12 (3d Cir. 2016) (quoting *Burlington Coat Factory*, 114 F.3d at 1420).

## III.    DISCUSSION

For the reasons explained below, the Court finds that Plaintiffs have standing to assert claims under the laws of states where they do not reside and as to Class Vehicles that Plaintiffs did not purchase.  The Court also dismisses Plaintiffs' claims for fraud based on both omission and misrepresentation (Counts I, IV, VII, X, XIII, XIV, XVII, XX, XXIII, XXVI, XXVII, XXX, and XXXIII), for breach of express warranty (Counts V, VIII, XI, XV, XVIII, XXI, XXIV, XXVIII, and XXXI), for breach of implied warranty in New York (Count XXV), and based on the MMWA (Count III) and the UCL (Count VII).  The Court denies FCA's Motion as to Plaintiffs' unjust enrichment (Count II) and breach of implied warranty (Counts VI, IX, XII, XVI, XIX, XXII, XXIX, XXXII) claims.

### A.    Standing for Nationwide Class Claims

FCA argues that "Plaintiffs lack standing to assert claims under the laws of states where they do not reside and did not purchase their vehicles."  D.I. 47 at 26.  Plaintiffs respond that "[w]hether Plaintiffs can represent a nationwide class is a Rule 23 matter unrelated to Article III standing."  D.I. 54 at 26.

In *Neale*, the Third Circuit held that "unnamed, putative class members need not establish Article III standing . . . so long as a class representative has standing, whether in the context of a settlement or litigation class."  794 F.3d at 362.  The Third Circuit also clarified that "class representatives need to present a justiciable claim" and must "'demonstrate standing for each claim [they] seek[] to press.'"  *Id.* at 359, 366 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  However, *Neale* did not address whether named plaintiffs may bring class action claims under the laws of states where the named plaintiffs do not reside.

This Court has recently reached opposite conclusions as to named plaintiffs' obligations at the motion to dismiss stage.  On the one hand, Judge Stark read *Neale* and concluded that class

action plaintiffs "cannot premise Article III standing for claims outside of the 15 states [in which they reside] on the injuries allegedly suffered by putative, unnamed class members in other states." *In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*, 2022 WL 736250, at *17 (D. Del. Mar. 11, 2022); *accord Diaz v. FCA US LLC*, 2022 WL 4016744, at *19 (D. Del. Sept. 2, 2022) (Wallach, J.) (reaching the same conclusion). On the other hand, Chief Judge Connolly recognized *Neale* but, rather than "wade through complex issues of jurisdiction and constitutional law[,]" deferred consideration of standing in other states to after the Court decided class certification under Federal Rule of Civil Procedure 23. *In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934, at *16 (D. Del. July 5, 2022); *accord Garner v. Glob. Plasma Sols. Inc.*, 590 F. Supp. 3d 738, 743 (D. Del. 2022) (Bibas, J.) ("Any problem with raising claims under several states' laws goes to the propriety of class certification, not standing."). The Second and First Circuits have also decided to defer the standing question until after class certification. *See Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 95 (2d Cir. 2018) ("[C]onsidering variations in state laws as questions of predominance under Rule 23(b)(3), rather than standing under Article III, . . . acknowledges the obvious truth that class actions necessarily involve plaintiffs litigating injuries that they themselves would not have standing to litigate."); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) ("[O]nce the named plaintiff establishes injury and membership in the class, the inquiry should shift 'from the elements of justiciability to the ability of the named representative to "fairly and adequately protect the interests of the class."'" (quoting *Sosna v. Iowa*, 419 U.S. 393, 403 (1975), quoting, in turn, Fed. R. Civ. P. 23(a))).

Here, Plaintiffs bring three claims on behalf of a nationwide class of "[a]ll persons or entities in the United States (including its territories and the District of Columbia) that purchased

8

or leased a Class Vehicle." D.I. 34 ¶ 262, Count I (fraud), Count II (unjust enrichment), Count III (MMWA). However, according to the Complaint, named plaintiffs reside in or purchased a vehicle in only California, Florida, Texas, Illinois, New Hampshire, Massachusetts, Alabama, Georgia, New York, Maryland, and Pennsylvania. D.I. 34 ¶¶ 25–26, 39–40, 52–53, 65–66, 77–78, 89–90, 104–05, 117–18, 130–31, 143–44. In *Neale*, the Third Circuit explained that "considerations under Rule 23 are themselves procedural rules, and thus rarely can be antecedent to the question of whether a federal court has jurisdiction to hear a claim at all." *Neale*, 794 F.3d at 360. However, the *Neale* Court also noted that, "once the named parties have demonstrated they are properly before the court, the issue becomes one of compliance with the provisions of Rule 23, not one of Article III standing." *Id.* at 361 (cleaned up). Since *Neale* can be read to permit or to prohibit the deferral of the standing inquiry until after class certification, the Court does not find that *Neale* mandates a particular result. Instead, the Court is persuaded by Judge Bibas, who explained that "[a] plaintiff has standing if he can show a judicially redressable injury. And a plaintiff's injury is not pegged to the laws of different states: an injury is an injury even if no law allows recovery." *Garner*, 590 F. Supp. 3d at 743 (citations omitted). Here, Plaintiffs' three class-wide claims are identical, even if they invoke state-specific common law doctrines. If FCA thinks that the analysis will differ from state to state, "it should oppose class certification." *Id.*

**B.     Standing for Vehicles Not Purchased**

FCA argues that "Plaintiffs lack standing to pursue claims for vehicles they did not purchase." D.I. 47 at 7. FCA advances two arguments: first, components of the 3.6L Pentastar V6 engine changed over time, so the subject vehicles are not identical and, second, "courts expressly reject the notion a plaintiff has standing to pursue claims based on products that did ***not*** cause the plaintiff's injury." D.I. 47 at 8 (emphasis in original). Plaintiffs respond that they "have adequately pleaded that the Class Vehicles have the same [e]ngines in all material respects that all

suffer from the same [d]efect." D.I. 54 at 4. Plaintiffs also argue that, "[u]nder Third Circuit jurisprudence, Plaintiffs need not own every vehicle they allege is defective." D.I. 54 at 5. The Court finds that plaintiffs have adequately pled that owners and lessees of all Class Vehicles suffered from the same injury-in-fact.

"[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ." *TransUnion*, 141 S. Ct. at 2208. "Thus, [courts] do not exercise jurisdiction over one claim simply because it arose from the same nucleus of operative fact as another claim." *Neale*, 794 F.3d at 359 (internal quotation marks and citation omitted). "In the context of a class action, Article III must be satisfied by at least one named plaintiff." *Id.* Standing requires a concrete and particularized injury-in-fact. *See Boley*, 36 F.4th at 130–31. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (citation omitted). Named class action plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotation marks and citation omitted).[3]

Here, Plaintiffs' allegations stem from defects in the Pentastar engine. D.I. 34 ¶¶ 1, 4 (limiting the class to purchasers and lessees of cars with 3.6L Pentastar V6 engines). Plaintiffs

---

[3] Several district courts within this Circuit have "refused to dismiss claims for products that the named plaintiffs did not buy themselves" if (1) plaintiffs "'sufficiently allege that the basis for the claims is the same'"; (2) "'the Court finds that the products are closely related'"; and (3) the defendant is the same for both products. *Cox v. Chrysler Grp., LLC*, 2015 WL 5771400, at *15 (D.N.J. Sept. 30, 2015) (citation omitted); *see also Stewart v. Smart Balance, Inc.*, 2012 WL 4168584, at *15–16 (D.N.J. June 26, 2012) (similar). Other district courts within this Circuit, however, have concluded that a putative class action plaintiff only has standing to pursue claims as to products that the plaintiff actually purchased. *See Lieberson v. Johnson & Johnson Consumer Companies, Inc.*, 865 F. Supp. 2d 529, 537 (D.N.J. 2011); *Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 280 (D.N.J. 2011). Since Plaintiffs allege that they purchased the same engine, here, the split within the Third Circuit is not relevant to the current dispute.

allege that the engines in all vehicles at issue here are "based on the same design and include[] the same fundamental dual overhead camshaft design configuration including the rocker arms, camshaft and lifters." D.I. 34 ¶ 177. Plaintiffs explain that there are defects in "the rocker arms, camshafts, lifters and related components, as well as in the electronic and hydraulic modules . . . ." D.I. 34 ¶ 179. The defects cause "lifter collapse, rocker arm roller failure, and/or camshaft lobe destruction . . . ." D.I. 34 ¶ 180. While FCA attempted to change its engine over time, its "redesigned parts ultimately suffered from similar defects . . . ." D.I. 34 ¶ 188. Thus, Plaintiffs adequately plead a similar defect across all of the Class Vehicles.

Since Plaintiffs allegations stem from a defective engine, Plaintiffs' allegations are sufficient to show, at this stage, that Plaintiffs and other putative class members purchased the same product, i.e., the engine at issue, as a component of their Class Vehicle. *See, e.g.*, D.I. 34 ¶¶ 42, 55, 68 (stating that the Pentastar engine was a "component" of the Class Vehicle). All of the engines suffered from the same defect. Therefore, at this early stage, Plaintiffs have standing to represent the putative class. However, Plaintiffs have an ongoing obligation to maintain standing in this case, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and FCA will have another chance to raise relevant differences within the proposed class at the class certification stage, *see Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 599 (3d Cir. 2012) (reviewing uniformity of "alleged misrepresentations or omissions . . . across [] different product types" under Rule 23).

## C.    Fraud-Based Claims

FCA argues that Plaintiffs' thirteen (13) Counts based on fraud suffer from six (6) different failures. *See* D.I. 47 at 9–18. Plaintiffs contest each of FCA's arguments. *See* D.I. 54 at 6–18. For the reasons below, the Court finds that Plaintiffs fail to allege sufficient facts to support a plausible allegation that FCA had knowledge of the alleged defect prior to sales of the Class

Vehicles. The Court also finds that Plaintiffs fail to allege misrepresentation claims with particularity. Thus, the Court dismisses all of Plaintiffs' fraud claims.

## 1.    Omission:  General Issues

The parties agree that the Rule 9(b) standard applies to Plaintiffs' omission claims. *See* D.I. 47 at 9; D.I. 54 at 6–7. FCA argues that the Complaint fails to describe the content of FCA's alleged omission or where the omission should have been revealed. D.I. 47 at 10; D.I. 55 at 2. FCA also argues that the Complaint fails to give samples of advertisements on which Plaintiffs relied that did not include the omission. D.I. 47 at 10. Plaintiffs argue that they adequately plead omission, because they describe the omitted information, its materiality, and Plaintiffs' reliance thereon. D.I. 54 at 7.

Plaintiffs must state their omission claims "with particularity." Fed. R. Civ. P. 9(b). Thus, Plaintiffs must allege "the who, what, when, where, and how of the events at issue." *Bookwalter*, 946 F.3d at 176 (internal quotation marks and citation omitted). Even "where the factual information is peculiarly within the defendant's knowledge or control[,] . . . boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Burlington Coat Factory*, 114 F.3d at 1418. According to the Restatement, a party with superior knowledge is liable for an omission if the claimant shows (1) "that the fact at issue was basic to the transaction[,]" (2) "a legitimate reason to rely on" the entity that failed to disclose, and (3) that the claimant could not have discovered the issue. Restatement (Third) of Torts: Liab. for Econ. Harm § 13, cmt. *d* (2020); *see also Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (explaining that, under the California Consumer Legal Remedies Act (CLRA) and UCL, plaintiff must prove that, "'had the omitted information been disclosed, one would have been aware of it and behaved differently'" (citation omitted)); D.I. 34 at Counts IV & VII (bringing claims under the CLRA and UCL).

12

Plaintiffs explain the defect, where FCA should have stated the defect, and how the named Plaintiffs relied on its omission. First, Plaintiffs allege that FCA "manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles possessed a defect that materially affects the ability of the vehicles to operate . . . ." D.I. 34 ¶ 3. The Complaint explains the nature of the defect (i.e., "the defective valvetrain cannot adequately, properly and timely transfer the motion of the cam lobes to open and close the valves to effectuate proper internal combustion"). D.I. 34 ¶¶ 179–87.

Second, the Complaint alleges that FCA marketed the Class Vehicles in a generally positive light without disclosing the engine defects. *See* D.I. 34 ¶¶ 192–98. The Complaint cites to a 2010 Stellantis press release—one that still remains online[4]—that discusses some of the Class Vehicles' low cost of ownership, D.I. 34 ¶ 195 & n.9, despite FCA's knowledge of a defect that was costly to repair. The Complaint also notes that window stickers on the Class Vehicles "listed the 3.6L Pentastar Engine as a component" and that FCA was "responsible" for the content and production of those window stickers. D.I. 34 ¶¶ 42, 160, 248. Additionally, the named plaintiffs spoke with representatives of authorized Class Vehicle dealers about the "quality, safety, and reliability" of the Class Vehicles. *See, e.g.*, D.I. 34 ¶¶ 28, 42, 92, 107. Plaintiffs alleged that FCA had "a significant amount of control over the actions of the dealerships, including sale and marketing over the vehicles" via contracts. D.I. 34 ¶ 159; *see* D.I. 34 ¶¶ 249(b), (g). FCA goes so far as to admit that "Plaintiffs allege that information about the purported defect was well-known by dealerships . . . ." D.I. 55 at 2. Plaintiffs' allegations that the named plaintiffs heard from dealer salespersons about vehicle safety and reliability, that FCA had significant control over the

---

[4] *See* Nick Cappa & Rick Deneau, All-new Pentastar V-6 Engine from Chrysler Group LLC Improves Powertrain Flexibility and Fuel Efficiency, Stellantis (Mar. 18, 2010), https://media.stellantisnorthamerica.com/newsrelease.do?id=9506&mid=.

dealerships, and that the salespersons did not disclose the alleged engine defect are sufficient to establish with specificity the alleged omission.

Third, the Complaint shows with specificity that Plaintiffs relied upon FCA's alleged omission. The named plaintiffs allege that they would not have purchased their Class Vehicles if they had known about the engine defects. D.I. 34 ¶¶ 44, 94, 109, 122, 136, 148. Plaintiffs also allege that the named plaintiffs heard and relied upon the representations that dealer salespersons made to the named plaintiffs and that safety and reliability were important factors in their selection of a Class Vehicle. D.I. 34 ¶¶ 42, 92, 107, 120, 133, 146.

FCA takes issue, generally, with the lack of "factual support" for plaintiffs' omission claims. D.I. 55 at 2. In particular, FCA argues that Plaintiffs fails to allege (1) what the omission was, (2) where FCA should have revealed the omission, and (3) what advertisements, on which Plaintiffs relied, lacked the omission. D.I. 47 at 10. However, Plaintiffs allege that FCA should have told Plaintiffs about the engine defect at issue in the representations as to vehicle safety and reliability by dealer salespersons and that FCA had control over its dealerships. *See* D.I. 34 ¶¶ 130–36, 159, 179–87. Further, the named plaintiffs had reason to rely on FCA, since consumers lack the information-gathering resources—such as information from dealer networks—that FCA possessed.[5] Thus, Plaintiffs have pled sufficient facts to overcome FCA's initial arguments.

### 2.    Omission:  Pre-Sale Knowledge

FCA separately argues that Plaintiffs have failed to plead that FCA knew of the alleged defect prior to selling Plaintiffs their Class Vehicles. D.I. 47 at 12. FCA argues that the specific evidence to which Plaintiffs point—i.e., service bulletins from 2014 and 2017, online forum posts,

---

[5] To the extent FCA argues in passing that "the information about the purported defect was well-known by . . . consumers[,]" D.I. 55 at 2, Plaintiffs' allegations are to the contrary, *see, e.g.*, D.I. 34 ¶ 135 (alleging that, if the named plaintiff knew about the defect, he "would not have purchased his Class Vehicle, or would have paid less" for it).

and complaints to the National Highway and Transportation Safety Administration ("NHTSA")—post-date the alleged omissions or fail to show knowledge of the defect. D.I. 47 at 11–14. Plaintiffs respond that "Rule 9(b) does not apply to Plaintiffs' allegations regarding FCA's knowledge" because the matter is peculiarly within FCA's knowledge and control. D.I. 54 at 9. Plaintiffs argue, instead, that their allegations are sufficient to "raise a plausible inference of [FCA]'s knowledge regarding the [engine d]fect." D.I. 54 at 9.

Rule 9(b) provides that "knowledge . . . may be alleged generally." Fed. R. Civ. P. 9(b). The Supreme Court explained that "Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 556 U.S. at 686–87 (citation omitted); *see United States v. Allergan, Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018) ("Although under Rule 9(b), scienter may be pled generally, Rule 8 still requires [False Claims Act] plaintiffs to plead facts sufficient to raise a plausible claim of fraud."). Thus, the Complaint still must plausibly suggest "facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Princeton Univ.*, 30 F.4th at 342 (quoting *Iqbal*, 556 U.S. at 678) (citing *Twombly*, 550 U.S. at 557). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz*, 991 F.3d at 462 (quoting *Iqbal*, 556 U.S. at 678). The Court disregards "'legal conclusions . . . supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th at 342 (quoting *Davis*, 824 F.3d at 341).

Plaintiffs allege the following defect:

> The Engine suffers from defects . . . in components of its valve train, specifically the rocker arms, camshafts, lifters and related components, as well as in the electronic and hydraulic modules controlling the timing, phasing and function of the camshafts, intake valves, lifters and related components, which cause said

components to prematurely fail. As a result, the fundamental elements of the function of an internal combustion engine, which requires the precise timing of its valve train components, cannot be accomplished due to the subject defects. In short, the defective valvetrain cannot adequately, properly and timely transfer the motion of the cam lobes to open and close the valves to effectuate proper internal combustion (the "Defect").

D.I. 34 ¶ 4. This defect "result[s] in engine misfires . . . ." D.I. 34 ¶¶ 5, 178. "The movement of the rocker arm caused by the rotation of the camshaft must open and close the intake and exhaust valves in the combustion chamber in a precisely timed manner for proper combustion to occur resulting in the production of horsepower and torque to drive the vehicle in which the engine is installed." D.I. 34 ¶ 170. Thus, as the rocker arms and other components fail, the engine valves cannot open and close properly, "resulting in a significant loss of power or total engine failure." D.I. 34 ¶¶ 179–81. The named plaintiffs suggest that the symptoms of this defect were primarily a ticking noise, but also included misfiring engine cylinders, hesitation on hills, and bucking and surging. D.I. 34 ¶¶ 33, 47, 60, 72, 85, 97, 112, 125, 138, 151. The named plaintiffs purchased their Class Vehicles in July 2014 (Archer), August 2014 (Kundrath), September 2014 (Reichlen), April 2015 (Esteves), September 2015 (Cantu, Shumate), January 2016 (Skleres), June 2016 (Hunter), July 2017 (Maugain), and November 2018 (Dreikosen). D.I. 34 ¶¶ 26, 40, 53, 66, 78, 90, 105, 118, 131, 144.

Thus, Plaintiffs must plead facts sufficient to support a plausible inference that FCA knew of the engine defect as early as July 2014. Plaintiffs assert three primary categories of evidence of FCA's knowledge: FCA service bulletins sent to dealerships; consumer complaints made through FCA websites and to NHTSA; and general allegations of pre-production knowledge and testing. While the Court reviews each category in turn, "the amended complaint must be read as a whole, and its averments and the inferences reasonably drawn from those averments must be viewed in

16

the light most favorable to the plaintiff." *Est. of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 855 (3d Cir. 2014).

The Complaint points to two bulletins—or communications from FCA to its nationwide dealer network—from March 18, 2014 and from August 11, 2017. D.I. 34 ¶¶ 206–08. The 2014 bulletin concerns reported engine "[t]icking" and instructs dealers to replace "missing or worn needle bearings" and "collapsed lash adjusters" in the "rocker arm." D.I. 34 ¶ 206. The 2014 bulletin further explains that "[t]his failure may also set [the diagnostic trouble code] for Mis-Fire." D.I. 34 ¶ 206. The 2017 bulletin identifies the need to replace the "rocker arm" where the "[c]ustomer [i]ndicates [v]ehcile [m]isfires at [h]igh [rotations per minute] [] [u]sually [d]uring an [a]ccelerating [c]ondition." D.I. 34 ¶¶ 208–09. This Court has previously found that Plaintiffs must "connect the symptoms that the service bulletins address to the [d]efect" alleged. *Diaz*, 2022 WL 4016744, at *29. Here, the service bulletins establish FCA's knowledge as early as 2014 of weakness in the rocker arm of the engines at issue. However, neither bulletin identifies issues with the camshafts, lifters, or "electronic and hydraulic modules." Both bulletins identify ticking, but the passing reference to a diagnostic trouble code related to misfiring in the 2014 bulletin is insufficient to support an inference that misfiring was a potential defect symptom. The Complaint did not explain what a diagnostic trouble code is or why such a code is significant. Neither bulletin made any reference to a significant loss of power. Thus, the bulletins were sufficient to establish FCA's knowledge of (1) a connection between a ticking sound and rocker arm weakness as early as March 2014 and (2) a connection between that rocker arm weakness and engine misfiring as early as August 2017. Plaintiffs argue that these bulletins "support[] an inference [FCA] knew of the defect years before issuance." D.I. 54 at 10. However, Plaintiffs allege no facts to support a plausible inference about when FCA knew of these symptoms and defects before the bulletins.

Plaintiffs also point to complaints to NHTSA and complaints made in online forums. The Complaint alleges that "[t]he content, consistency, and disproportionate number of those complaints alerted, or should have alerted, FCA to the Defect in as early as 2014." D.I. 34 ¶ 213. Plaintiffs submit a sample of the complaints "filed with the NHTSA for the Class Vehicles . . . ." D.I. 34 ¶ 213. The earliest complaint submitted, dated May 15, 2015, states that "the vehicle's engine light came on while driving. It began to lose power, shake, and sputter. . . . [The dealer] indicated that there was a code that indicated that there was a misfire and that they had cleared it" but "the problems resumed" and were attributed to the car's engine. D.I. 34-1 at 23 (capitalization altered). The next complaint, chronologically, is dated August 15, 2016 and states that "engine ticking on the left side . . . seems to be a common problem with the 3.6 Pentastar engine" and that Jeep dealerships had heard of the issue. D.I. 34-1 at 21. None of the complaints to NHTSA were filed in 2017. Plaintiffs also submit a "sampling" of the complaints posted to online forums. D.I. 34 ¶ 214. One of the online complaints was posted in 2015, two in 2016, and three in 2017. D.I. 34-2. The November 2, 2015 online complaint discusses a "hellacious lifter noise" and "replac[ing] the camshaft and lifters[.]" D.I. 34-2 at 2. A February 21, 2016 complaint discusses a "tick" and "knocking" that a dealer described as "'normal.'" D.I. 34-2 at 3. An October 15, 2016 complaint discusses a "ticking noise" that required replacement of the rocker arms, but that was resolved with oil changes. D.I. 34-2 at 5. A March 21, 2017 complaint discussed a "ticking noise" that failed to improve when the dealership replaced "the lifters," and a May 16, 2017 complaint referenced only the "ticking sound." D.I. 34-2 at 4. An October 9, 2017 complaint referenced a "noise like that of an old motor" that persisted after the "camshaft" and "lift and rocker arm" were replaced. D.I. 34-2 at 3–4.

Taken together, these complaints establish that FCA should have been aware of issues that caused a ticking noise in the engines of at least some Class Vehicles. However, as a result of this ticking noise, complainants had a variety of experiences, with some requiring rocker arm, lifter, and/or camshaft and lifter replacement and others not discussing any maintenance work. In other complaints, the replacement of the lifters, rocker arm, and/or camshaft caused no improvement in the sounds heard. The single complaint that mentions a misfiring is isolated and unconnected to the ticking noise or rocker arm weakness elsewhere identified. Thus, these complaints arguably support FCA's knowledge, as of 2017, that rocker arms, camshafts, and lifters were connected to a ticking noise, but not to more severe symptoms of the alleged defect. *See Diaz*, 2022 WL 4016744, at *30 ("Where courts have viewed consumer complaints as sufficient to establish pre-sale knowledge, the complaints must identify or describe the defect alleged, not merely identify some symptoms.") (collecting out-of-circuit cases).

The third category of evidence the Complaint alleges is general averments that FCA knew of the alleged defect. Plaintiffs point, for example, to "pre-production testing, pre-production [and production] design failure mode analysis," "quality control audits[,]" aggregate repair and warranty data from dealerships, and other testing as evidence that "FCA was aware or should have been aware of the [d]fect in the Class Vehicles." D.I. 34 ¶ 200. Plaintiffs explain that "Federal law . . . compel[s] the confidential disclosure of defects and related data by automakers to NHTSA, including field reports . . . and warranty data." D.I. 34 ¶ 211. The Complaint further explains that, "[o]nce assembled, the engines were thoroughly tested and evaluated on dynamometers," and one "'batch of engines'" were sent to Roche Industries for testing in 2009. D.I. 34 ¶¶ 203–04. Thus, the Complaint alleges, "FCA would have been made aware of the problems with the rocker arms, and other engine components, failing well before their designed-lifespan runs." D.I. 34 ¶ 204.

Plaintiffs also point to "other sources of internal data not available to consumers" and "ongoing communications with [FCA's] suppliers regarding defective parts . . . ." D.I. 34 ¶ 16. However, these general statements about the testing of cars and potential data that FCA may (perhaps likely does) possess about the Class Vehicles provide insufficient support for a plausible inference that FCA actually knew about the alleged defect. To the extent Plaintiffs allege that FCA had such knowledge or that it may have found evidence of the alleged defect somewhere in its data, such allegations are the type of "'mere conclusory statements'" that the Court must ignore. *Princeton Univ.*, 30 F.4th at 342 (quoting *Davis*, 824 F.3d at 341).

The final question for the Court is whether the above factual allegations, taken together, support a plausible inference that—as of either 2014 or 2017–FCA had knowledge of the alleged defect. As of 2014, the Plaintiffs establish only that FCA knew of a ticking noise connected to a weakness in the rocker arm of the Class Vehicles' engine. The Plaintiffs allege facts sufficient, as of 2017, to connect the ticking noise to the camshaft and lifters and to connect the defective rocker arms to the misfiring of the Class Vehicles' engine. However, Plaintiffs fail to allege facts sufficient to support a plausible inference that, even as of 2017, FCA knew (or should have known) about the defects in the "electronic and hydraulic modules controlling the timing, phasing and function of the camshafts, intake valves, lifters and related components" or that FCA knew or should have known about the possibility of "catastrophic engine failure" or an engine misfire that causes "the engine . . . to buck and surge."[6] D.I. 34 ¶¶ 4–5; *see* D.I. 34 ¶ 112 (alleging that one

---

[6] Plaintiffs allege that worn "valve train components," which include the rocker arms, cam shaft, and lifters, "cause[] improper valvetrain tolerances, which result in engine misfires . . . ." D.I. 34 ¶¶ 179–80. "[F]ailed rocker arms" may "eventually" "contaminate the engine oil" and damage the engine, and Plaintiffs alleges that "worn valve train components cause catastrophic engine failure . . . ." D.I. 34 ¶ 5. Plaintiffs fail to cite—and, thus, do not rely upon—these allegations in their argument that FCA had knowledge of the defect alleged. *See* D.I. 54 at 9–13. Further, these allegations are insufficient to support a plausible inference that FCA's knowledge of rocker arm,

named plaintiff complained of "misfiring resulting in bucking and surging" in March 2021). Further, Plaintiffs do not allege facts that support a plausible inference that FCA should have connected knowledge of camshaft and lifter defects—as opposed to rocker arm defects—to Class Vehicle engines misfiring. *See* D.I. 34 ¶ 208 (showing the 2017 bulletin that references only the defective rocker arm); D.I. 34-2 at 3 (complaining of a "noise like that of an old motor" in 2017 that remained even after the dealer replaced the camshaft and lifter). In short, Plaintiffs allege an engine defect that results in the failure of "the fundamental elements of the function of an internal combustion engine[,]" D.I. 34 ¶ 4, but Plaintiffs' allegations support FCA's knowledge only of defective lifters, rocker arms, and camshafts connected to a ticking noise and (as to only the rocker arms) engine misfiring. Since Plaintiffs' allegations fail to support a plausible inference that FCA knew of the extensive defect that FCA describes in its Complaint, the Court must dismiss all of Plaintiffs' fraud claims based on omission. Plaintiffs' allegations support knowledge only of a defect much narrower than the defect alleged.

### 3.    Misrepresentation

The parties agree that the Rule 9(b) standard applies to Plaintiffs' misrepresentation claims. *See* D.I. 47 at 9; D.I. 54 at 6–7 (not contesting application of Rule 9(b)). FCA argues that "Plaintiffs plead no facts setting forth when, where, or how they saw [FCA statements that constituted misrepresentations]; what is false or misleading about them; or why any of them are false." D.I. 47 at 10. Plaintiffs respond that "[t]he Complaint alleges the date, place, and time of the misrepresentations and FCA's specific and general advertising statements that the Engine installed in the Class Vehicles was 'of high quality, with exceptional performance and comparatively low cost of ownership.'" D.I. 54 at 8 (citing D.I. 34 ¶¶ 6, 17, 181, 196, 227).

cam shaft, and lifter weakness would lead FCA to also know about eventual catastrophic engine failure, or the risk thereof.

Plaintiffs say they reviewed the advertisements prior to their Class Vehicle purchases. Plaintiffs fail to allege facts that support plausible allegations of fraud by misrepresentation, the Court finds, because Plaintiffs fail to allege with particularity that FCA made a false statement.

As with omissions, Plaintiffs must state their misrepresentation claims "with particularity." Fed. R. Civ. P. 9(b). Thus, Plaintiffs must allege "the who, what, when, where, and how of the events at issue." *Bookwalter*, 946 F.3d at 176 (internal quotation marks and citation omitted). "A misrepresentation is material if a reasonable person would give significant weight to it in deciding whether to enter into the relevant transaction . . . ." Restatement, *supra*, § 9, cmt. *d*. "A false statement of opinion may result in liability only if . . . the defendant claims to have expertise or other knowledge not accessible to the plaintiff and offers the opinion to provide the plaintiff with a basis for reliance." *Id.* § 14.

Plaintiffs' briefing points to the following allegations to support their misrepresentation claims, D.I. 54 at 8:

> 6. Despite FCA's knowledge, as early as 2013, of the existence and severity of the Defect, it touted the quality, durability, reliability, and performance of the Class Vehicles via its public statements and multimedia marketing campaigns. FCA also advertised that the Engine was of high quality, with exceptional performance and comparatively low cost of ownership.
>
> . . .
>
> 17. FCA has exclusive knowledge of, and has been in exclusive possession of, information pertaining to the Defect, which was material to Plaintiffs and Class Members, who could not reasonably know of the Defect. . . . FCA failed and refused—and continues to refuse—to disclose the Defect and provide a meaningful remedy to those who have suffered economic harm as a result of the Defect. . . .
>
> . . .
>
> 181. Despite FCA's knowledge, as early as 2013, of the existence and severity of the Defect, it touted the quality, durability, reliability, and performance of the Class Vehicles via its public statements and multimedia marketing campaigns. FCA also advertised that the Engine was of high quality, with exceptional performance and comparatively low cost of ownership.
>
> . . .

> 196. In brochures, FCA advertised the Pentastar V-6 Engine []as a "workhorse []
> designed to deliver the kind of power needed to tackle off-road elements and
> support all-weather travel on any terrain" and "gives you the goods to go forth with
> confidence."
>
> . . .
>
> 227. Plaintiffs make the following specific fraud allegations with as much
> specificity as possible, although they do not have access to information necessarily
> available only to FCA: . . . *What*: FCA knew, or was reckless or negligent in not
> knowing, that the Class Vehicles suffer from the Defect. FCA concealed the Defect
> and made contrary representations about the quality, durability, performance, and
> other attributes of the Class Vehicles. . . . *How*: FCA concealed the Defect from
> Plaintiffs and Class members and made representations about the quality and
> durability of the Class Vehicles. FCA actively concealed the truth about the
> existence and nature of the Defect from Plaintiffs and Class members at all times,
> even though it knew about the Defect and knew that information about the Defect
> would be important to a reasonable consumer, and FCA promised in its marketing
> materials that the Class Vehicles have qualities that they do not have, and moreover,
> made representations in its warranties that it knew were false, misleading, and
> deceptive. . . . .

D.I. 34 ¶¶ 6, 17, 181, 196, 227 (footnote omitted) (most alterations added). The Court relies on

Plaintiffs to identify the allegations that support their claims. *See OFI Asset Mgmt. v. Cooper Tire*

*& Rubber*, 834 F.3d 481, 491 (3d Cir. 2016) ("A District Court enjoys substantial discretion in

managing complex disputes, particularly when, as in this case, the claims become unwieldy.").

Only one of the paragraphs above, paragraph 196, points to any particular representation

that FCA made. However, Plaintiffs fail to explain why the defect they allege means that the

engine was not "designed to deliver" power and all-terrain maneuverability or how the defect could

have made false the statement "[the engine] gives you the goods to go forth with confidence." *See*

D.I. 34 ¶ 196. Such general advertising statements are non-quantifiable "mere puffery" and are,

thus, the type of statements generally not actionable as common law fraud or under the various

state-specific statutes that Plaintiffs invoke. *See Beardshall v. Minuteman Press Int'l, Inc.*, 664

F.2d 23, 28 (3d Cir. 1981) (reciting approvingly the district court's oral charge on common law

fraud); *Edmundson v. Procter & Gamble Co.*, 537 F. App'x 708, 709 (9th Cir. 2013) (explaining that, under the CLRA and UCL, "[s]pecific, quantifiable 'statements of fact' that refer to a product's absolute characteristics may constitute false advertising, while general, subjective, unverifiable claims are 'mere puffery' that cannot").

Since Plaintiffs' fail to allege any specific false statement, Plaintiffs fail to plead sufficient facts to plausibly allege misrepresentation, much less do so with particularity. The Court grants FCA's motion to dismiss as to Plaintiffs' misrepresentation allegations.

For the reasons explained above, the Court dismisses all of Plaintiffs' fraud claims based on FCA's omissions and misrepresentations. *See* D.I. 34 § IV(C). Plaintiffs nowhere argue that they have another basis for their fraud claims. *See* D.I. 54 at 6–8. Further, Plaintiffs do not challenge FCA's assertion that Plaintiffs' claims in Counts I, IV, VII, X, XIII, XIV, XVII, XX, XXIII, XXVI, XXVII, XXX, and XXXIII are "based upon the same averments of misrepresentation and omission . . . ." D.I. 47 at 9; *see* D.I. 54 at 6–18 (mirroring FCA's argument structure). Thus, the Court dismisses each of the aforementioned counts, save certain UCL claims (Count VII) that the Court addresses below.

## D.   **Unjust Enrichment**

FCA argues that the Court should dismiss Plaintiffs' unjust enrichment claims (Count II) for five reasons: (1) Plaintiffs have an express warranty; (2) Plaintiffs have pled no facts showing inadequate legal remedies; (3) the claims are duplicative; (4) "under Florida, Georgia, New York, and Pennsylvania law, no such claim is legally viable unless the plaintiff pleads facts showing he or she provided a benefit 'directly' to the defendant"; and (5) "under California law, a standalone cause of action for unjust enrichment is not cognizable." D.I. 47 at 18–20. Plaintiffs argue, in response to FCA's first three grounds for dismissal, that they are permitted to plead in the

alternative and, in response to grounds (4) and (5), that FCA mischaracterizes the law of all five states.  D.I. 54 at 18–19.

Rule 8 provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2).  Such claims may be inconsistent with one another.  *Id.* 8(d)(3).  Here, even if a claimant with an express warranty or adequate legal remedies could not bring an unjust enrichment claim, Plaintiffs may bring multiple, inconsistent claims in the alternative to one another.  That Plaintiffs' unjust enrichment claim may be inconsistent with or duplicative of Plaintiffs' remaining claims is no reason to dismiss Plaintiffs' claims at this stage.  *See Indep. Enterprises Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997) ("[A] court may not construe a plaintiff's first claim as an admission against another alternative or inconsistent claim." (cleaned up)); *CrowdStrike, Inc. v. NSS Labs, Inc.*, 2018 WL 6716094, at *3 (D. Del. Dec. 21, 2018) (citing *Pittsburgh Water*, 103 F.3d at 1175).

FCA argues that Plaintiffs fail to plead "facts showing [they] provided a benefit directly" to FCA.  D.I. 47 at 20.  Plaintiffs respond that they "plead they conferred a direct benefit on FCA by purchasing vehicles from its authorized distributors and dealers, all in FCA's control, at higher prices than the vehicles' true value.  FCA, thus, received a benefit from Plaintiffs flowing from the challenged conduct."  D.I. 54 at 19 (citing D.I. 34 ¶¶ 285–86).  When defendant drug manufacturers sought to dismiss claims for unjust enrichment brought against them by indirect purchasers of those drugs at inflated (i.e., supracompetitive) prices, this Court explained that,

> [t]o state an unjust enrichment claim in most states, a plaintiff must allege that the defendant received a benefit at the plaintiff's expense under circumstances that would make it unjust for the defendant to retain the benefit without paying for it where there is not an adequate remedy at law.  Here, the [indirect purchasers] allege

that they paid for brand and generic Seroquel XR® at supracompetitive prices. In other words, Defendants received excess profits at the [indirect purchaser]s' expense on account of Defendants' alleged anticompetitive conduct. These facts are sufficient to plausibly state prima facie unjust enrichment claims.

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934,

at \*23 (D. Del. July 5, 2022) (Connolly, C.J.). To support their assertion that Plaintiffs gave a

direct benefit to FCA, Plaintiffs point to only two paragraphs of their Complaint:

285.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

286.   As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, FCA charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid th[e] higher price for their vehicles to FCA's authorized distributors and dealers, which are in FCA's control.

D.I. 34 ¶¶ 285–86. Thus, just as in *Seroquel*, Plaintiffs allege that they paid inflated prices for

Class Vehicles. Further, since FCA "enters into agreements with its nationwide network of

authorized dealerships to engage in retail sales with consumers[,]" D.I. 34 ¶ 245, the Court may

plausibly infer that FCA can charge higher prices to dealers if dealers can charge higher prices to

consumers. Thus, even in states that require the plaintiff to confer a direct benefit upon a defendant

to sustain an unjust enrichment claim, *see, e.g.*, *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084,

1102 (11th Cir. 2021) ("'[T]o prevail on an unjust enrichment claim, the plaintiff must directly

confer a benefit to the defendant." (quoting *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017))),

Plaintiffs allege sufficient facts to support a plausible unjust enrichment allegation.

Lastly, FCA argues that California does not recognize a standalone claim for unjust

enrichment. D.I. 47 at 20; D.I. 55 at 7. Plaintiffs seek to construe their unjust enrichment claim

as a "'quasi-contract claim seeking restitution.'" D.I. 54 at 19 (quoting *Rutherford Holdings, LLC*

*v. Plaza Del Rey*, 223 Cal. App 4th 221, 231 (2014)). "The Ninth Circuit has instructed district

courts to construe claims for unjust enrichment under California law as quasi-contract claims." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1233 (C.D. Cal. 2017) (citing *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)). Thus, the Court declines to dismiss the California unjust enrichment claim and, instead, permits Plaintiffs to maintain a claim in quasi-contract under California law.

Therefore, the Court denies the Motion as to Count II.

**E.      Express Warranty and MMWA Claims**

The parties agree that "Plaintiffs' MMWA claim stands or falls with their state-law warranty claims." D.I. 47 at 20; *see* D.I. 54 at 20.   FCA argues that the Court should dismiss Plaintiffs' express warranty claims "for five reasons": (1) The warranties "cover only defects in material, workmanship, or factory preparation" and Plaintiffs allege "a defect in design," D.I. 47 at 21; (2) the express warranty claims fail to "set forth *facts* showing any breach occurred[,]" D.I. 47 at 22 (emphasis in original); (3) no express warranties or promises were made outside of the written warranties, D.I. 47 at 22; (4) a four—or, in Florida, three—year statute of limitations applies, D.I. 47 at 23; and (5) Plaintiffs' unconscionability claims do not "create a breach where one would not otherwise exist" and, instead, expand potential remedies for proven warranty breaches, D.I. 47 at 23.   Plaintiffs respond that they allege specific manufacturing defects, plead sufficient facts to show breach of the express warranty, made timely claims, and allege facts to support allegations "that the durational and mileage limitations of the written warranties are unconscionable." D.I. 54 at 20–23.

First, FCA argues that the warranties do not cover design defects, that Plaintiffs plead a design defect, and that Plaintiffs plead no facts that would show a manufacturing defect. D.I. 47 at 21; D.I. 55 at 7–8.   Plaintiffs respond that they plead both manufacturing and design defects and that they may plead either. D.I. 54 at 20–21.   Plaintiffs cite to seven paragraphs from the fact

portion of their Complaint, *see, e.g.*, D.I. 34 ¶¶ 346 ("FCA breached the express warranty through

the acts and omissions described above."), 645, which they argue allege manufacturing defects,

D.I. 54 at 20 (citing D.I. 34 ¶¶ 7, 22, 179–82), but only three are relevant here:

> 7. Discovery will show that the Defect is the result of: . . . (2) the use of ***substandard materials in the design and manufacture of the rocker arms*** and other internal components of the valve train assembly; (3) ***sub-standard procedures in manufacturing the rocker arms and lifters*** such that the bearings and spring-loaded lift pins in the rocker arms and spring-loaded locking pins in the lifters break down and fail; (4) defective or miscalibrated software in the modules that control the timing, phasing and function of the operation of the camshafts, intake valves and lifters in the valve train; and/or (5) poor quality-control procedures to ensure such defectively designed and/or manufactured rocker arms and lifters and other related valve train components are not installed in the Engine. . . .
>
> . . .
>
> 179. As described above, the Engine suffers from ***defects in*** design, material selection, ***manufacturing***, and/or workmanship ***in components of its valve train***, specifically the rocker arms, camshafts, lifters and related components, as well as in the electronic and hydraulic modules controlling the timing, phasing and function of the camshafts, intake valves, lifters and related components which cause said components to prematurely fail. . . .
>
> . . .
>
> 182. Discovery will show that the Defect is the result of: . . . (2) the use of ***substandard materials in the design and manufacture of the rocker arms*** and other internal components of the valve train assembly; (3) ***sub-standard procedures in manufacturing the rocker arms and lifters*** such that the bearings and spring-loaded lift pins in the rocker arms and spring-loaded locking pins in the lifters break down and fail; (4) defective or miscalibrated software in the modules that control the timing, phasing and function of the operation of the camshafts, intake valves and lifters in the valve train; and/or (5) poor quality-control procedures to ensure such defectively designed and/or manufactured rocker arms and lifters and other related valve train components are not installed in the Engine.

D.I. 34 ¶¶ 7, 179, 182. "A claim is facially plausible 'when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.'" *Klotz*, 991 F.3d at 462 (quoting *Iqbal*, 556 U.S. at 678). The Court disregards "'legal

conclusions . . . supported by mere conclusory statements.'" *Princeton Univ.*, 30 F.4th at 342

(quoting *Davis*, 824 F.3d at 341). Here, Plaintiffs effectively assert that the mere existence of

faulty parts supports a plausible inference of a manufacturing defect.   While the Court is sympathetic to the concern that FCA has superior knowledge of any manufacturing issues, the Rule 8 pleading standard requires more than a bare assertion that manufacturing defects exist. Thus, the Court finds that the portions of Plaintiffs' Complaint to which Plaintiffs cite do not allege sufficient facts to support a plausible allegation of a manufacturing defect.

FCA admits that Plaintiffs plead a design defect. *See* D.I. 47 at 21.  The warranties at issue cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" (the "Basic Limited Warranty") and "the cost of all parts and labor needed to repair a powertrain component listed in section 2.4.E below that is defective in workmanship and materials" (the "Powertrain Limited Warranty").   D.I. 47-1 §§ 2.1(B), 2.4(B).   Plaintiffs argue that "factory preparation" contains sufficient ambiguity to cover design defects. *See* D.I. 54 at 20.  FCA disagrees. *See* D.I. 55 at 8.  The warranties do not define "factory preparation."  The plain meaning of "preparation" is "the action or process of making something ready for use or service" or "the action or process of putting something together[.]"[7]  In this context, "factory preparation" refers to the manufacture of an automobile in a factory.  "A product: . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller . . . and th[at] omission renders the product not reasonably safe . . . ." *See* Restatement (Third) of Torts: Prod. Liab. § 2(b) (1998).  Thus, the Court finds that "factory preparation" would not include a design defect.  Plaintiffs do not contest that a design defect is not a defect in "workmanship" or "materials." *See* D.I. 54 at 20–21.

---

[7] *Preparation*, Merriam Webster's Unabridged Dictionary (Accessed Jan. 23, 2023), https://unabridged.merriam-webster.com/unabridged/preparation.

Plaintiffs advance the following additional argument:

> FCA's representations in the Warranties regarding repair were materially false to the extent that FCA could not (and did not intend to) repair the Defect as it promised to do. Plaintiffs have alleged that, at the time of sale, FCA knew the Defect existed and typically manifests within and/or shortly outside of the warranty period and that when notified, FCA provided partial, ineffective repairs or denied warranty coverage. Specifically, for each Plaintiff's vehicle, the FCA-authorized dealers repaired or replaced only *some* rocker arms, lifters, or component parts and failed to examine the interior of the Engine to check for damage from debris, ensuring that Plaintiffs would have to return to have the other parts repaired. These allegations plead breach of the express warranty.

D.I. 54 at 22 (citations omitted) (emphasis in original). First, the Court found above that the Plaintiffs failed to allege sufficient facts to support their allegation of FCA's pre-sale knowledge. *See* Section III.C.2., *supra*. Second, the Basic Limited Warranty only covers repairs of "any item on your vehicle . . . that is defective in material, workmanship or factory preparation" and the Powertrain Limited Warranty only covers repairs of "a powertrain component . . . that is defective in workmanship and materials." D.I. 47-1 §§ 2.1(B), 2.4(B). Thus, a failure to repair cannot breach either warranty unless a defect exists. Plaintiffs argue that they plead manufacturing and design defects, D.I. 54 at 20–21, and the Court finds both that the warranties do not cover design defects and that Plaintiffs fail to plausibly allege manufacturing defects. Thus, Plaintiffs' failure to repair allegations cannot support Plaintiffs' breach of warranty claims.

Lastly, Plaintiffs argue that they "also allege facts demonstrating . . . that the durational and mileage limitations of the written warranties are unconscionable." D.I. 54 at 23 (citing D.I. 34 ¶¶ 350, 406, 464, 541, 601, 660, 719, 801, 860). FCA argues that Plaintiffs fail to make "the necessary showing of both 'substantive' and 'procedural' unconscionability to undo the applicable warranty provisions." D.I. 55 at 8. Plaintiffs make their arguments as to unconscionability in less than a single sentence, D.I. 54 at 23, and thus waive those arguments, *see John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing . .

30

. , but not squarely argued, are considered waived."); *Affinity Empowering, Inc. v. Eurofins Sci., Inc.*, 2022 WL 6734604, at *3 (D. Del. Oct. 11, 2022) (same).[8]

For the reasons above, the Court dismisses Plaintiffs' express breach of warranty claims, which are in Counts V, VIII, XI, XV, XVIII, XXI, XXIV, XXVIII, and XXXI. The Court also denies Plaintiffs' MMWA claims, which are in Count III.

**F.    Implied Warranty Claims**

FCA argues that "Plaintiffs' breach of implied warranty claims fail" for three reasons: (1) "Plaintiffs have failed to show their vehicles are unmerchantable." D.I. 47 at 24. (2) Plaintiffs' claims exceed the applicable statutes of limitations. D.I. 47 at 24–25. (3) "[T]he implied warranty claims under Florida, Illinois, and New York law are also subject to dismissal for lack of privity (Counts IX, XVI, XXV)." D.I. 47 at 25. Plaintiffs respond as follows: (1) The Class Vehicles are unmerchantable because "the Defect causes components of their [e]ngines' valve train to

---

[8] The Court would also dismiss Plaintiffs' argument on the merits. Magistrate Judge Sherry R. Fallon recently explained that, "'[w]here the alleged breach [of an express warranty] regards a latent defect that manifests outside the period covered by the warranty, a plaintiff may sometimes state [an express warranty] claim if he alleges that the warranty was unconscionable.'" *Robinson v. Gen. Motors LLC*, 2021 WL 3036353, at *17 (D. Del. July 19, 2021) (quoting *Skeen v. BMW of N. Am., LLC*, 2014 WL 283628, at *12 (D.N.J. Jan. 24, 2014)) (last two alterations in original), report and recommendation adopted, 2021 WL 7209365, at *1 (D. Del. Nov. 30, 2021). "A contract term is substantively unconscionable if it is excessively disproportionate, involving an exchange of obligations so one-sided as to shock the court's conscience." *Id.* (internal quotation marks and citation omitted). Judge Fallon, in that case, found that a "4 years/50,000 miles" warranty was not substantively unconscionable based in part on precedent from other district courts. *Id.* (collecting cases). Plaintiffs fail to assert—and the Court cannot think of—any reason that the 3-year/36,000-mile Basic Limited Warranty and 5-year/100,000-mile Powertrain Limited Warranty at issue here is particularly one-sided or shocking to the conscience. For example, other courts have found prior knowledge of a defect insufficient to establish such unconscionability. *See In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d 618, 628–30 (E.D. Mich. 2019) (rejecting arguments of substantive and procedural unconscionability based on manufacturer's knowledge of the defect for a 36,000-mile warranty); *see also Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986) ("A rule that would make failure of a part actionable based on such 'knowledge' [i.e., of time to failure for car parts] would render meaningless time/mileage limitations in warranty coverage.").

prematurely fail, eventually resulting in catastrophic engine failure[,]" D.I. 54 at 23; (2) "FCA's fraudulent[] concealment of the [engine] [d]efect tolled the statute [of limitations,]" D.I. 54 at 24; and (3) "Plaintiffs allege privity" because they directly received and are the intended users of their vehicle warranties, D.I. 54 at 24.

The parties agree that, for a vehicle to be merchantable, the vehicle must provide safe and reliable transportation. *See* D.I. 55 at 9; D.I. 54 at 23. Here, Plaintiffs allege that the Class Vehicles' 3.6L Pentastar V6 Engine "suffers from defects . . . in components of its valve train . . . which cause said components to prematurely fail. As a result, . . . the defective valvetrain cannot adequately . . . transfer the motion of the cam lobes to open and close the valves to effectuate proper internal combustion . . . ." D.I. 34 ¶ 4. This engine defect, Plaintiffs allege, "causes . . . lifter collapse, rocker arm roller failure, and/or camshaft lobe destruction, which lead to significant power loss, decreased engine performance, hesitation and/or catastrophic engine failure." D.I. 34 ¶ 5. Further, the defect "causes internal damage to other engine components, notably the camshaft, lifters and valve springs[,]" and named Plaintiffs suffered such failures. D.I. 34 ¶¶ 10, 33. At the motion to dismiss stage, these facts are sufficient to support a plausible allegation that the Class Vehicles failed to provide safe and reliable transportation.

FCA also argues that "Plaintiffs fail to adequately plead facts invoking any tolling doctrine to save their claims from the applicable statutes of limitation." D.I. 55 at 9 (citing D.I. 55 § II.B.1) (emphasis ommitted). Plaintiffs, FCA argues, must affirmatively rebut a statute of limitations defense and allege that knowledge of the engine defect was "widespread." D.I. 55 at 5–6 (citing D.I. 34, ¶¶ 8, 205–206, 213).

The Third Circuit has explained that

[s]tatutes of limitations are affirmative defenses that are not grounds for a Rule 12(b)(6) dismissal unless untimeliness is apparent on the face of the complaint.

> And under [Rule] 8, a complaint need not anticipate or overcome affirmative defenses; thus, a complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense. . . . [W]hile a court may entertain a motion to dismiss on statute of limitations grounds, it may not allocate the burden of invoking equitable tolling in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense.

*Wiggins v. Albert Einstein Med. Ctr.*, 2022 WL 1197015, at *2 (3d Cir. Apr. 22, 2022) (cleaned up). Thus, "when the pleading does not reveal when the limitations period began to run the statute of limitations cannot justify Rule 12 dismissal." *Schmidt v. Skolas*, 770 F.3d at 251 (cleaned up). The question is whether allegations in the Complaint "clearly suggest[] that [Plaintiffs] did in fact have knowledge of the full scope of [their] injury prior to" the date the statute of limitations had run. *Id.* at 252.

Here, Plaintiffs allege that many consumers posted online and submitted to NHTSA complaints about the Class Vehicles. D.I. 34 ¶¶ 213–15. However, Plaintiffs allege that FCA, not individual vehicle purchasers, had reason to monitor those complaints. *Id.* FCA points to no other allegations in the Complaint that clearly suggest Class Vehicle purchasers knew of the full scope of the defect at or after the time of their purchases. *See* D.I. 55 at 6 (citing D.I. 34 ¶¶ 8, 205–06, 213); D.I. 34 ¶¶ 8, 205–06 (alleging FCA had superior knowledge and sent bulletins to dealerships, not to consumers). The court rejects FCA's argument that Plaintiffs must affirmatively rebut FCA's affirmative defense at the motion to dismiss stage.[9]

In its Opening Brief, FCA asserts that named Plaintiffs in Florida, Illinois, and New York "admit they purchased their vehicles from a third-party dealership, not FCA []. And privity is

---

[9] FCA asserts an argument as to California law only in a footnote, D.I. 55 at 9 n.2, so the Court considers the argument waived, *see John Wyeth & Bro.*, 119 F.3d at 1076 n.6 ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."); *Affinity Empowering*, 2022 WL 6734604, at *3 (same).

required in order to state an implied warranty claim." D.I. 47 at 25 (citing D.I. 34 ¶¶ 53, 66, 131).

Plaintiffs respond that they

> expressly allege having direct contacts with FCA through FCA dealers and vehicle warranties directly provided by FCA. Courts have found that, under Florida law, privity exists where a manufacturer provides a direct, written warranty. Plaintiffs also allege they are third party beneficiaries to the contracts between FCA and its authorized dealerships, and that Plaintiffs, *not* the dealerships, are the intended users. These allegations adequately allege an exception to the privity requirement.

D.I. 54 at 24 (emphasis in original) (citations omitted). In their Reply Brief, FCA responds only that "the lack of privity for Plaintiffs' claims under Florida, Illinois, and New York law cannot be saved by their conclusory allegations of third-party beneficiary status." D.I. 55 at 9. Thus, FCA fails to dispute that FCA's warranties establish privity under Florida law.

Illinois imposes a direct privity requirement, but it creates an exception "when there are 'direct dealings' between a buyer and a manufacturer." *Redmon v. Whirlpool Corp.*, 2020 WL 9396529, at *5 (N.D. Ill. Apr. 28, 2020) (quoting *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 705 (N.D. Ill. 2016)). For example, a federal district Court in Illinois found that "direct dealings with [defendant] via its advertisements, warranty forms, and registration cards" and via "dishwasher retailers, who are [defendant]'s agents[,]" was sufficient to meet the direct dealings exception. *Elward*, 214 F. Supp. 3d at 705. Here, Plaintiffs allege that they dealt directly with FCA via the warranties FCA issued to Plaintiffs and via interactions with authorized dealerships, which Plaintiffs allege are FCA's agents and under FCA's control. *See* D.I. 34 ¶¶ 21, 60, 133, 218, 249. The Court finds that Plaintiffs allege sufficient facts to plausibly support the applicability of the direct dealing exception.

Plaintiffs do not refute FCA's argument that an implied warranty of merchantability claim under New York law generally requires privity between the parties. *See* D.I. 47 at 25; D.I. 54 at 24. While Plaintiffs cite to only one case that asserts but does not analyze a third-party beneficiary

exception to New York's privity requirement, D.I. 54 at 24, (citing *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *16 (D.N.J. May 8, 2017)), FCA cites a case, *see* D.I. 47 at 25, which explains that New York's third-party beneficiary exception applies only if there is a valid contract intended for the third-party's immediate, "rather than incidental," benefit, *Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 365 (E.D.N.Y. 2022). Plaintiffs allege that FCA "enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers" and assert, without additional support, that consumers are the intended beneficiaries of FCA's agreements. *See* D.I. 34 ¶¶ 245, 305; D.I. 54 at 24. Thus, Plaintiffs fail to allege facts that support a plausible allegation that a contract between FCA, on the one hand, and dealerships, on the other hand, existed for the immediate benefit of Plaintiffs. Further, Plaintiffs raise implied warranty claims as to the Class Vehicles, not as to the express warranties that FCA provides directly. See D.I. 54 at 24 (arguing the direct warranty creates privity in Florida, but not asserting the same as to New York). Thus, the Court dismisses the implied warranty claims under New York law.

For the reasons above, the Court denies the Motion as to Plaintiffs' implied warranty claims (Counts VI, IX, XII, XVI, XIX, XXII, XXIX, XXXII), save those under New York law (Count XXV).

## G.    The California Unfair Competition Law (UCL)

FCA argues that the Court should dismiss Plaintiffs' UCL claims because Plaintiffs fail to identify a "legislative policy or anti-competitive behavior" or to allege "a plausible claim based on immoral, unethical, oppressive, unscrupulous or substantially injurious conduct." D.I. 47 at 25. Plaintiffs and FCA appear to agree that a balancing test Plaintiffs obtain from *Pemberton v. Nationstar Mortgage LLC*, 331 F. Supp. 3d 1018 (S.D. Cal. 2018), applies to Plaintiffs' UCL claims, *see* D.I. 54 at 25; D.I. 55 at 9–10. In *Pemberton*, the Court explained that,

> [u]nder the balancing test, a business practice is "unfair" "when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." This test requires courts to "examine the practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer," and "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." The balancing test should not be a particularly difficult test to satisfy at the motion to dismiss stage.

*Id.* at 1051 (citations omitted). Here, "Plaintiffs allege FCA failed to disclose a serious safety defect at purchase. FCA's conduct is unjustified and therefore the balancing test's scale tilts fully in Plaintiffs' favor." D.I. 54 at 25. FCA takes issue with Plaintiffs' failure to "point to a single allegation" of fact that would support Plaintiffs' claims under the balancing test. D.I. 55 at 9–10. Plaintiffs' briefing, indeed, fails to cite to any allegations in the Complaint. As noted above, Plaintiffs' Complaint stretches to 906 paragraphs over 192 pages. Plaintiffs cannot expect the Court to hunt through its Complaint to find the factual allegations that would support a plausible inference that a balance of FCA's motives against the impact of the alleged defect favors a finding that FCA's actions were immoral or unscrupulous. *See generally OFI Asset Mgmt.*, 834 F.3d at 491 ("A District Court enjoys substantial discretion in managing complex disputes, particularly when, as in this case, the claims become unwieldy."). Thus, the Court dismisses FCA's UCL claim brought under the "unfair" prong of the UCL (Count VII).

## IV.    CONCLUSION

For the reasons above, the Court grants FCA's Motion as to and dismisses all claims in Counts I, III, IV, V, VII, VIII, X, XI, XIII, XIV, XV, XVII, XVIII, XX, XXI, XXIII, XXIV, XXV, XXVI, XXVII, XXVIII, XXX, XXXI, and XXXIII. The Court denies FCA's Motion as to all claims in Counts II, VI, IX, XII, XVI, XIX, XXII, XXIX, and XXXII. Thus, Plaintiffs' unjust enrichment and implied breach of warranty claims remain.

The Court will issue an Order consistent with this Memorandum Opinion.