# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ETIENNE MAUGAIN, et al.,            )
individually and on behalf of       )
all others similarly situated,      )
                                    )
          Plaintiffs,               )
                                    )
     vs.                            )  CASE NO.
                                    )  1:22:CV-00116-JLH
                                    )
FCA US LLC,                         )
                                    )
          Defendant.                )
_____)

REMOTE VIDEOTAPED DEPOSITION OF JOHN KUNDRATH

LA PUENTE, CALIFORNIA

MARCH 17, 2025

Magna Job No.: 1298274

Reported by: Kimberly Crane, CSR No. 11594, RPR, CLR



Page 48

```
 1      Q.   Okay.  As we go into page 39, we start seeing
 2   more service records.
 3           As we're going to page 48, it looks like we're
 4   seeing more service-related documents.
 5           As we go to page 49, it looks like Internet
 6   printouts again.
 7           As we go on to page 53, we're looking at
 8   service contract information again.
 9           Does that sound right?  Does that look right?
10      A.   Yes.
11      Q.   Going to page 61, it looks like another
12   business card.
13      A.   Some of this looks kind of repetitive.
14      Q.   You know what, I've got a couple of questions
15   about that here in a little bit.  I'm glad you brought
16   that up.
17           Going to page 62, it looks like we're back to
18   service records.
19           Then page 63, looks like we're looking at a
20   service bulletin again.
21           Do you see those same things?
22      A.   Right.  Yeah.
23      Q.   Get down to page 73, we see a copy of the title
24   for the 2015 Jeep Grand Cherokee again, right?
25      A.   Right.
```



1      Q.    And as we get to the end of the document, page

2   75, and, you know, there's a warranty bulletin.

3           And then as we get to the last page, page 76,

4   it looks like a copy of that -- that generic letter

5   about certain other vehicles.

6           Do you see that?

7      A.    Yes.

8      Q.    Okay.  So having kind of gone through each of

9   these 76 pages here in Exhibit A -- we'll get back to

10  that question that I originally asked -- having gone

11  through that, does that look to be like the set of

12  documents that you produced to your counsel in this

13  case?

14     A.    Yes, it does.

15     Q.    As we looked through those documents, are you

16  aware of any documents that you collected and gave to

17  your counsel that you don't see set forth in Exhibit A?

18     A.    Well, it's been a while, but this all looks

19  like the stuff that I sent them.

20          Especially the service bulletins.  That was the

21  whole crux of my complaint, that there was a problem

22  that Chrysler had found in earlier engines.

23     Q.    But as we scan through those -- those 76 pages

24  here, you didn't immediately notice anything that you

25  think should be included in that -- that set of



Page 50

1  documents?

2      A.  No.  It looks like it's everything that I sent

3  them I thought was pertinent.

4      Q.  Are there documents relating to the 2015 Grand

5  Cherokee that you have but did not give to your counsel

6  because you did not believe that they were pertinent?

7      A.  No.  I gave them everything that I had.

8      Q.  When you went to give them everything you had,

9  where did you go to find those documents?

10     A.  Pardon?  Where did I go to do what?

11     Q.  You said that you gave all the documents you

12  had relating to your Grand Cherokee to your counsel,

13  right?

14     A.  I mailed them.

15     Q.  Perfect.  When you went to go get those

16  documents though, where did you go to get them?

17     A.  The documents?

18     Q.  Yes, sir.

19     A.  Well, I had -- I had most of them.

20         Some of them I printed off from, you know,

21  online.

22     Q.  And that's kind of the answer.

23         So where did you get them?  It sounds like some

24  of them you printed out from online?

25     A.  Yes.



Page 51

1    Q.    Okay.

2    A.    Like the service bulletin.

3    Q.    Had you printed those out beforehand?

4    A.    I had them -- I had hard copies of them, and I

5    just forwarded those to the attorney.

6          I don't have those anymore.  I don't have those

7    service bulletins.

8    Q.    Where did you have hard copies of those service

9    bulletins stored?

10   A.    In my folder with the rest of the items, like

11   the bills and repair information, whatever.

12   Q.    When you say -- when you say "folder," are we

13   talking about kind of that same binder organization

14   system --

15   A.    Yeah.

16   Q.    -- you told us before?

17   A.    Yeah, they're all in the same place.

18   Q.    All right.  Other than that, that binder or

19   that folder, any other places that you went to go and

20   collect documents that related to this case?

21   A.    Not that I can recall.

22   Q.    Do you keep any sort of documents or records in

23   the glove box of the 2015 Grand Cherokee?

24   A.    Just the registration and the manual for the --

25   that came with the car.


MAGNA
LEGAL SERVICES

Page 52

1    Q.   Is there a reason that you didn't produce the

2    registration card or the manual for the vehicle?

3    A.   Well, I didn't really think they needed it, and

4    the manual is several hundred pages.

5    Q.   Were you aware that FCA US had asked for a copy

6    of that manual?

7    A.   No, I'm not.

8    Q.   Were you aware that FCA US had asked you for

9    certain documents at all?

10   A.   No, not from FCA.  Kind of like --

11   Q.   What do you mean, "not from FCA"?

12   A.   Well, I've never had any contact with them.

13   Q.   As you were going through collecting the

14   records that we saw in Exhibit A, do you know whether

15   you were doing that in response to requests that FCA US

16   had made for certain documents?

17   A.   No, I did not.

18   Q.   So let me go back to that other question.

19        Like the manual then, were there any other

20   documents that you have in your possession that relate

21   to the 2015 Grand Cherokee but that you did not believe

22   were pertinent to produce?

23   A.   No, I don't think so.

24   Q.   Did you search your email for any

25   communications that related to your 2015 Grand Cherokee



Page 53

1  with either FCA US or the La Puente dealership?

2      A.   No, I've never seen anything from them that I

3  can recall.

4      Q.   Did you go and conduct any searches in your

5  email account?

6      A.   I looked through it every now and then, but if

7  I'd seen something from either of those parties, I would

8  have certainly looked at it.

9      Q.   Did you go through, as part of this - this

10  process of collecting documents, did you go back and

11  check your email to see if there was anything in that

12  account?

13      A.   Well, not specifically relating to that, but I

14  checked the email.  And like I said, if I had seen

15  something from either of those parties, I would have

16  certainly looked into it.

17      Q.   When did you check your email in the context of

18  looking for documents that related to your 2015 Grand

19  Cherokee that you gave to your attorneys?

20      A.   That would have been around the time that I was

21  having problems with the engine, so that would have been

22  September or October of 2021.

23      Q.   Did you search your email for any

24  communications with anyone besides your counsel and FCA

25  US for communications relating to the 2015 Grand



Page 55

1          MR. MORGAN:  Perfect.  So let's come back -- so

2    let's come back at 11:00 then?

3          THE COURT REPORTER:  Sure.

4          THE WITNESS:  All right.

5          MR. MORGAN:  Perfect.

6          THE WITNESS:  All right.  We'll see you then.

7          MR. MORGAN:  Thank you, sir.

8          THE VIDEOGRAPHER:  This marks the end of Media

9    No. 3.  The time is 10:56 a.m.  We are off the record.

10          (A recess was taken.)

11          THE VIDEOGRAPHER:  This marks the beginning of

12    Media No. 4.  The time is 11:01 a.m.  We are on the

13    record.

14    BY MR. MORGAN:

15      Q.   Mr. Kundrath, do you know how many miles the

16    2015 Grand Cherokee has on it now?

17      A.   64,000, about 250.

18      Q.   Can you say that number one more time for me,

19    please?

20      A.   It's 64,000, I think, about 250.

21      Q.   I'm going to share my screen to show what we

22    will designate as Exhibit A-1.

23          (Exhibit A-1 was marked for identification.)

24    BY MR. MORGAN:

25      Q.   All right.  Do you see a --



Page 56

1      A.    Yeah.  Yep.

2      Q.    I will zoom in a little bit too.

3            What is Exhibit A-1?

4      A.    It looks like part of the papers when we bought

5   the car.

6      Q.    Do you have any other papers from when you

7   bought the car besides this transfer and reassignment

8   form?

9      A.    I should have all of the original.

10     Q.    When you say that you should have all of the

11  original sales papers, do you know where they would be?

12     A.    Yes, it's in that same binder we've been

13  talking about.  It's right here on my desk.

14     Q.    As we looked at Exhibit A, did you see -- and I

15  didn't -- did you see any other sales-related documents

16  in that exhibit?

17     A.    Yeah, it - it looked like their contract.

18     Q.    Okay.  Do you still have a copy of the -- the

19  sales contract for the vehicle?

20     A.    Yes.

21     Q.    Okay.  Is that in front of you right now?

22     A.    Yes, it is.

23     Q.    Can you pull open that binder then and put that

24  in front of you and let's take a look --

25     A.    Right here.



Page 57

1      Q.   Great.  Okay.  Is there a reason that you

2   didn't produce that?

3      A.   Pardon?

4      Q.   Is there a reason that you didn't produce that?

5      A.   I thought I did send it.  If I didn't, I don't

6   know why.  I just assumed that they knew the car was

7   mine.  I believe I did copy it.  Although, it's kind of

8   long, you know.  It looks like it would have required

9   about three or four passes through the machine.

10     Q.   Let's go through that set of documents that

11  you've got in front of you and see if there's any other

12  documents that -- that either you didn't produce or --

13  or thought you did, but that didn't end up in Exhibit A.

14          As you're looking at that folder, what is that

15  first piece of paper that you're looking at it?

16     A.   Well, it looks to me, from memory, that it's

17  the original sales contract.

18     Q.   Okay.  After that original sales contract, what

19  do you have in that binder that relates to the 2015

20  Grand Cherokee?

21     A.   A lot -- a lot of things here.  There was an

22  extended warranty.  Notice transfer release of

23  liability, whatever that is.  We traded in the car, so

24  that might have been that.

25          Sorry to sound so dull here, but it's just --



Page 58

1   so many different things here.

2          Agreement to furnish.  Insurance policy.

3   Precontract disclosure.  Notice to consignor.  Vehicle

4   transfer and reassignment.  That's probably, again, with

5   the trade-in.  That's probably about it.  That's all the

6   yellow pages anyhow.  Those stick in my memory as being

7   the purchase documents.

8      Q.   All right.  What else do you have in that

9   binder that relates to the 2015 Grand Cherokee?

10     A.   The printouts from the lawyer originally, the

11  complaint.  I think I sent all the rest of the stuff in.

12  It's just -- just some things I downloaded from the

13  Internet probably, but I think you had all of that on

14  there earlier.  Nothing pertinent except the repair

15  bill.

16     Q.   What repair bills do you have in that binder?

17     A.   Well, when I first brought it in to have them

18  diagnose it and they did a compression test and then

19  they couldn't find anything really definitive, their

20  suggestion was just to start tearing the engine down,

21  which did not appeal to me.

22          And I took it home again and thought it over

23  awhile, and then I brought it back after I had found

24  those service bulletins and told them what I thought was

25  the problem that I had.  And then we just decided to go



Page 59

1    ahead and replace the head, but it ended up being just

2    the tappets and the rocker arms.  That's a bill for that

3    too.  It's like $2233.

4         Q.   What's the date of that service record?

5         A.   Let me see here.  Let me get my magnifier.

6              November 21 -- 30th of November, '21.

7         Q.   Do you have any other service records relating

8    to the 2015 Grand Cherokee in that binder?

9         A.   Just that one where they did the compression

10   test.  It was the 29th of November, '21.

11        Q.   So here's kind of the -- the reason why we're

12   going through this is we've talked a couple times about,

13   as you were going through and collecting records, you

14   know, there were some things that related to the Grand

15   Cherokee but maybe you thought weren't pertinent because

16   of, you know, one reason or another.  But for one reason

17   or another, those things are really pretty pertinent to

18   FCA US.

19             So we will follow up with your counsel on this,

20   but it sounds like from that list you gave us, there are

21   quite a few additional sales-related documents that you

22   have in front of you in that binder but that we didn't

23   see as we reviewed Exhibit A.  Is that accurate?

24        A.   I'm not sure.  I -- I think I -- I think I gave

25   them everything I had.



Page 60

1     Q.    Okay.  All right.  Let's go back to Exhibit A

2   then.  All right.

3          So here's -- here's what we're looking for now

4   in Exhibit A.  It looks like there's an original sales

5   contract, there's warranty documents, there's a release

6   of liability; there's an agreement to furnish, I think,

7   maybe insurance.  There's some sort of precontract

8   disclosure and some other notice that you referred to.

9          So we'll scroll back through Exhibit A again

10   and see if any of those documents are in what you --

11   what -- at least what we received from your counsel.

12     A.    All right.  I'll -- I'll try.

13     Q.    We'll go through them one by one then and just

14   make sure we've got everything that we need here.

15     A.    I'd be happy to make copies of all this and

16   send it to you if that would help.

17     Q.    Well, yeah.  So we did that, right?  I mean,

18   you did that once before, right?

19     A.    I assumed I did, yeah.

20     Q.    Yeah.  So I -- I guess, here's -- here's kind

21   of what I'm getting at then, is I said, did you see any

22   of those documents in Exhibit A?  You said you weren't

23   sure.

24          So we were going to go back through Exhibit A

25   and confirm whether or not you produced those.



Page 61

1      A.    Okay.

2      Q.    Okay.

3      A.    I have the -- I have the one that's on the

4   screen now.  It's right in front of me, right here.

5      Q.    Great.  Perfect.

6            So we've got, on page 1, a service record

7   dated -- I'm seeing a repair order opened November 29,

8   2021.

9            So obviously, you know, that is something that

10  we received, right?  But what we haven't received are

11  the things that you listed for us:  The original sales

12  contract, some warranty documents, some sort of release

13  of liability, some other things.

14           So as we're going through Exhibit A, you said

15  that you thought that maybe you had produced those.

16  What I'm saying is I didn't see those in Exhibit A.

17     A.    Okay.

18     Q.    Right.  So page 1 and 2, we've got a service

19  record dated -- you know, again, repair opened on

20  November 29, 2021.  I think you mentioned that one

21  earlier, right?

22     A.    I believe so, yes.

23     Q.    Yeah.  All right.  So that one, we have.

24           As we go into page --

25     A.    I'm going by the number on the top, 345093.



Page 62

1     Q.   Perfect.

2     A.   I have that one right here in front of me.

3     Q.   And this is more of a check of the documents

4 that you have in front of you that we don't have in

5 front of us, right?

6     A.   Well, you have that one.

7     Q.   Yeah.  What we've got here is exhibit -- in

8 Exhibit A, is a service record dated October 4, 2021.

9 It's got the repair order number of 345093.

10    A.   Right.

11    Q.   Okay.  So, again --

12    A.   It's right here.

13    Q.   Here's kind of -- perfect.

14         Here's kind of the reason why we're going

15 through this again to confirm, right?

16         Earlier I had asked if there was any other

17 service records that you had in your binder relating to

18 the 2015 Grand Cherokee other than the service record

19 dated November 30, 2021.  And you said no, that was the

20 only service record you had.

21         And now we are going --

22    A.   I only took it in the two times.

23    Q.   Okay.  So in your binder though, you have more

24 than just that November 30, 2021, service record.  We

25 are, in fact, looking at other service records that your



Page 63

1    binder has, right?

2        A.   Well, like I said, the only time they worked on

3    it was the -- the compression test and the -- and the

4    actual repair.  That's the only two times that I've ever

5    had them work on it.

6        Q.   All right.  And those two times then, we're

7    seeing a second time reflected in this service record on

8    page 3 of Exhibit A; is that right?

9        A.   Well, I have that one right here as well.

10       Q.   Great.  But still no -- I mean, as we're

11   looking at page 3, still no original sales contracts,

12   still no those warranty documents, still no release of

13   liability, still none of those documents that you listed

14   out for me earlier though, right?

15       A.   Well, I probably wouldn't have sent the release

16   of liability because it had to do with another car.  It

17   was a KIA we traded in.

18       Q.   And that KIA --

19       A.   I didn't see that it had anything to do with

20   the Jeep.

21       Q.   And that KIA trade-in related to the sale of

22   the 2015 Grand Cherokee, right?

23       A.   Yes, it was -- they gave us $9500 for it.

24       Q.   So here's kind of the disconnect that I'm --

25   that I'm seeing, is I'm asking the question of, "Well,



Page 64

1    did you produce everything that you have relating to the

2    2015 Grand Cherokee?"

3           And the answer I'm getting is, "Yes, I have."

4           And then as we go through some of these

5    documents, now what I'm hearing is, well, there are some

6    other documents relating to the 2015 Grand Cherokee that

7    you didn't produce because you didn't think that they

8    were related, right?

9    A.   Well, they didn't really have anything to do

10   with the Jeep.

11   Q.   Okay.

12   A.   It was a trade-in, you know.

13   Q.   So here -- we'll go back to -- we'll go back to

14   the original question that I had asked earlier.

15          What other documents do you have relating to

16   the 2015 Grand Cherokee did you not produce because you

17   did not believe that it was pertinent?

18   A.   I can't really recall.  It's several years ago.

19   I thought I gave them everything that had to do with the

20   Jeep.

21   Q.   Well -- and we're not talking about several

22   years ago.  What we're talking about is the process

23   through which you collected these documents.  And I

24   thought you said that was September or October of -- was

25   it last year?



Page 65

1    A.    2021.

2    Q.    Of 2021.  Okay.

3    A.    Yeah.

4    Q.    So we sit here then, as you've got the binder

5    in front of you, as you're looking at what documents you

6    produced to me, we've gone through some records that

7    relate to your vehicle but that you didn't believe were

8    pertinent.

9         Are there other records that you did not

10   produce in this case because you did not believe that

11   they were pertinent?

12   A.    I don't really recall that.  I thought I gave

13   everything that had to do with -- with the -- the Jeep.

14   Yeah.

15   Q.    Was there some sort of sorting process that you

16   went through then?  As you were going through that

17   binder collecting records to give to your counsel, was

18   there some sort of sorting process where you decided

19   that you would produce certain service records, certain

20   sales documents, but not, for instance, the sales

21   contracts or the warranty document that went along with

22   it?

23   A.    I wasn't aware of that.  I wasn't even thinking

24   along those lines.  I just gave them whatever I had that

25   seemed like it had something to do with the Jeep.



Page 66

1      Q.   Do you think that --

2      A.   I tried to be as complete as possible.

3      Q.   Do you think that the original sales contract

4   for the purchase of the Jeep had something to do with

5   the Jeep?

6      A.   Well, obviously it's the purchase of it, but I

7   thought I saw it on there when you scanned through those

8   documents.

9      Q.   Okay.  So then that's -- now we're going to

10  find it.  Then we will go back through Exhibit A and we

11  will look to see if it is actually in Exhibit A.  I

12  didn't see it, but we'll go through it and look for it.

13     A.   Well, it's this big, long document here, so...

14     Q.   Yeah.  And I'm hearing you say that you thought

15  you saw it in Exhibit A, so we're going to go back and

16  check each page of Exhibit A and see if we see that in

17  there.

18          So far, pages 1 through 4 have to do with

19  service records.

20     A.   Yeah.  I have all of that stuff.  Yeah.

21     Q.   I know, but what we're looking for is whether

22  or not a -- the original sales contract that you thought

23  you saw in Exhibit A is actually in Exhibit A.  So I

24  know you've got --

25     A.   Well, it would be yellow.  So when you get to



Page 67

1    the yellow thing.  Okay.  That's a yellow.  That is

2    the -- something with the transfer and reassignment.  I

3    can't really see what it's transferring here.  Jeep.

4    Okay.  That has to do with the Jeep.  Okay.

5             So you've got that one?

6        Q.   Yep.  What about the original sales contract?

7        A.   Keep going and let's see.

8        Q.   Yep.  All right.

9             So pages 1 through 4, service records.  Not the

10   original sales contract, not any warranty documents, not

11   any of the other documents that you said you have,

12   but -- I don't think we have an Exhibit A.

13            Page 5.  What is the title of page 5?

14       A.   Vehicle/Vessel Transfer and Release Form.

15       Q.   "Reassignment Form," right?

16       A.   Yeah.  I have that one right here.

17       Q.   You would agree with me that the Vehicle/Vessel

18   Transfer and Reassignment Form is not the original sales

19   contract, right?

20       A.   Yes.

21       Q.   All right.  You would agree with me that this

22   isn't referring to warranty documentation or

23   obligations, right?

24       A.   I'm not sure what it refers to, but it's --

25   it's for the Jeep, and it's not the sales.



Page 68

1     Q.   Okay.  All right.  It's also not any sort of

2   agreement to furnish insurance.  It's not any sort of

3   any precontract disclosure, right?  None of those

4   things.

5         As we get down to page 6, it looks like we're

6   looking at that November 29, 2021, service record again?

7     A.   Yeah.  The same thing over again.

8     Q.   Yep.  The same thing over again.

9         Page 7 looks like a continuation of that

10  service record?

11    A.   Yeah, same thing.

12    Q.   Page 8, same thing.

13        Why did you produce so many copies of the same

14  thing?

15    A.   I don't know.  I thought I just sent them one

16  each.  I don't know how they put this up on here.  I

17  didn't have anything to do with the way it was

18  presented.

19    Q.   Because -- I mean -- I mean, I'll cut to the

20  chase, I guess -- we're getting a little off-topic.  But

21  we've got 76 pages in Exhibit A, and of those 76 pages,

22  I think we've only got 23 or 24 unique documents.  It

23  looks like --

24    A.   Yeah, a lot of it's duplicated, obviously.  You

25  can see that.



Page 69

1     Q.   Did you produce all of those duplicates?

2     A.   Not to my knowledge.

3     Q.   Did anybody else, aside from you and your

4   counsel, have anything to do with your collection of

5   documents in this case?

6     A.   No.

7     Q.   If we go on to page 9, it looks like we're

8   looking at another copy of that November 29 service

9   record, right?

10     A.   Yeah.  It's all the same.  Yes.

11     Q.   Page 10, now we're looking at a vehicle service

12   contract, right?

13     A.   Let me see what this has to do with.

14          I'm not even sure what it is.  I'm sure I have

15   it, but...

16     Q.   Well, and it's really not even a question of

17   whether you have it.  Clearly, it came from somewhere

18   because we're looking at it right now.  The question is

19   --

20     A.   Well, I probably sent it to them.  I copied

21   everything and tried to give them a copy of everything I

22   had.

23     Q.   Yep.  The question is, this is not the original

24   sales contract or any of those --

25     A.   No.



Page 70

1       Q.    -- other documents that you listed, right?

2       A.    No.

3       Q.    No.

4             As we go to page 11, we've got Internet

5    printouts.  That, you would agree with me, these

6    Internet printouts are not the original sales contract,

7    not warranty documents, none of those other things --

8       A.    Yes.

9       Q.    -- you said you had?

10      A.    I would agree with you.

11      Q.    You would agree with me?

12      A.    Yes.  Yes, I do.

13      Q.    So more Internet printouts as we keep going.

14   11, 12, pages 14.  Page 15, it looks like we've got

15   another copy of that service contract.

16      A.    Yeah.  It looks like the same thing.

17      Q.    Page 16, it looks like a continuation of that

18   service contract.

19            Page 17, page 18, page 19.  And so far, we

20   haven't seen the original sales contract.  We haven't

21   seen --

22      A.    No.

23      Q.    -- any of those other sales documents, correct?

24      A.    Yes.

25      Q.    Okay.  Page 20, page 21 still looks like



Page 71

 1    service contract documents.

 2             Business card on page 23, right?

 3        A.   I don't know why that's there, but yes, I see.

 4    That's another repeat.

 5        Q.   Yep.  On page 24, another repeat?  Is that what

 6    you're saying for the service record?

 7        A.   It looks like.

 8        Q.   Page 25, start with a service bulletin.

 9        A.   Those were things that I found on the Internet

10    and -- and printed out and sent in.

11        Q.   Page 26 looks to be more

12    service-bulletin-related documents.  Do you agree?

13        A.   Yes.

14        Q.   We're continuing to scroll all the way through

15    page 29 at this point.

16             Upside down on page 30.

17             31.

18             We've got a blank page on page 32.  Maybe this

19    is the back of page 31.  But it's blank, right?

20        A.   Yes.

21        Q.   Okay.  Page 33, more service bulletin

22    documents.

23        A.   Title.  Yes.

24        Q.   Page 35, the title.

25             Page 36, we're seeing another copy of this



Page 72

1    vehicle transfer and reassignment form, right?

2        A.    Yeah.   It's what it looks like.

3        Q.    Starting with page 37, we have a warranty

4    bulletin document.

5              Page 38, we've got a generic customer letter.

6        A.    That's the same one again.

7        Q.    Page 39, we're referring to the same service

8    order, right?

9        A.    Yes.

10       Q.    Page 40 relates to that service record.

11             Page 41, now it looks like another copy of the

12   October service record, correct?

13       A.    That's all -- all repeats.

14       Q.    All right.  Another repeat on page 42 of the

15   same November service record, right?

16       A.    It appears to be, yes.

17       Q.    Another repeat of the vehicle vessel transfer

18   and reassignment form on page 43.

19             Do you see that?

20       A.    Yes.

21       Q.    Then to page 44, now we're back to repeats of

22   the November service record; is that accurate?

23       A.    Yes.

24       Q.    Page 45, same thing.

25       A.    Yep.



Page 73

1      Q.    Page 46, another repeat of the October service

2   record, right?

3      A.    Yes.

4      Q.    Page 47, now we're looking at something, again,

5   related to that same November service record, right?

6      A.    Yes.

7      Q.    Now we're back to the service contract again

8   with page 48.  Do you see that?

9      A.    Yes.  We've seen this one before too.

10      Q.    Now we're back to the Internet printouts on

11   page 49.

12           We've seen these before too, right?

13      A.    Yes, we have.

14      Q.    Page 50, Internet printouts.

15           51, 52, Internet printouts.

16           Then we're back to 53, and it's the service

17   contract again, right?

18      A.    Yes.

19      Q.    54, it looks like the service contract

20   information that we've already reviewed, right?

21      A.    It looks like it.

22      Q.    So going through 56, page 57, page 58 -- and

23   still, to this point though, we still haven't seen the

24   original sales contract, the warranty information, the

25   precontract disclosure, or this other notice that you



Page 74

1    referred to, right?  We haven't seen that yet?

2        A.    It doesn't appear to be.

3        Q.    Okay.  Page 58, page 59, page 60, all service

4    contract.

5              We get Debbie McGill's business card again on

6    page 61.

7              Do you see that?

8        A.    Yes, I do.

9        Q.    Is there a reason you redacted the email for

10   Ms. McGill here?

11       A.    I had nothing to do with that.

12       Q.    Service record on page 62, it looks like the

13   same November service record we've seen a few times now,

14   right?

15       A.    Yes, we have.

16       Q.    Okay.  We're back to the service bulletins --

17   service bulletin printouts on page 63.

18             Going on to 64, 65, 66, 67, 68, 69, blank page

19   on page 70.  But we're still looking at service bulletin

20   documents on page 71, page 72.

21             Then we get to page 73.  We see the title

22   again, right?

23       A.    It looks like it.

24       Q.    Page 74 is another copy of the Vehicle/Vessel

25   Transfer -- that's the fourth copy of this one?



Page 75

1        A.   At least.  Yes.

2        Q.   Page 75, we've got a warranty bulletin

3    printout, it looks like.

4             And then we end up with that generic consumer

5    letter on page 76.

6        A.   Like the same thing again, yes.

7        Q.   All right.  So having reviewed Exhibit A, in

8    any of documents -- we went through them one by one --

9    we didn't see the original sales contract, we didn't see

10   any warranty information, didn't see the release of

11   liability form, didn't see any agreement to furnish --

12   whatever it is.  No precontract disclosure and no --

13   no -- no other notice that you referred to; is that

14   accurate?

15       A.   It doesn't -- it doesn't look like it.

16       Q.   All right.

17       A.   But I do believe I sent that stuff in.  I had

18   nothing to do with the way this was presented.

19       Q.   So you had nothing to do with producing 76

20   pages -- or essentially, what I think is 47 pages of

21   duplicates?  You had nothing to do with that?

22       A.   I had nothing to do with that.

23            MS. PARK:  Mr. Morgan, I don't want to

24   interfere with your questioning, but I -- we can discuss

25   off the record the documents that Mr. Kundrath is



Page 76

1   describing to you that do not appear to be in the

2   production and the manner of the production here.

3          But I -- again, I don't want to interfere with

4   your questioning, which I do not think is objectionable,

5   and therefore, I haven't objected.  I just -- if you

6   want to save some time, we can -- this is something that

7   Counsel can discuss off the record.

8          MR. MORGAN:  Okay.  Well, I also think -- and I

9   think that you've acknowledged, right, that I'm -- I am

10  entitled to be able to go through this production.

11  We've received certain representations from Plaintiff's

12  counsel that Plaintiff's productions are complete.  And

13  it seems like that that may not be the case.

14         And not only are Plaintiff's productions not

15  complete, but it looks like we've got half of

16  Plaintiff's productions are really just the exact same

17  thing duplicated over and over again.

18         And so I think I'm entitled to be able to put

19  that on the record.  And yes, we will certainly take

20  this discussion off the record as well.

21         But, no, I -- I appreciate that offer.

22  BY MR. MORGAN:

23     Q.   All right.  Let's get back to what we've

24  designated as Exhibit A-1.

25         Looking at Exhibit A-1 then, Mr. Kundrath,



Page 77

1    what -- we talked about this a couple of times.  At

2    least -- at least four and going over it twice -- eight

3    times now.  But this is a vehicle vessel transfer and

4    reassignment form, right?

5        A.    Yes.

6        Q.    Okay.  So having this in front of you, I wanted

7    to ask you some questions since this is the only

8    sales-related document we received about the purchase of

9    your -- of your vehicle.

10            So being able to refer to Exhibit A-1 then,

11   what day did you purchase your Grand Cherokee?

12       A.    It looks like on the 15th of August, 2014.

13       Q.    And who was -- I think up here towards the

14   top -- who was the seller of the Grand Cherokee?

15       A.    Puente Hills Chrysler.

16       Q.    Have you done business with Puente Hills

17   Chrysler before that would be unrelated to the

18   2015 Grand Cherokee?

19       A.    No.

20       Q.    The price that I think I saw that you paid for

21   your vehicle in your interrogatory answers was about

22   $37,000.

23            Do you remember that?

24       A.    That's what I recall.

25       Q.    Okay.  Looking at the original sales contract



Page 161

1                    REPORTER'S CERTIFICATION

2

3            I, KIMBERLY CRANE, CSR, RPR, reporter in

4    and for the State of California do hereby certify:

5

6            That the proceeding took place before me at

7    the time and place herein set forth; that the

8    testimony and proceedings were accurately reported

9    stenographically by me during the proceeding.

10

11           I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage and that I am not interested in the outcome

14   of this matter, financially or otherwise.

15

16           IN WITNESS THEREOF, I have hereunto set my

17   hand this 15th day of April, 2025.

18

19

20

21   _Kimberly Crane_____

22           KIMBERLY CRANE, CSR NO. 11594, RPR

23

24

25

